**UNITED STATES DISTRICT COURT**  **EASTERN DISTRICT OF TEXAS**

| | | |
|---|---|---|
| EQUAL EMPLOYMENT OPPORTUNITY COMMISSION, | § § § | |
| Plaintiff, | § § | |
| *versus* | § § | CIVIL ACTION NO. 1:21-CV-451 |
| THE MODERN GROUP, LTD., and DRAGON RIG SALES & SERVICE, LLC, | § § § | |
| Defendants. | § § | |

### MEMORANDUM AND ORDER

Pending before the court is Plaintiff Equal Employment Opportunity Commission's ("EEOC") Motion to Exclude Defendants' Expert Witness (#64), in which the EEOC seeks to exclude the testimony of Dr. Andre Chen ("Dr. Chen"), the expert witness retained by Defendants The Modern Group, Ltd. ("Modern") and Dragon Rig Sales & Service, LLC ("Dragon Rig") (collectively, "Defendants"). Defendants filed a response (#82), and the EEOC filed a reply (#94). Also pending before the court is Defendants' Motion to Exclude the Testimony of Plaintiff's Expert (#66), in which Defendants seek to exclude the testimony of Dr. Douglas Wayne Martin ("Dr. Martin"), the rebuttal expert witness retained by the EEOC. The EEOC filed a response (#79), Defendants filed a reply (#88), and the EEOC filed a sur-reply (#100). Having considered the pending motions, the submissions of the parties, the record, and the applicable law, the court is of the opinion that the EEOC's motion should be granted in part and denied in part, and Defendants' motion should be granted in part and denied in part.

I.      Background

The EEOC filed this lawsuit on behalf of Alexander Dare ("Dare"), alleging that Defendants discriminated against Dare in violation of the Americans with Disabilities Act of 1990 ("ADA"), 42 U.S.C. § 12112(a), when they revoked his conditional offer of employment.  On February 27, 2019, Dare, who had previously worked as a welder, applied for a welding position with Dragon Rig at its main location in Victoria, Texas.  Dragon Rig is a manufacturer and service company that constructs and provides oilfield service equipment.[1]  After interviewing Dare, Dragon Rig conditionally offered him a position as a welder and requested that he complete a mandatory pre-employment drug screen, which was administered by a third-party testing facility.  Dare disclosed to the drug testing facility that he had prescriptions for both methadone and Xanax.  Dare suffers from opioid use disorder and is prescribed methadone as part of a medically assisted therapy ("MAT") program.  Dare is also prescribed Xanax to treat his anxiety disorder.  At the time he applied for a welding position with Dragon Rig, Dare was prescribed 90 milligrams per day of methadone and 8 milligrams per day of Xanax.

Defendants' Medical Review Officer ("MRO"), Dr. J. Taylor Starkey ("Dr. Starkey"), reviewed Dare's drug screen and prescriptions.  Dare's drug screen indicated quantities of methadone and Xanax above the confirmation cutoff quantities for both medications.  Dr. Starkey marked Dare's drug screen as "negative: has prescriptions" but included the following note: "His drug screen is negative but both the methadone and especially the high dose Xanax are

---

[1] Dragon Rig is a subsidiary of Modern.  The EEOC alleges that both Defendants are liable for discriminating against Dare because the two business entities operated as an "integrated enterprise." Defendants' Motion for Summary Judgment (#63) disputes that they operated as an integrated enterprise and asserts that Modern is not a proper defendant and accordingly should be dismissed.

SEDATING so he cannot work in a safety sensitive position or operate equipment." Dr. Starkey did not communicate with or examine Dare before submitting the drug screen results and his appended note to Dragon Rig. Subsequently, Dragon Rig rescinded Dare's conditional offer of employment.

Dare later filed a charge of discrimination with the EEOC. On September 8, 2020, the EEOC issued Defendants a Letter of Determination finding reasonable cause to believe that they had violated the ADA. After the EEOC and Defendants were unable to resolve the matter through informal methods of conciliation, the EEOC filed this lawsuit in August 2021.

In September 2022, Defendants designated Dr. Chen as their expert witness on various topics, including the uses and risks of treatment with methadone and alprazolam,[2] the interaction between methadone and alprazolam, the risks and safety concerns of combining high doses of methadone and alprazolam, the safety concerns related to Dare's working in a safety-sensitive position or operating heavy machinery, the duties of an MRO to alert an employer of a safety concern, the medical support for and reasonableness of Dr. Starkey's opinion and warning that Dare not be permitted to work in a safety-sensitive position or with heavy machinery, and the reasonableness of Dragon Rig's heeding Dr. Starkey's warning and withdrawing Dare's conditional offer of employment. The EEOC now moves to disqualify Dr. Chen under Federal Rule of Evidence 702, arguing that he is not qualified to testify as an expert because he lacks the experience, expertise, and specialized knowledge necessary to opine on the relevant issues. The EEOC further contends that Dr. Chen's conclusions are unreliable because they lack proper scientific, factual, and legal bases and ignore or improperly apply the relevant facts. Lastly, the

---

[2] Alprazolam is the generic name for Xanax.

EEOC invokes Federal Rule of Evidence 403 to argue that several of Dr. Chen's opinions should be excluded because they are more prejudicial than probative.

In November 2022, the EEOC designated Dr. Martin as its rebuttal expert.[3]  Defendants seek to exclude Dr. Martin's testimony under Rule 702, asserting that he is not qualified to opine on matters relating to pain and addiction medicine and the consequences of Dare's medications. They insist that, "[a]t most, Dr. Martin's testimony should be limited to his understanding of the role of the MRO and the duties and responsibilities of an MRO." Defendants also claim that many of Dr. Martin's opinions are not the product of reliable principles and methods, are not based upon sufficient facts or data, and result from his failure to apply the facts of this case properly. Defendants also cite Rule 403 to argue that one of Dr. Martin's statements should be stricken because it may "confuse or unduly prejudice" the trier of fact.

II.    Analysis

The admission or exclusion of expert witness testimony is a matter that is left to the discretion of the district court.  *Kumho Tire Co. v. Carmichael*, 526 U.S. 137, 152 (1999); *see United States v. Herman*, 997 F.3d 251, 269 (5th Cir. 2021); *Hicks-Fields v. Harris County*, 860 F.3d 803, 810 n.22 (5th Cir.), *cert. denied*, 583 U.S. 1014 (2017); *Huss v. Gayden*, 571 F.3d 442, 452 (5th Cir. 2009), *cert. denied*, 559 U.S. 1006 (2010); *Nano-Proprietary, Inc. v. Cannon, Inc.*, 537 F.3d 394, 399 (5th Cir. 2008).  Pursuant to Rule 702 of the Federal Rules of Evidence:

---

[3] In particular, Dr. Martin states that his opinions rebut the following conclusions reached by Dr. Chen:  (1) "There are no circumstances where an individual such as Mr. Dare, who is 'concurrently taking high-dose methadone and high-dose alprazolam could be cleared to work in a safety-sensitive position' such as a welder"; (2) "[Dr. Starkey] acted appropriately in reporting out the results of Mr. Dare's drug test and recommending that he not be hired"; and (3) "Defendants' decision to immediately follow this recommendation was reasonable and justified."

> A witness who is qualified as an expert by knowledge, skill, experience, training, or education may testify in the form of an opinion or otherwise if the proponent demonstrates to the court that it is more likely than not that:  (a) the expert's scientific, technical, or other specialized knowledge will help the trier of fact to understand the evidence or to determine a fact in issue; (b) the testimony is based on sufficient facts or data; (c) the testimony is the product of reliable principles and methods; and (d) the expert's opinion reflects a reliable application of the principles and methods to the facts of the case.

FED. R. EVID. 702; *accord Kumho Tire Co.*, 526 U.S. at 152; *Daubert v. Merrell Dow Pharms., Inc.*, 509 U.S. 579, 588 (1993).  Prior to admitting expert testimony, "[d]istrict courts must be assured that the proffered witness is qualified to testify by virtue of his 'knowledge, skill, experience, training, or education.'" *Wellogix, Inc. v. Accenture, L.L.P.*, 716 F.3d 867, 881 (5th Cir. 2013) (quoting *Wilson v. Woods*, 163 F.3d 935, 937 (5th Cir. 1999)), *cert. denied*, 573 U.S. 904 (2014); *accord* FED. R. EVID. 702; *Albert v. City of Petal*, 819 F. App'x 200, 202 (5th Cir. 2020).  Accordingly, "[t]o qualify as an expert, 'the witness must have such knowledge or experience in [his] field or calling as to make it appear that his opinion or inference will probably aid the trier in his search for truth.'" *United States v. Hicks*, 389 F.3d 514, 524 (5th Cir. 2004) (quoting *United States v. Bourgeois*, 950 F.2d 980, 987 (5th Cir. 1992)), *cert. denied*, 546 U.S. 1089 (2006); *accord United States v. Cooks*, 589 F.3d 173, 179 (5th Cir. 2009), *cert. denied*, 559 U.S. 1024 (2010); *Henderson v. Atmos Energy*, 496 F. Supp. 3d 1011, 1015 (E.D. La. 2020).

"The burden is on the proponent of the expert testimony to establish its admissibility by a preponderance of the evidence." *Robles v. Eminent Med. Ctr.*, 619 F. Supp. 3d 609, 647 (N.D. Tex. 2022) (citing *Daubert*, 509 U.S. at 592 n.10; *Johnson v. Arkema, Inc.*, 685 F.3d 452, 459 (5th Cir. 2012)); *see Sandifer v. Hoyt Archery, Inc.*, 907 F.3d 802, 809 (5th Cir. 2018) ("The proponent need not prove to the judge that the expert's testimony is correct, but she must prove

by a preponderance of the evidence that the testimony is reliable." (quoting *Moore v. Ashland Chem. Inc.*, 151 F.3d 269, 276 (5th Cir. 1998), *cert. denied*, 526 U.S. 1064 (1999))).

The trial court possesses considerable flexibility in assessing the reliability of expert testimony. *Kumho Tire Co.*, 526 U.S. at 141; *United States v. Schaffer*, 439 F. App'x 344, 346 (5th Cir. 2011) (citing *Guy v. Crown Equip. Corp.*, 394 F.3d 320, 325 (5th Cir. 2004)); *United States v. Valencia*, 600 F.3d 389, 424 (5th Cir.), *cert. denied*, 562 U.S. 893 (2010); *Alpizar v. John Christner Trucking, LLC*, 568 F. Supp. 3d 714, 717-18 (W.D. Tex. 2021). In *Daubert*, the United States Supreme Court articulated a nonexhaustive set of factors that courts may consider when evaluating whether the reasoning or methodology underlying an expert's testimony is reliable: (1) whether the expert's theory or technique can be or has been tested; (2) whether the theory or technique has been subjected to peer review and publication; (3) the known or potential rate of error of the challenged method; and (4) whether the theory or technique is generally accepted in the relevant scientific community. 509 U.S. at 593-94; *United States v. Arthur*, 51 F.4th 560, 574 (5th Cir. 2022) (quoting *United States v. Hodge*, 933 F.3d 468, 477 (5th Cir. 2019), *cert. denied*, 141 S. Ct. 131 (2020)), *cert. denied*, 143 S. Ct. 846 (2023).

Given the diverse contexts in which expert testimony is offered, however, the application of specific factors may not be appropriate in any individual case. *Schaffer*, 439 F. App'x at 346; *Stolt Achievement, Ltd. v. Dredge B.E. Lindholm*, 447 F.3d 360, 366 (5th Cir. 2006) (citing *Kumho Tire Co.*, 526 U.S. at 147-49). Indeed, "*Daubert*'s list of specific factors neither necessarily nor exclusively applies to all experts or in every case. Rather, the law grants a district court the same broad latitude when it decides *how* to determine reliability as it enjoys in respect to its ultimate reliability determination." *Kumho Tire Co.*, 526 U.S. at 141-42; *accord Hicks*, 389

F.3d at 525.  The overarching goal "is to make certain that an expert, whether basing testimony upon professional studies or personal experience, employs in the courtroom the same level of intellectual rigor that characterizes the practice of an expert in the relevant field." *Kumho Tire Co.*, 526 U.S. at 152; *Certain Underwriters at Lloyds*, *London v. Axon Pressure Prods. Inc.*, 951 F.3d 248, 269 (5th Cir. 2020); *Roman v. W. Mfg., Inc.*, 691 F.3d 686, 693 (5th Cir. 2012); *Wells v. SmithKline Beecham Corp.*, 601 F.3d 375, 378 (5th Cir. 2010).

To determine whether expert testimony is sufficiently reliable, the court may consider "[w]hether experts are 'proposing to testify about matters growing naturally and directly out of research they have conducted independent of litigation or whether they have developed their opinions for the purposes of testifying.'" FED. R. EVID. 702 advisory committee's note to 2000 amendment (quoting *Daubert v. Merrell Dow Pharm., Inc.*, 43 F.3d 1311, 1317 (9th Cir.), *cert. denied*, 516 U.S. 869 (1995)).  Courts have "warned that when 'an expert becomes an advocate for a cause, he therefore departs from the ranks of an objective expert witness, and any resulting testimony would be unfairly prejudicial and misleading.'" *Betts v. Gen. Motors Corp.*, No. 3:04-CV-169-M-A, 2008 WL 2789524, at *12 (N.D. Miss. July 16, 2008) (quoting *Viterbo v. Dow Chem. Co.*, 646 F. Supp. 1420, 1425 (E.D. Tex. 1986), *aff'd*, 826 F.2d 420 (5th Cir. 1987)).  Nevertheless, the fact that an expert is paid for his testimony "does not necessarily cast doubt on the reliability of his testimony," as few experts do their work for charitable purposes. *Id.* (quoting *Daubert*, 43 F.3d at 1317).

The court plays the role of a gatekeeper, determining the admissibility of "all types of expert testimony, not just scientific testimony." *United States v. Ebron*, 683 F.3d 105, 139 (5th Cir. 2012) (citing *Pipitone v. Biomatrix, Inc.*, 288 F.3d 239, 244 (5th Cir. 2002)), *cert. denied*,

571 U.S. 989 (2013); *accord Gibson Brands, Inc. v. Armadillo Distrib. Enters., Inc.*, 534 F. Supp. 3d 694, 696 (E.D. Tex. 2021). In this role, "trial courts make 'a preliminary assessment of whether the reasoning or methodology underlying the testimony is scientifically valid and of whether that reasoning or methodology properly can be applied to the facts in issue.'" *McGill v. BP Expl. & Prod., Inc.*, 830 F. App'x 430, 433 (5th Cir. 2020) (quoting *Daubert*, 509 U.S. at 592-94); *Hathaway v. Bazany*, 507 F.3d 312, 318 (5th Cir. 2007). The district court should approach this task "with proper deference to the jury's role as the arbiter of disputes between conflicting opinions." *United States v. 14.38 Acres of Land*, 80 F.3d 1074, 1077 (5th Cir. 1996) (quoting *Viterbo v. Dow Chem. Co.*, 826 F.2d 420, 422 (5th Cir. 1987)); *accord United States ex rel. Montcrieff v. Peripheral Vascular Assocs., P.A.*, 507 F. Supp. 3d 734, 746 (W.D. Tex. 2020).

The trial court's role as a gatekeeper "is not intended to serve as a replacement for the adversary system: 'Vigorous cross-examination, presentation of contrary evidence, and careful instruction on the burden of proof are the traditional and appropriate means of attacking shaky but admissible evidence.'" *Primrose Operating Co. v. Nat'l Am. Ins. Co.*, 382 F.3d 546, 562 (5th Cir. 2004) (quoting *14.38 Acres of Land*, 80 F.3d at 1078); *accord Puga v. RCX Sols., Inc.*, 922 F.3d 285, 294 (5th Cir. 2019); *Dearmond v. Wal-Mart La. LLC*, 335 F. App'x 442, 444 (5th Cir. 2009) ("Cross-examination at trial . . . is the proper forum for discrediting testimony, and credibility determinations are, of course, the province of [the fact finder].").  "The *Daubert* analysis should not supplant trial on the merits." *Mathis v. Exxon Corp.*, 302 F.3d 448, 461 (5th Cir. 2002) (citing *Pipitone*, 288 F.3d at 250). Rather, "[t]he focus . . . must be solely on principles and methodology [of the expert witness], not on the conclusions that they generate."

*Hodge*, 933 F.3d at 477 (quoting *Daubert*, 509 U.S. at 594-95); *Watkins v. Telsmith, Inc.*, 121 F.3d 984, 989 (5th Cir. 1997); *see Valencia*, 600 F.3d at 419.  Indeed, "it is the role of the adversarial system, not the court, to highlight weak evidence." *Primrose Operating Co.*, 382 F.3d at 563.  Thus, "[w]hile the district court must act as a gatekeeper to exclude all irrelevant and unreliable expert testimony, 'the rejection of expert testimony is the exception rather than the rule.'" *United States v. Perry*, 35 F.4th 293, 330 (5th Cir.) (quoting *Puga*, 922 F.3d at 294), *cert. denied*, 143 S. Ct. 463 (2022).

Ultimately, the trial court's role as a gatekeeper is intended to ensure that only reliable and relevant expert testimony is presented to the jury.  *Puga*, 922 F.3d at 293; *United States v. John*, 597 F.3d 263, 274 (5th Cir. 2010); *Dearmond*, 335 F. App'x at 444; *Rushing v. Kan. City S. Ry. Co.*, 185 F.3d 496, 506 (5th Cir. 1999) (citing *Daubert*, 509 U.S. at 590-93), *cert. denied*, 528 U.S. 1160 (2000).  The United States Court of Appeals for the Fifth Circuit has held that "[a] district court should refuse to allow an expert witness to testify if it finds that the witness is not qualified to testify in a particular field or on a given subject." *Wilson*, 163 F.3d at 937; *Prejean v. Satellite Country, Inc.*, 474 F. Supp. 3d 829, 833 (W.D. La. 2020); *Floyd v. Hefner*, 556 F. Supp. 2d 617, 642-43 (S.D. Tex. 2008).

    A.    <u>Dr. Chen</u>

        1.    <u>Dr. Chen Is Qualified to Testify</u>

            a.    <u>Dr. Chen's Qualifications to Testify About Methadone and Xanax</u>

The EEOC first asserts that Dr. Chen is not qualified to testify as an expert regarding methadone, Xanax, and the interaction between the two drugs.  Primarily, the EEOC takes issue with the fact that Dr. Chen has never worked in an opioid treatment program, is not authorized

to prescribe methadone for the treatment of addiction, rarely prescribes Xanax, and "admits to having very limited experience with patients taking both medications, so he has not made clinical observations of the effects of the combination to support his opinions." The EEOC also points out that Dr. Chen has not published any articles or conducted any research on the two medications. Finally, the EEOC emphasizes that Dr. Chen has not previously opined as an expert witness on the use of methadone or the interaction between methadone and Xanax.

In response, Defendants detail Dr. Chen's extensive experience as a physician specializing in addiction medicine and opioid stewardship. In his current position as an Addiction Medicine Specialist at Advanced Pain Care, the largest interventional pain management practice in Texas, Dr. Chen treats patients with substance use disorders and regularly prescribes opioids, including methadone, for purposes of pain management. In fact, for the last eleven to fourteen years,[4] Dr. Chen has held a waiver from the Drug Enforcement Administration ("DEA") to treat up to 275 active patients—the maximum number of patients for which the DEA will issue a waiver—for opioid use disorder. Dr. Chen's primary role is to provide opioid stewardship consultations, which involve evaluating and treating "patients for whom the use of prescription opioids carries a high risk due to aberrant medication-taking behavior, history of substance abuse, co-morbidities, concurrent prescriptions of controlled medications, [and] prescription medication dependence." Although Dr. Chen is not authorized to prescribe methadone for the treatment of addiction—as only an opioid treatment program or MAT may issue such prescriptions—he prescribes methadone for the treatment of pain and has treated patients who have been enrolled in MATs. Furthermore, while Dr. Chen "rarely" prescribes Xanax due to what he perceives as "accepted knowledge

---

[4] Dr. Chen testified that he first obtained this waiver "around 2010" or "around maybe 2013."

among practitioners that prescribe controlled substances . . . that opiates and benzodiazepines[5] are a very problematic combination," he "treat[s] patients with opiates and benzo[diazepine]s" "every day." In fact, he "spend[s] most of [his] day . . . prescribing opiates and reviewing benzodiazepines."

The court is thus of the opinion that Dr. Chen's work history and education provide him with an adequate basis from which to testify about methadone and Xanax. The court rejects the notion that Dr. Chen must have specific experience and training matched precisely to the circumstances at issue. *See Pride v. BIC Corp.*, 218 F.3d 566, 577 (6th Cir. 2000) (noting that the requirements of Rule 702 should be applied liberally); *In re Paoli R.R. Yard PCB Litig.*, 35 F.3d 717, 741 (3d Cir. 1994) (citing *Hammond v. Int'l Harvester Co.*, 691 F.2d 646, 652-53 (3d Cir. 1982)) ("We have eschewed imposing overly rigorous requirements of expertise and have been satisfied with more generalized qualifications."), *cert. denied*, 513 U.S. 1190 (1995); *Wagoner v. Exxon Mobil Corp.*, 813 F. Supp. 2d 771, 800 (E.D. La. 2011) ("Rule 702 'embodies a liberal policy towards qualification as an expert.'"); *Rondout Valley Cent. Sch. Dist. v. Coneco Corp.*, 321 F. Supp. 2d 469, 475 (N.D.N.Y. 2004) ("Rather than relying upon rigidity, demanding that an expert's qualifications match perfectly with the issues at hand, liberality and flexibility in evaluating qualifications should be the court's guide."); *see also Van Winkle v. Rogers*, 82 F.4th 370, 379 (5th Cir. 2023) ("Rule 702 does not mandate that an expert be highly qualified in order to testify about a given issue. Differences in expertise bear chiefly on the weight to be assigned to the testimony by the trier of fact, not its admissibility." (quoting *Huss*, 571 F.3d at 452)). As the Supreme Court has admonished, "Rule 702 [does not create] a schematism that

---

[5] The term "benzodiazepines" refers to the class of medication to which Xanax belongs.

segregates expertise by type while mapping certain kinds of questions to certain kinds of experts. Life and the legal cases that it generates are too complex to warrant so definitive a match." *Kumho Tire Co.*, 526 U.S. at 151.

Moreover, the fact that Dr. Chen has not published any articles or conducted any research on methadone or Xanax does not prevent him from being qualified as an expert. Although the EEOC accurately states that the fact of publication (or lack thereof) in a peer-reviewed journal is a relevant consideration in assessing the scientific validity on which an opinion is premised, such a consideration guides the court's evaluation of the reliability of an expert's opinion, not a determination of whether he is qualified to offer expert testimony. *See Daubert*, 509 U.S. at 594 ("The fact of publication (or lack thereof) in a peer reviewed journal thus will be a relevant, though not dispositive, consideration in assessing the scientific validity of a particular technique or methodology on which an opinion is premised."); *Perry*, 35 F.4th at 329 (explaining that *Daubert* set out several factors, including "whether the technique has been subject to peer review and publication," that courts "should consider when . . . making their preliminary assessments of whether the reasoning underlying expert testimony is scientifically valid and can properly be applied to the facts in issue"). Defendants also correctly note that Rule 702 does not require a witness to publish articles or conduct research in order to qualify as an expert. *See generally* FED. R. EVID. 702; *see also Van Winkle*, 82 F.4th at 379 ("Experience alone can provide a sufficient foundation for expert testimony." (citing FED. R. EVID. 702 advisory committee's note to 2000 amendment)).

As for the EEOC's contention that Dr. Chen is unqualified because he has not previously testified as an expert regarding the use of methadone or the interaction between methadone and

Xanax, Dr. Chen's "lack of experience as an expert witness is no bar to his testimony.  An expert witness must be an expert in a given field, not an experienced witness."  *Johnson v. BAE Sys. Land & Armaments, L.P.*, No. 3:12-CV-1790-D-BH, 2014 WL 1714487, at *31 n.25 (N.D. Tex. Apr. 30, 2014) (quoting *Rolls-Royce Corp. v. HEROS, Inc.*, No. 3:07-CV-0739-D, 2010 WL 184313, at *5 (N.D. Tex. Jan. 14, 2010)); *see Sexton v. Exxon Mobil Corp.*, 484 F. Supp. 3d 321, 334 (M.D. La. Sept. 4, 2020) ("[C]ourts have rejected the notion that the Federal Rules of Evidence require an expert to have previously opined on a specific issue to be 'qualified' as an expert on that issue.").  Accordingly, the court determines that Dr. Chen is qualified to offer expert testimony about methadone and Xanax.

> b.    Dr. Chen's Qualifications to Testify About the Role of an MRO

The EEOC also argues that Dr. Chen is not qualified to testify about the responsibilities of an MRO, including whether Defendants' MRO, Dr. Starkey, appropriately reported Dare's drug screen results (including the warning about Dare's medications) to Defendants.  The EEOC points out that, although Dr. Chen is certified as an MRO,[6] he has never worked as a vocational MRO.  The EEOC also contends that, although Dr. Chen references the eleventh edition of the American Association for Medical Review Officers ("AAMRO") Handbook in his supplemental report, "he has no understanding of the publication or its applications" because he misapplied the United States Department of Transportation's ("DOT") drug-testing guidelines to the facts of this case.  The EEOC further notes that Dr. Chen failed to take into account that both MRO-certifying

---

[6] The EEOC also notes that Dr. Chen's curriculum vitae ("CV") does not list his MRO certification.  Nevertheless, Dr. Chen testified during his deposition that he had been certified as an MRO for approximately five years.  The EEOC cites no authority for the proposition that the court must disbelieve that an expert holds a certification merely because it is not listed on his CV.  Accordingly, the absence of a reference to an MRO certification on Dr. Chen's CV does not render Dr. Chen unqualified to testify.

bodies, AAMRO and the Medical Review Officer Certification Council ("MROCC"), "warn against an employer and an MRO making automatic determinations that an applicant has an impairment or is unfit for the job based on his prescription medications."[7]  Finally, the EEOC emphasizes that Dr. Chen acknowledged during his deposition that he is unfamiliar with the ADA and its requirements.  According to the EEOC, as a result, Dr. Chen "cannot testify with any knowledge, expert or otherwise, that Defendants' withdrawal of the job offer in response to Dr. Starkey's admonition [was] reasonable."

In response to the EEOC's assertion that Dr. Chen is not qualified to testify about an MRO's responsibilities because he has never served as an MRO in a vocational setting, Defendants point out that while Dr. Chen "does not in the strict sense serve in that capacity [of an MRO] for employers, Dr. Chen, nevertheless, routinely performs all the functions of an MRO in his practice," in that he "reviews the results of medical toxicology reports," "interprets drug screens and results," and "review[s] drug test[s] every day . . . ."  On occasion, Dr. Chen is also "asked to give an opinion as to whether a patient can perform a certain duty on the medication that they are being prescribed."  In other words, Dr. Chen's deposition testimony indicates that he is familiar with an MRO's responsibilities and carries out various duties comparable to those of a vocational MRO in his practice.  Thus, the court finds that, despite Dr. Chen's lack of experience

---

[7] Notably, however, the paragraph of Dr. Martin's rebuttal report that the EEOC cites to support this proposition relies on the following quote from the MROCC Guide to Drug Testing:  "[D]rug tests are *generally* unreliable measures of drug related impairment" (emphasis added).  The word "generally" indicates that there are some specific circumstances where drug tests may be reliable measures of impairment.  As the court discusses in more detail below, Dr. Chen is apparently of the opinion that such a circumstance arises where a drug test presents high-dosage quantities of both Xanax and methadone, as he states that he "cannot envision any circumstance where an individual who is concurrently taking high-dose methadone and high-dose alprazolam could be cleared to work in a safety-sensitive position."  Therefore, after reviewing the EEOC's support for this argument, the court is unconvinced that Dr. Chen's opinion is unreliable on these grounds.

in the precise role of a vocational MRO, Dr. Chen is nevertheless sufficiently qualified to testify about the responsibilities of an MRO by virtue of his knowledge, experience, and training, including his MRO certification and his analogous duties in his medical practice.

As for the EEOC's contention that Dr. Chen "has no understanding" of the AAMRO Medical Review Officers Handbook because he applies a DOT regulation[8] that is not applicable to the welding position for which Dare applied,[9] the court declines to find that Dr. Chen is unqualified on this ground.  Indeed, Dr. Starkey—Defendants' MRO who reviewed Dare's drug test results—acknowledged in his deposition that the welding position at issue is not subject to DOT regulations.  Nevertheless, Dr. Starkey explained that he "consider[s] DOT guidelines to be sort of, the gold standard in occupational medicine" because he "feel[s] like you could always be on solid footing if you're following federal guidelines" and he strives to avoid implementing a "double standard" for non-DOT positions.  Besides a vague assertion that Dr. Starkey "had a duty to *not* disclose [personal medical] information," the EEOC fails to explain why an MRO may not apply a "higher" standard (such as the DOT regulations) when reviewing drug test results and reporting potential safety concerns.[10]  The EEOC thus does not clarify how an MRO's reliance on

---

[8] *See* 49 C.F.R. § 40.327(a) ("As the MRO, you must . . . report drug test results and medical information you learned as part of the verification process to third parties without the employee's consent if you determine, in your reasonable medical judgment, that:  (1) The information is likely to result in the employee being determined to be medically unqualified under an applicable DOT agency regulation; or (2) The information indicates that continued performance by the employee of his or her safety-sensitive function is likely to pose a significant safety risk.").

[9] *See* 49 C.F.R. § 40.1(b) ("This part concerns the activities of transportation employers, safety-sensitive transportation employees . . ., and service agents.").

[10] The only sources that the EEOC cites to the contrary are Dr. Martin's statements in his report and deposition testimony that MROs are prohibited from providing specific information about potential safety issues due to "concerns about HIPAA [the Health Insurance Portability and Accountability Act of 1996, Pub. L. No. 104-191, 110 Stat. 1936 (1996)] and the ADA."  The EEOC does not expound upon

15

DOT regulations when assessing an applicant for a non-DOT position is improper.  As such, the EEOC fails to demonstrate how Dr. Chen's so-called "misapplication" of the DOT guidelines renders him unqualified to testify.  Ultimately, the court is convinced that, given Dr. Chen's certification as an MRO for about five years, his consultation of the AAMRO Medical Review Officers Handbook, and his experience with handling responsibilities paralleling those of a vocational MRO, Dr. Chen is qualified to serve as an expert on the role of an MRO.[11]

        2.     <u>Dr. Chen's Opinions Are Reliable</u>

        a.     <u>Dr. Chen Does Not Disregard the Treating Physicians' Opinions</u>

The EEOC next argues that Dr. Chen's testimony is unreliable because he ignores medical science contradicting his opinions.  Specifically, the EEOC asserts that Dr. Chen's generalization that he "cannot envision any circumstance" where an individual "concurrently taking high-dose methadone and high-dose alprazolam could be cleared to work in a safety-sensitive position" is improper because a medical determination of whether an individual can perform the essential functions of a job must be made on an individualized basis.  The EEOC cites the testimony of its rebuttal expert, Dr. Martin; Dare's treating physicians, Dr. John Hopper ("Dr. Hopper") and Dr. Natalie Carroll ("Dr. Carroll"); and Dare's MAT counselor, Magdalene Mata ("Mata"), to

---

this issue.  Essentially, this dispute pits one expert's opinion (Dr. Martin's) on what information may properly be disclosed against another expert's opinion (Dr. Chen's, whose opinion aligns with Dr. Starkey's).

[11] The EEOC also insists that Dr. Chen is unqualified because he admitted that he is unfamiliar with the ADA and its requirements.  Dr. Chen, does not, however, purport to opine about the ADA. Rather, his opinions discuss "the medical support for and reasonableness of Dr. Starkey's opinion and warning . . . and the reasonableness of Dragon Rig heeding Dr. Starkey's warning . . . ."  It is unclear to the court how Dr. Chen's unfamiliarity with the ADA disqualifies him from testifying about this subject matter.  Accordingly, whereas Dr. Chen is, by his own admission, not qualified to testify about the ADA, the court determines that Dr. Chen is sufficiently qualified to testify about the role of an MRO.

support a number of propositions that Dr. Chen purportedly ignores, including the range of typical

dosages for both Xanax and methadone, the factors that can impact whether a patient experiences

side effects from these medications, the fact that patients' tolerances for medications can vary, and

the fact that individuals taking both medications can perform safety-sensitive jobs, including

welding.  According to the EEOC, Dr. Chen's disregard for Dare's treating physicians' opinions

"demonstrates flaws inherent in [his] application of scientific principles and methodology."[12]

Defendants emphasize that Dr. Chen's reports explicitly note that he reviewed Dare's

medical records, as well as the depositions of Dr. Carroll, Dr. Hopper, Mata, and Dr. Martin.

They also note that Dr. Chen relied on the testimony of Defendants' MRO, Dr. Starkey, who cited

multiple medical sources himself.  Lastly, Defendants retort that Dr. Chen's opinions are

supported by multiple medical, governmental, and MRO sources that are cited in his reports.[13]

---

[12] The EEOC also asserts that Dr. Chen's opinions in his reports are unreliable because they "are contradicted by his own deposition testimony."  In particular, the EEOC contends that Dr. Chen contradicted his conclusion that he "cannot envision any circumstance" where an individual "concurrently taking high-dose methadone and high-dose alprazolam could be cleared to work in a safety-sensitive position."  The EEOC notes that Dr. Chen "admitted" in his deposition testimony that:  not everyone who takes the two medications together will have the side effects he attributed to the medications; the side effects of the medications will vary based on certain factors, including a patient's tolerance level; being prescribed a benzodiazepine can assist a patient taking methadone with his addiction recovery; he could not recall any patients who were taking both medications and exhibited the potential symptoms that he identified; he has never assessed whether someone on both medications is capable of operating heavy machinery; and individuals taking both medications can operate vehicles.

The court does not agree, however, that Dr. Chen contradicted himself.  For one matter, during his deposition, Dr. Chen never withdrew or expressly disavowed the aforementioned conclusion.  Moreover, Dr. Chen's so-called "admissions" during his deposition do not necessarily negate his conclusion.  Dr. Chen can recognize that side effects will vary among patients while simultaneously maintaining the opinion that no person taking methadone and Xanax at the dosages prescribed to Dare could be cleared to work in a safety-sensitive position.  Similarly, Dr. Chen can agree that a benzodiazepine can lower a patient's anxiety and assist with addiction recovery while still holding the opinion that an individual prescribed methadone and Xanax cannot perform a safety-sensitive job.  Thus, the court is unpersuaded that Dr. Chen's deposition testimony "contradicts" the opinions in his reports.

[13] Specifically, Dr. Chen relied on various letters and medical records from Dare's treating physicians; Dare's drug screen test and results; the eleventh edition of AAMRO's Medical Review Officer

To the extent the EEOC argues that Dr. Chen's conclusions are unreliable because they differ from its own experts' opinions, the court declines to strike Dr. Chen's opinion on such a basis.  As the court explained above, "[t]he focus . . . must be solely on principles and methodology [of the expert witness], not on the conclusions that they generate." *Hodge*, 933 F.3d at 477 (quoting *Daubert*, 509 U.S. at 594-95).  Indeed, "[w]hile the party offering the expert bears the burden of showing that the testimony is reliable, it 'need not prove to the judge that the expert's testimony is correct . . . .'" *Estech Sys., IP, LLC v. Carvana LLC*, No. 2:21-CV-00482-JRG-RSP, 2023 WL 2934920, at *2 (E.D. Tex. Apr. 13, 2023) (quoting *Johnson*, 685 F.3d at 459).  In fact, the Advisory Committee on Evidence Rules recently noted that "[i]t will often occur that experts come to different conclusions based on contested sets of facts.  Where that is so, the Rule 104(a)[14] standard does not necessarily require exclusion of either side's experts.  Rather, by deciding the disputed facts, the jury can decide which side's experts to credit." FED. R. EVID. 702 advisory committee's note to 2023 amendment.  Accordingly, the court rejects the EEOC's argument that Dr. Chen's testimony is unreliable on this basis.[15]

---

Handbook; a June 2011 article published in the journal PAIN MEDICINE, entitled *An Analysis of the Root Causes for Opioid-Related Overdose Deaths in the United States*; remarks from the president of the Texas Medical Board ("TMB") at the 14th Annual Texas Pain Society Scientific Conference in October 2022; and multiple websites, including the Substance Abuse and Mental Health Services Administration's website (SAMHSA.gov), MedlinePlus.gov, the DEA's website (DEA.gov), RxList.com, and the United States Food and Drug Administration's ("FDA") website (FDA.gov).

[14] Under Federal Rule of Evidence 104(a), "[t]he court must decide any preliminary question about whether a witness is qualified . . . or evidence is admissible." FED. R. EVID. 104(a).

[15] The EEOC also asserts that Dr. Chen's testimony is unreliable because his opinions are not based on personal observations.  The court agrees with Defendants that "an expert is permitted wide latitude to offer opinions, including those that are not based on firsthand knowledge or observation." *Daubert*, 509 U.S. at 592 (citing FED. R. EVID. 702, 703).  As a result, "[n]umerous courts have held that an expert witness need not personally examine a plaintiff in rendering his opinion" in personal injury cases. *Lacara v. Kohl's Inc.*, No. 21-2321, 2023 WL 5508082, at *2 (E.D. La. Aug. 25, 2023) (quoting *Mendoza v. Lafarge N. Am., Inc.*, No. 15-1257, 2016 WL 153952, at *3 (E.D. La. Jan. 13, 2016)).

b.      Dr. Chen Does Not Impermissibly Rely on His Own *Ipse Dixit*

The EEOC also contends that Dr. Chen's opinion that no one taking Dare's dosages of medications could be cleared to work in a safety-sensitive position is "fundamentally unsupported" and "connected to existing data only by [Dr. Chen's] *ipse dixit*."[16]  The court disagrees.  For one matter, an expert may properly rely upon his own experience when offering an opinion.  During his deposition, Dr. Chen testified that he has treated patients taking Xanax and methadone together and that he evaluates the combination of opiates and benzodiazepines "dozens of times a day." He is also occasionally asked "to give an opinion as to whether a patient can perform a certain duty on the medication that they are being prescribed."  In fact, Dr. Chen has "declined to furnish" letters stating that a patient could drive or operate heavy machinery if he is "uncomfortable with the medications [the patient is] taking and what [the patient is] asking to be cleared to do."  Although Dr. Chen could not recall furnishing (or declining to furnish) such a letter for a patient who was prescribed methadone, Xanax, or both medications, he is nevertheless familiar with the practice of assessing a job description and determining whether a patient's prescriptions would inhibit that patient from performing the requisite duties.

The Supreme Court has recognized that "[t]rained experts commonly extrapolate from existing data," with the caveat that "courts are free to reject a theory based on extrapolation when

---

"Instead, 'review of a plaintiff's medical records, combined with the expert's medical experience, is sufficient to ensure the reliability of that expert's testimony'" about the causation of the plaintiff's injuries. *Id.* (quoting *Gonzales v. Charlotte Pipe & Foundry Co.*, No. 6:19-cv-00181-ADA-JCM, 2020 WL 13609936, at *6 (W.D. Tex. June 23, 2020), *adopted by* No. 6-19-CV-00181-ADA, 2020 WL 13610359 (W.D. Tex. July 23, 2020)).  The court sees no reason why the same principle should not apply in this ADA case, particularly given that neither the EEOC's expert nor Defendants' expert personally examined Dare.  Accordingly, Dr. Chen's lack of personal observation does not render his opinion unreliable.

[16] "*Ipse dixit*" refers to "something asserted but not proved."  *Ipse Dixit*, BLACK'S LAW DICTIONARY (11th ed. 2019).

'there is simply too great an analytical gap between the data and the opinion proffered.'" *Johnson*, 685 F.3d at 460-61 (quoting *Gen. Elec. Co. v. Joiner*, 522 U.S. 136, 146 (1997)).  Such an analytical gap does not exist here because Dr. Chen has experience with both treating patients taking methadone and Xanax and assessing patients' ability to perform certain job tasks.  The court concludes that Dr. Chen's experience with prescribing opiates, evaluating patients taking both opiates and benzodiazepines, and evaluating patients' abilities to perform certain job duties when taking other medications, coupled with his knowledge of the common side effects of prescribing opiates and benzodiazepines together, demonstrate that his opinion on this subject is, more likely than not, reliable.  While there may be certain limitations on Dr. Chen's experience, in that he could not recall any patients who were taking both medications and exhibited the potential side effects that he identified and he has never assessed whether a patient taking methadone, Xanax, or both medications could perform certain job duties, such limitations impact the weight of his opinions, not their admissibility.  The EEOC may properly elucidate these issues on cross-examination.

Additionally, although the EEOC criticizes Dr. Chen's remark that it is "just accepted knowledge among practitioners that prescribe controlled substances that opiates and benzodiazepines are a very problematic combination," Rule 702 explicitly states that an expert may be qualified by, *inter alia*, his "knowledge."  Furthermore, one of the relevant considerations when determining whether an expert's opinion is admissible is whether the expert's "specialized knowledge will help the trier of fact to understand the evidence or to determine a fact in issue."  FED. R. EVID. 702.  Thus, Rule 702 plainly contemplates that an expert may properly rely upon his knowledge, including generally accepted knowledge in his field.  As explained above, Dr.

Chen cites several medical resources that support his opinion, including the "black box warnings" attached to methadone and Xanax, which advise that the two medications should be used together with caution.  Dr. Chen also references the TMB president's recent remarks, delivered at the Texas Pain Society Scientific Conference in October 2022, that the TMB expressly frowns upon prescribing opiates and benzodiazepines together.  This statement certainly indicates that the importance of exercising caution in prescribing methadone and Xanax together is, in fact, "accepted knowledge" among pain management physicians like Dr. Chen.  Dr. Chen may properly rely on such common knowledge in his field.

### c.  Dr. Chen's "Publicly Available Sources" Are Not Unreliable

The EEOC further argues that Dr. Chen's testimony is unreliable because he bases his opinion upon "publicly available" information that is "available to any lay person online," including "black box warnings" for the medications, the FDA website, the DOT's commercial driver's license requirements, and overdose statistics from the National Institutes of Health. Besides emphasizing that these sources are publicly available, the EEOC identifies no reason why these sources are unreliable and cites no authority for the proposition that an expert cannot consult publicly available sources.  In fact, as Defendants point out, Rule 702 does not require an expert to rely only on sources in a written, journal format.  *See Glossip v. Gross*, 576 U.S. 863, 890 (2015) (concluding that a pharmacist's expert testimony "may not be disqualified simply because one source (drugs.com) warns that it 'is not intended for medical advice'" and observing that "[m]edical journals . . . typically contain similar disclaimers").

Furthermore, although the EEOC may disagree with Dr. Chen's conclusions or question the sources he used to reach his conclusions, those contentions go to the weight rather than the

admissibility of the evidence.  *See Puga*, 922 F.3d at 295-96 (explaining that "[i]f [the expert] missed any important facts, the oversight should go to the weight of his opinion, not its admissibility"); *Hodge*, 933 F.3d at 478 ("As a general rule, questions relating to the bases and sources of an expert's opinion affect the weight to be assigned that opinion rather than its admissibility . . . ." (quoting *14.38 Acres of Land*, 80 F.3d at 1077)); *Cantu v. Wayne Wilkens Trucking, LLC*, 487 F. Supp. 3d 578, 584 (W.D. Tex. 2020) ("[Q]uestions relating to the bases and sources of an expert's opinion affect the weight of the evidence rather than its admissibility, and should be left for the finder of fact." (citing *Viterbo*, 826 F.2d at 422)); *Hargrave v. Blake Drilling & Workover Co., Inc.*, No. 07-985, 2008 WL 2625524, at *3 (E.D. La. Feb. 12, 2008) (concluding that a party's objection to expert's use of assumptions in his calculations attacked the credibility rather than the admissibility of the expert's testimony).  Nevertheless,

> this does not mean, as certain courts have held, that arguments about the sufficiency of an expert's basis always go to weight and not admissibility.  Rather it means that once the court has found it more likely than not that the admissibility requirement has been met, any attack by the opponent will go only to the weight of the evidence.

FED. R. EVID. 702 advisory committee's note to 2023 amendment.

Here, the court finds that it is more likely than not that the admissibility requirement has been met as to Dr. Chen based on his experience discussed above, as well as the medical resources he relies upon to support his opinion.  *See Williams v. Manitowoc Cranes, L.L.C.*, 898 F.3d 607, 625 (5th Cir. 2018) ("As long as there are 'sufficient indicia' that an individual will 'provide a reliable opinion' on a subject, a district court may qualify that individual as an expert." (quoting *Huss*, 571 F.3d at 455-56)).  Thus, while the EEOC may cross-examine Dr. Chen about his sources, the EEOC's criticisms of the same do not warrant the exclusion of his testimony.

3.      Dr. Chen's Opinions Properly Apply the Facts in This Case

The EEOC next claims that Dr. Chen improperly applies the facts in this case because he incorrectly asserts that Dare's "prescribing physicians . . . expressed significant concern about the safety of [Dare's medication] regimen." It also takes issue with Dr. Chen's statement that "[n]one of [Dare's] treating clinicians had, or have, full knowledge of the medications prescribed to or taken by [Dare]." Although the EEOC is correct that an expert's opinions must be "sufficiently tied to the facts of the case," *Daubert*, 509 U.S. at 591, the court is satisfied that Dr. Chen's conclusions are sufficiently linked to the facts.[17] Indeed, Dr. Chen's opinions are supported by the deposition testimony of Dare's psychiatrist, Dr. Hopper, who testified that "[i]t could concern [him] regarding the patient's response to [Xanax and an opioid] together. Some people will report they can't function because of sedation or confusion or incoordination . . . ."

Furthermore, while the EEOC is also correct that Dr. Hopper testified elsewhere that he understood that Dare was taking methadone "sometimes" and that, in any event, "[Dare's] mental status was always very good," "[t]here were never any signs of [Dare's] taking too much opioid," and even knowing Dare's methadone dosage, he "would not hesitate to prescribe exactly" Dare's current Xanax dosage because "[c]linically [Dare] was responding and doing well," such statements do not negate his assertion that, in a general sense, the potential side effects of a patient taking both Xanax and an opioid "could concern [him]." Accordingly, the court is not inclined to strike Dr. Chen's opinion for "improperly applying" the facts in this case. To the extent Dr.

---

[17] The EEOC also alleges that Dr. Chen's statement that "[i]t is difficult or impossible to determine how an individual is affected by their prescription medication based on a few office encounters as their presentation will largely depend on the most recent dosing of medications and vary from hour to hour" improperly implies that Dare's physicians could not have accurately assessed his clinical presentation. It is unclear how this assertion "improperly applies the facts in this case." Rather, this statement seems to be Dr. Chen's personal opinion based on his experience with assessing patients in a clinical setting.

Chen's opinion portrays only some of the facts or fails to paint a full picture of the facts, the EEOC will have an opportunity to illuminate these purported flaws through cross-examination.

                      4.      <u>The EEOC's Objections to Certain Conclusions in Dr. Chen's Reports</u>

                      a.      <u>"Reasonable and Justified"</u>

The EEOC also contends that Dr. Chen "cannot testify with any knowledge, expert or otherwise, that Defendants' withdrawal of the job offer in response to Dr. Starkey's admonition [was] reasonable" because he admitted that he is unfamiliar with the ADA and its requirements. The EEOC further argues that such an opinion is inadmissible because an expert may not express an opinion that amounts to a legal conclusion.

Once allowed to testify as an expert, an expert witness may assert opinions that "embrace an ultimate issue to be decided by the trier of fact." *Sting Soccer Operations Grp. LP v. JP Morgan Chase Bank, N.A.*, No. 4:15-CV-127, 2016 WL 4141118, at *3 (E.D. Tex. Aug. 4, 2016) (quoting FED. R. EVID. 704(a)).  Although Rule 704 permits expert witnesses to offer testimony as to ultimate issues of fact, an expert may not offer opinions that amount to legal conclusions. *McBroom v. Payne*, 478 F. App'x 196, 200 (5th Cir. 2012) (quoting *United States v. Izydore*, 167 F.3d 213, 218 (5th Cir. 1999)); *DHI Grp., Inc. v. Kent*, 397 F. Supp. 3d 904, 917 (S.D. Tex. 2019); *Kipp Flores Architects, LLC v. Mid-Continent Cas. Co.*, No. 4:14-CV-02702, 2016 WL 1212067, at *9 (S.D. Tex. Feb. 29, 2016) ("Indeed, despite its permissive language, Rule 704 'does not allow an expert to render conclusions of law.'" (quoting *Snap-Drape, Inc. v. Comm'r of Internal Revenue*, 98 F.3d 194, 197-98 (5th Cir. 1996), *cert. denied*, 522 U.S. 821 (1997))), *adopted by* No. H-14-2702, 2016 WL 1246096 (S.D. Tex. Mar. 30, 2016), *aff'd*, 852 F.3d 405 (5th Cir. 2017).  Indeed, while expert witnesses are given wide latitude, including the

ability to offer opinions that are not based on firsthand knowledge or observation, this freedom is not limitless.  *See Kumho Tire Co.*, 526 U.S. at 148; *Daubert*, 509 U.S. at 592.  Neither Rule 702 nor 704(a) of the Federal Rules of Evidence permits expert witnesses to offer legal opinions. *See* FED. R. EVID. 702, 704(a); *C.P. Ints., Inc. v. Cal. Pools, Inc.*, 238 F.3d 690, 697 (5th Cir. 2001); *Owen v. Kerr-McGee Corp.*, 698 F.2d 236, 240 (5th Cir. 1983); *Sapp v. MHI P'ship, Ltd.*, 199 F. Supp. 2d 578, 589 (N.D. Tex. 2002).  "[A]llowing an expert to give his opinion on the legal conclusions to be drawn from the evidence both invades the court's province and is irrelevant."  *Owen*, 698 F.2d at 240.  Moreover, expert testimony expounding upon what the law requires is "unnecessary and improper."  *Neutrino Dev. Corp. v. Sonosite, Inc.*, 410 F. Supp. 2d 529, 545-46 (S.D. Tex. 2006); *see Owen*, 698 F.2d at 239-40.

As an initial matter, Dr. Chen's conclusion regarding the reasonableness of Defendants' actions does not purport to opine on the ADA or its requirements.  Rather, he merely opines from his own medical and factual perspective that Defendants' reliance on Dr. Starkey's recommendation was reasonable; he offers no legal opinion as to whether Defendants' actions were sanctioned by the ADA.  As a result, the court declines to strike this conclusion in Dr. Chen's report on merely because he is, by his own admission, unfamiliar with the ADA and its requirements.

The EEOC similarly fails to persuade the court that the question of whether Defendants acted reasonably in withdrawing Dare's conditional offer of employment calls for a legal conclusion.  For one matter, the sole case that the EEOC relies upon in support of this argument is inapposite.  *See Est. of Sowell v. United States*, 198 F.3d 169, 171-72 (5th Cir. 1999) (upholding the district court's exclusion of expert testimony on the issue of whether an estate

25

executor had acted reasonably because it was, "for all practical purposes, the only issue for the jury in this case to decide"). Moreover, the question of whether an employee or potential employee poses a "direct threat" requires "an individualized assessment of the individual's present ability to safely perform the essential functions of the job" that is "based on a *reasonable medical judgment . . . .*" 29 C.F.R. § 1630.2(r) (emphasis added). Notably, the question of whether the medical professional's judgment was reasonable is distinct from the issue of whether the employer itself acted reasonably in relying upon the medical judgment. Here, Dr. Chen does not state in a conclusory fashion that Dr. Starkey's medical judgment of Dare's capabilities was reasonable. Instead, Dr. Chen opines that, from a medical and factual perspective, Defendants' decision to follow Dr. Starkey's recommendation was reasonable because "this particular MRO was intimately familiar with the company's job positions because he regularly performed the drug screens, fitness for duty determinations, and return-to-work evaluations for the company since the company began." Thus, Dr. Chen's opinion concerning Defendants' reasonableness does not constitute an impermissible legal conclusion.

The court is concerned, however, that Dr. Chen's opinion that Defendants' reliance on Dr. Starkey's opinion was "justified" crosses the line into a legal conclusion. *See United States v. Warren*, No. 10-154, 2010 WL 11623588, at *5 (E.D. La. Nov. 8, 2010) (striking an expert's opinion that a law enforcement officer "was justified in firing his weapon" because it was "unmistakably [a] legal conclusion[ ]"); *Interplan Architects, Inc. v. C.L. Thomas, Inc.*, No. 4:08-cv-03181, 2010 WL 4065465, at *20 (S.D. Tex. Oct. 9, 2010) (determining that an expert could not "offer [a] legal conclusion[ ]" that the defendant "was justified" in his interpretation of who owned the copyrighted work at issue in a copyright infringement case); *see also Justifiable*,

26

BLACK'S LAW DICTIONARY (11th ed. 2019) (defining "justifiable" as meaning "*[l]egally* or morally acceptable for one or more good reasons" (emphasis added)).  Accordingly, the court strikes the phrase "and justified" from Dr. Chen's report.  Dr. Chen likewise may not testify at trial that Defendants' reliance on Dr. Starkey's recommendation was "justified."

b.   <u>Dare's Possible "Diversion" of Medication</u>

Finally, the EEOC asserts that Dr. Chen's opinion that Dare might be "diverting" his medications, including by selling them illicitly, is inadmissible because it is irrelevant and there are no facts to support this conclusion.  According to his reports, Dr. Chen based this opinion on Dare's statement during his July 2022 deposition that he sometimes does not take either methadone or Xanax for several days in an effort to wean himself off the medications, thereby leaving "[s]ignificant quantities of controlled medications that [Dare] routinely skips . . . unaccounted for."  Referencing the "high street value" of these drugs and Dare's testimony about his "financial hardships," Dr. Chen opines that "the possibility of diversion of controlled medications must be considered" because "illicit prescription pills are an ever-present hazard in certain types of workplaces."  Dr. Chen admitted, however, that he has no personal knowledge that Dare is either stockpiling or selling his medications.  Defendants do not specifically respond to these arguments.

Here, the court agrees with the EEOC that Dr. Chen's opinion regarding possible diversion is not relevant to the issues in this case, which concerns whether Defendants violated the ADA when they rescinded Dare's conditional job offer.  As the EEOC points out, Dr. Chen discusses only potential behaviors in which Dare might have been engaging at the time of his deposition in July 2022, not at the time he applied for employment with Defendants in February 2019, which is the relevant time period for purposes of this case.  No facts in Dare's deposition testimony or

27

otherwise indicate that he was deviating from taking his medications at the time of his application.

Thus, it is unclear how Dr. Chen's conclusion that Dare might have been diverting his medications

in 2022 will assist the jury as the trier of fact with "understand[ing] the evidence" or

"determin[ing] a fact in issue." FED. R. EVID. 702; *see Nucor Corp. v. Requenez*, 578 F. Supp.

3d 873, 888 (S.D. Tex. 2022) ("Expert testimony which does not relate to any issue in the case

is not relevant and, ergo, non-helpful." (quoting *Daubert*, 509 U.S. at 591)).  Moreover, even if

such an opinion was somehow relevant, it is certainly more prejudicial than probative.  *See* FED.

R. EVID. 403 (permitting the court to "exclude relevant evidence if its probative value is

substantially outweighed by a danger of . . . unfair prejudice . . . ."); *see also Nucor Corp.*, 578

F. Supp. 3d at 888 ("The Court scrutinizes proposed expert testimony more searchingly than lay

witness testimony for its pertinency and potential prejudice."); *Fetty v. City of Baton Rouge*, 518

F. Supp. 3d 923, 928 (M.D. La. 2021) ("[E]ven if the proposed expert testimony satisfies each

of the elements set forth in [Rule 702], the testimony may still be excluded pursuant to the

discretionary provisions of [Rule 403] . . . .").  Accordingly, Dr. Chen may not testify about

Dare's possible diversion of his medication, and the corresponding conclusions are stricken from

his reports.

      B.    Dr. Martin

          1.    Dr. Martin Is Qualified to Testify

Turning now to Defendants' motion to exclude the testimony of the EEOC's rebuttal

expert, Dr. Martin, Defendants first assert that Dr. Martin is unqualified to rebut various aspects

of Dr. Chen's testimony because:  he is not board certified in occupational medicine; he is not a

pain and addiction specialist; he did not complete fellowships in addiction or pain management

medicine; and he has little experience treating patients using or abusing Xanax and/or methadone.[18]  Defendants also claim that, because only 3-4 percent of Dr. Martin's patients are welders, he is unqualified to opine about Dare's ability to work as a welder while taking "high-dose" prescriptions of methadone and Xanax.  Finally, Defendants contend that Dr. Martin is unqualified because none of his publications relate to methadone, Xanax, opioid use disorder, or anxiety; he has never served as an expert in a case involving methadone or Xanax; and he has provided expert testimony about the MRO process on only one occasion about twelve years ago.[19]

In response, the EEOC highlights Dr. Martin's medical education, career, training, and experience.  Before assuming his current role as the Medical Director for Occupational Medicine at the Center for Neuroscience Orthopedics and Spine, Dr. Martin served as the Medical Director for UnityPoint Health in Occupational Medicine for over 23 years.  Previously, in addition to completing a residency in family medicine, Dr. Martin participated in the Occupational Medicine Comprehensive Training Course.  He has also completed other training on various subjects, including disability evaluation, MRO certification, and American Medical Association guidance

---

[18] Specifically, Defendants believe that Dr. Martin is not qualified to opine about:

(1) medical practices involving addiction and addiction medicine; (2) the uses and risks of methadone maintenance treatment and the interaction between methadone and alprazolam (Xanax); (3) the risks and safety concerns of combining high-dose methadone and high-dose alprazolam, and (4) the safety concerns relating to Dare working in a safety-sensitive position or operating heavy machinery and [the] basis for reaching the opinion that Dare could not safely do either.

Defendants concede, however, that Dr. Martin is qualified to testify about the role of an MRO.

[19] As the court previously discussed in relation to Dr. Chen, neither a lack of pertinent publications nor inexperience as an expert witness renders an expert unqualified to testify.  *See Van Winkle*, 82 F.4th at 379 (citing FED. R. EVID. 702 advisory committee's note to 2000 amendment); *Sexton*, 484 F. Supp. 3d at 334.  Accordingly, the court rejects Defendants' arguments on these grounds.

certification, and he obtained a certification as an Evaluator of Disability Impairment Rating from the International Academy of Independent Medical Examiners.   In terms of his relevant experience, "Dr. Martin has performed many post-job-offer and return-to-work fitness-for-duty examinations and determinations where the safe use of medications or a combination of medications was an issue; and he has performed hundreds of drug screens where he reported a 'potential safety-sensitive issue' involving the use of medications, including opioids."

Nevertheless, Defendants argue that Dr. Martin is unqualified to opine about addiction medicine; Xanax, methadone, and their concurrent effects; and the safety concerns of Dare's working as a welder because such testimony about addiction medicine is "outside of his specialty." Defendants observe that the American Board of Medical Specialties has recognized addiction medicine as a unique subspecialty since 2015, emphasizing that their own expert, Dr. Chen, is an addiction medicine specialist.[20]   They contend that Dr. Martin lacks the specialized expertise that this case allegedly requires because he has never worked as a methadone provider and does not treat patients for drug addiction; he does not treat patients for anxiety or anxiety-related disorders except in short-term, injury-recovery situations; he has rarely prescribed Xanax; and his occasional prescriptions of Xanax are limited to short-term, post-injury recovery situations that are distinct from concurrently taking high-dose methadone and high-dose Xanax.   In particular, Defendants cite a Texas Supreme Court case for the proposition that, while "expert qualifications should not be too narrowly drawn," "given the increasingly specialized and technical nature of medicine, there is no validity, if there ever was, to the notion that every licensed medical doctor

---

[20] Notably, however, "the *Daubert* standards are flexible, and the most important question is not whether one party's expert is more qualified than the other's, but rather, whether an expert's testimony is reliable." *Williams*, 898 F.3d at 625 (quoting *Huss*, 571 F.3d at 455).

should be automatically qualified to testify as an expert on every medical question." *Larson v. Downing*, 197 S.W.3d 303, 303-05 (Tex. 2006) (excluding the plaintiff's expert witness because he had not performed the particular surgery at issue in the case in fifteen years).

As an initial matter, *Larson*—a non-binding, state court case—is readily distinguishable. First, *Larson* arose from a medical malpractice action. *Id.* at 303. As a result, the Texas Supreme Court's analysis centered on a Texas statute that governs expert testimony in medical malpractice actions and is inapplicable to this ADA case.[21]  *See id.* Second, as a state court case, *Larson* naturally did not apply Federal Rule of Evidence 702.[22]  *See generally id.*

Moreover, while the court agrees that a medical degree alone does not unequivocally qualify a doctor as an expert—particularly in cases involving nuanced medical issues—Dr. Martin's education, training, and experience qualify him to testify in the case at bar. Indeed, as the EEOC emphasizes, Dr. Martin is not testifying outside of his specialty. Instead, Dr. Martin's testimony concerns duties that he performs on a regular basis as an MRO and when performing fitness-for-duty evaluations. The EEOC also points out that Defendants' own expert, Dr. Chen, has several of these so-called deficiencies that Defendants maintain should disqualify Dr. Martin. For example, like Dr. Martin, Dr. Chen is not licensed to prescribe methadone for the treatment of addiction and has never worked in an MAT program.[23]  Dr. Chen likewise acknowledged that,

---

[21] *See* TEX. CIV. PRAC. & REM. CODE ANN. § 74.401(c)(2) (West 2003) (directing courts to consider, among other things, "[i]n a suit involving a health care liability claim against a physician for injury to or death of a patient . . . whether, at the time the claim arose or at the time the testimony is given, the witness . . . is actively practicing medicine in rendering medical care services relevant to the claim.").

[22] In fact, *Larson* does not cite Texas Rule of Evidence 702, the state's analogue to Federal Rule of Evidence 702.  *See generally id.*

[23] For that matter, Defendants' MRO, Dr. Starkey, is similarly not licensed to prescribe methadone for addiction treatment and has never worked in an MAT program.

akin to Dr. Martin, he "lacks experience with prescribing Xanax regularly, prescribing methadone for addiction treatment, or prescribing the two medications together," and he also "rarely" prescribes Xanax.  Taking all of this into account, as discussed above in relation to Dr. Chen, the court rejects the notion that Dr. Martin must have specific experience and training matched precisely to the situation at issue.  *See Van Winkle*, 82 F.4th at 379.

Furthermore, while Dr. Martin does not practice addiction medicine, he demonstrates sufficient familiarity with various issues in addiction medicine.  For example, since 2018, Dr. Martin has been a member of the Opioid Member Advisory Group for the American Academy of Family Physicians, and he previously served on the Opioid Task Force for the American College of Occupational & Environmental Medicine ("ACOEM").  Dr. Martin also has experience with treating patients taking both Xanax and methadone, confirming during his deposition testimony that he "[has] several patients that are currently doing safety-sensitive position work that are on those two medications [Xanax and methadone]."  Furthermore, the EEOC posits, and the court agrees, that Dr. Martin's deposition testimony illustrates his knowledge of Xanax and its effects, including:  the conditions that Xanax is prescribed to treat; the effects of Xanax, including sedating effects and depressing effects on the central nervous system; dosing ranges for Xanax; and Xanax's interactions with other drugs with similar depressant-type effects, including opioids like methadone.  *See* #79-7 at 112:1-117:11; 118:15-121:5.  Thus, Defendants' reliance on *Larson* fails to persuade the court that Dr. Martin is unqualified to provide expert testimony in this case.[24]

---

[24] Defendants also argue that, "[l]ike the physician-expert excluded in *Tanner* [*v. Westbrook*, 174 F.3d 542, 547-48 (5th Cir. 1999)]," another medical malpractice case, Dr. Martin lacks the "more fitting background" and "specialized knowledge" that is required in order for him to be qualified to opine on the specific questions that this case presents.  As detailed above, Dr. Martin's experience demonstrates that he has a sufficiently "fitting background" that qualifies him to opine on the issues in the present case.

Defendants next assert that Dr. Martin is unqualified because he conceded that only 3-4 percent of his patients are welders.[25]   The EEOC responds that defense counsel directed Dr. Martin to consider only the number of welders that he treats for "[i]njury care alone."  Thus, the EEOC explains, Dr. Martin's estimation "pertains only to the work-related injury or illness component of his practice, and not to the services he provides as [an] MRO and in performing fitness-for-duty determinations."   In any event, for the reasons stated above, as well as Dr. Martin's testimony that he treats other patients who take Xanax and methadone while working in safety-sensitive occupations—including construction workers, meat-packing workers, and a transport driver—the court remains convinced that Dr. Martin is qualified to testify in this case.

2.    Dr. Martin's Opinions Are Reliable

a.    Dr. Martin's Testimony Does Not Contradict His Opinions

Next, Defendants assert that Dr. Martin's testimony should be excluded because, for various reasons, his opinions are not the result of reliable principles and methods.  In particular, Defendants take issue with a number of opinions in Dr. Martin's report and addendum, asserting that these conclusions are either inconsistent with or contradicted by Dr. Martin's deposition testimony.  For example, Defendants claim that Dr. Martin's opinions that "[i]t is not possible for a[n] [MRO] to make a determination of fitness for duty" and "[t]he fact here that the MRO seemed to make a judgment with regard to the fitness for duty is something that is not standard practice for a[n] [MRO] to undertake" are unreliable because he contradicted these conclusions when testifying:  "[A]s an MRO, we have the ability to evaluate somebody's fitness for duty."

---

[25] The court notes that Dr. Martin estimated that the percentage was "4 or 5 percent."

Here, the court agrees with the EEOC that Defendants' argument "misconstrue[s]" Dr. Martin's testimony.  Indeed, in the sentences immediately following the portion of Dr. Martin's deposition testimony that Defendants highlight, Dr. Martin elaborates:

> The MRO works as a forensic function.  It's not a medical function.  *It's not a fitness-for-duty determination*.  In order to make a fitness-for-duty determination, [you] have to look at the individual's history and the individual's physical examination findings vis-a-vis the job description to make the determination of whether they're fit for that job or not, and it's not something that you can decide just based upon an MRO interview.

After examining the entire paragraph, the court determines that Dr. Martin was merely explaining that while a physician who is an MRO could evaluate a potential employee's fitness for duty, the MRO would need to perform the requisite steps of a fitness-for-duty evaluation in order to do so. In other words, in Dr. Martin's opinion, merely completing the usual duties of an MRO cannot supplant a fitness-for-duty evaluation.  Thus, considering the full context of Dr. Martin's testimony, the court is unconvinced that Dr. Martin contradicted himself in this instance.

Defendants also assert that Dr. Martin's statement that the decision of whether to report a potential safety-sensitive concern is "based on the likelihood of the event and the potential magnitude of harm" is unreliable because he provides no support for this opinion.[26]  Defendants also claim that Dr. Martin contradicts this opinion in his testimony discussing the identification of safety-sensitive situations, the MRO's duty to report safety-sensitive concerns, the MRO's duty to report medically accurate information, and the lack of rules or guidelines prohibiting the MRO

---

[26] The EEOC retorts that Dr. Martin's opinion is not unsupported because he cites to MROCC guidance regarding whether to report a "potential safety sensitive concern."  Indeed, while Dr. Martin's report does not directly attribute the aforementioned opinion to MROCC, he states in his report: "[MROCC] for example suggests that the MRO should not report every possible concern.  Doing so would unnecessarily inconvenience donors and employers and infringe on the donors' privacy."  The court accordingly detects no reason to determine that this opinion is unsupported.

from disclosing safety-sensitive concerns.  The court, however, agrees with the EEOC that Dr. Martin's testimony does not contradict his written opinions.  In fact, Dr. Martin's testimony provides an example of an MRO evaluating "the potential magnitude of harm," as he explains that "[t]here also can be medications that are disclosed . . . that potentially could rise to the level of a safety sensitive concern, not only just the name of the medication, but in some cases, the dosage and the interactions that may exist between multiple different medications that are disclosed." Here, Dr. Martin describes certain factors, like dosages and interactions with other medications, that can influence his determination of whether a potential safety-sensitive concern exists.  Thus, Dr. Martin's deposition testimony clarifies, rather than contradicts, his written opinion.

Defendants further assert that Dr. Martin's deposition testimony regarding reporting safety-sensitive concerns is contradicted by his written opinion.[27]  In response, the EEOC notes that while Dr. Martin acknowledged the "duty of an MRO to report out that there is a 'potential safety concern,'" he did not condone an MRO's reporting of confidential information.  In fact, Dr. Martin explained that when he has "indicated a potential safety-sensitive issue on hundreds of drug tests, if not a thousand," "[his] language has always been consistent that there was identified a potential safety-sensitive issue or concern."  Although he explained that an MRO may become aware of a potential safety concern based on information he learns about the patient's medication dosages and interactions, Dr. Martin never stated that he then discloses the patient's medications and dosages when reporting a potential safety concern.  In other words, Dr. Martin's deposition testimony merely clarified that, while he adheres to his duty to report potential safety concerns,

---

[27] Specifically, Defendants object to Dr. Martin's opinion that "[t]he proper way for this to be reported out to the [employer] would be 'negative-potential safety sensitive concern identified.'"

he does not provide other, confidential medical information to employers.  Thus, rather than undermining his opinion about the proper method for reporting potential safety concerns, Dr. Martin's deposition testimony instead bolsters and expands upon his written opinion.

Defendants next take issue with Dr. Martin's opinion that "the largest error that has occurred here" was Defendants "ma[king] an automatic determination that just because this gentleman was on a prescription medication of methadone that somehow that was directly a link to not being fit for the job and having some level of impairment."  Defendants assert that this opinion is inconsistent with Dr. Martin's acknowledgment that drug testing can alleviate concerns about the dangers of meat-packing facilities by making workplaces healthier and safer.  The court is unpersuaded by this argument.  Dr. Martin merely stated that drug-testing programs could play "a role" and "help with" "mak[ing] workplaces healthier and safer," not that he believes that relying entirely on drug tests (and making automatic determinations based on their results) is the only method that will ensure that these facilities remain safe.  Thus, the court declines to find that Dr. Martin's aforementioned opinion is unreliable on this basis.

Defendants also object to Dr. Martin's opinions that "many individuals who have been prescribed methadone for methadone maintenance purposes are actually able to do quite well in a variety of physically and mentally demanding occupations," and "[o]ne should not automatically make an erroneous assumption that just because the individual is on these medications that this would necessarily be an automatic disqualifier."  Specifically, Defendants claim that these opinions are unreliable because Dr. Martin also admitted that:  (1) combining Xanax with drugs with similar depressant-type effects such as narcotics-opioids, including methadone, poses a

36

medical concern; and (2) the depressing effects arising from the interaction between Xanax and narcotics-opioids "would be not necessarily just additive but potentially exponential."

The court, however, is unconvinced that Dr. Martin's opinion and deposition testimony are inconsistent.  Rather, Dr. Martin's testimony explains why concurrent prescriptions of methadone and Xanax can be concerning, but he later elaborates on factors that he would consider when evaluating a patient taking 8 milligrams of Xanax and 90 milligrams of methadone a day:

> So I think it depends on variabilities in the circumstances.  So if somebody had just recently started those medications, I think I would be more concerned compared to somebody that has been on those medications for a number of years.  I also would be concerned about any other medications besides those two that might be more of a short-term more of an acute type of situation, and, again, that has to do with regards to the metabolism of the medications and how the body handles those things, so obviously there's some variability with that, but the general concerns would be . . . depressing effects but then the timing as far as how long they've been on the prescriptions, if there's been any dosing changes recently. . . .

In other words, Dr. Martin's elaboration in his deposition testimony supported, rather than contradicted, the assertion that he would not automatically report a potential safety concern based merely on knowledge of a prescription of either Xanax or methadone (or both).  He testified that, instead, he would consider various factors, including how long the patient has been taking the medication(s), whether other medications are involved, the patient's metabolism, and whether the patient's dosages had been adjusted recently.  Thus, Dr. Martin's testimony establishes that, while he recognizes why there might be cause for concern when examining a patient taking both Xanax and methadone, rather than making an automatic determination about the patient's ability to

perform the work in question, he relies on a holistic approach that considers multiple variables specific to that patient.[28]  Such testimony is, accordingly, consistent with his written opinion.

Additionally, Defendants claim that Dr. Martin's opinions are unreliable because he illustrated his alleged "unfamiliarity" with pain and addiction medicine by purportedly contradicting himself when testifying about Xanax dosages.  In particular, Defendants point to a section of Dr. Martin's deposition testimony where he stated that "most of the recommendations . . . [are] to start with a lower dose, .25 milligrams, . . . and then most of the recommendations . . . suggest[ ] that you have to titrate that up," but then he later added that, according to "the guidance documents," "[t]herapeutic doses [of Xanax] . . . typically go anywhere from 1 milligram up to 10 milligrams per day . . . ."  In response, the EEOC retorts that Dr. Martin's testimony establishes his understanding of "the need to start some medications at sub-therapeutic doses and then titrate up to the correct therapeutic dose."  Pertinently, Dr. Martin prefaced the testimony at issue by stating that he can describe "what the recommendations are in starting medication and then how one eventually gets to a therapeutic dose," thereby indicating that there is (or may be) a distinction between a nontherapeutic starting dose and an eventual therapeutic dose.  Viewing Dr. Martin's testimony in this light, it seems clear that he states that .25 milligrams is a common nontherapeutic starting dose for Xanax, whereas therapeutic

---

[28] Contrary to Defendants' assertion, Dr. Martin did not testify that he had "significant concerns" about a patient taking the dosages of Xanax and methadone prescribed to Dare at the time he applied for the position with Defendants.  Instead, Dr. Martin explicitly stated that his concerns would "depend[ ] on variabilities," as described above.

doses typically begin at 1 milligram.  The court is thus unpersuaded that this testimony presents an inherent contradiction or that Dr. Martin's opinion is unreliable.[29]

      b.    <u>Dr. Martin's References to MRO Materials, HIPAA, and DOT Regulations Do Not Render His Opinions Unreliable</u>

Defendants also generally contend that several of Dr. Martin's opinions[30] are unreliable because he did not rely on medical publications or literature other than his "general knowledge of the [MRO's] handbook and the training documents and MRO syllabus."[31]  Defendants assert

---

[29] Defendants also assert that Dr. Martin's testimony that an employer could reasonably expect an MRO to provide medically accurate results and information is unreliable because it is inconsistent with his written opinion.  Similarly, Defendants assert that Dr. Martin's acknowledgment that he takes certain steps to ensure that his patients do not misuse or abuse Xanax "further undermin[es]" Dr. Martin's testimony.  Defendants do not, however, explain their arguments regarding either statement.  Without more information, the court cannot conclude that these statements contradict or undermine Dr. Martin's opinion.

[30] In particular, Defendants take issue with Dr. Martin's opinions discussing the information that an MRO should and should not disclose, as well as his opinion that an MRO's longstanding relationship with an employer does not affect the employer's duty to conduct an individual assessment of a prospective employee.  Defendants also challenge Dr. Martin's assertion that, according to organizations like the ACOEM, it is not "standard practice" for an MRO to make a judgment about an individual's fitness for duty, as well as his opinion that it is not "scientifically possible to make a determination of impairment based upon an MRO interview as this would require an in-person evaluation, which would look into the individual's history and perhaps even look[ ] at other medical records in order to make that determination."

[31] In a similar vein, Defendants argue that Dr. Martin's opinion that Dr. Starkey's "MRO review documentation seems to be somewhat substandard" should be stricken because he does not cite a document or specific standard.  Specifically, Dr. Martin's report states that the MRO documentation appears "substandard" because he "cannot tell when there was an attempt to contact from the MRO to the donor himself for the typical MRO review of the laboratory positive case nor does it say where the information that is written on the MRO interpretation was obtained."  Despite Defendants' assertions otherwise, Dr. Starkey's note that Dare "has prescriptions" fails to clarify how or when Dr. Starkey obtained this information about Dare's prescriptions.

Moreover, Dr. Martin's opinion is not, as Defendants contend, merely based on his own subjective opinion or *ipse dixit*.  Dr. Martin has significant experience as a certified MRO—indeed, he has been certified as an MRO since 1994.  In his deposition testimony, Dr. Martin also elaborates that "most of the MRO training and most of the recommendations suggest that the MRO should have a direct conversation with the donor . . . . [T]he current recommendation for most best practices on MRO review is to actually call the pharmacy and talk to the pharmacist to verify the prescription . . . ."  Based on this information, as well as Dr. Martin's other experience that is discussed in more detail below, the court will not strike Dr. Martin's opinion that the MRO documentation in this case appears "somewhat substandard."

that such vague references are supported by nothing more than Dr. Martin's own *ipse dixit*, and they criticize him for failing to attach his sources or provide specific citations.   Notably, Defendants cite no authority for the proposition that an expert lacks reliability when he fails to attach or provide specific citations to his sources.[32]

As the court noted when discussing Dr. Chen's opinions, Rule 702 states that an expert may be qualified by, *inter alia*, his "knowledge."   Furthermore, when determining whether an expert's opinion is admissible, the court considers whether the expert's "specialized knowledge will help the trier of fact to understand the evidence or to determine a fact in issue."   FED. R. EVID. 702(a).   Thus, Rule 702 plainly contemplates that an expert may properly rely upon his knowledge, including generally accepted knowledge in his field of practice.   The EEOC emphasizes that Dr. Martin has extensive knowledge of the role of an MRO due to his experience as a practicing certified MRO, as well as his service as a former president of the ACOEM, a teacher and author of resources related to the MRO role, and a member of the MROCC board of directors.   The EEOC further responds that, "in addition to his vast knowledge and experience,"

---

[32] Indeed, Federal Rule of Civil Procedure 26(a)(2)(B), which governs expert witness reports, contains no such requirement.   *See* FED. R. CIV. P. 26 (a)(2)(B) ("The report must contain:  (i) a complete statement of all opinions the witness will express and the basis and reasons for them; (ii) the facts or data considered by the witness in forming them; (iii) any exhibits that will be used to summarize or support them; (iv) the witness's qualifications, including a list of all publications authored in the previous 10 years; (v) a list of all other cases in which, during the previous 4 years, the witness testified as an expert at trial or by deposition; and (vi) a statement of the compensation to be paid for the study and testimony in the case.").

Defendants cite *Burleson v. Texas Department of Criminal Justice*, 393 F.3d 577, 587 (5th Cir. 2004) (quoting *General Electric Co.*, 522 U.S. at 146) for the proposition that "[a] court may rightfully exclude expert testimony where a court finds that an expert has extrapolated data, and there is 'too great an analytical gap between the data and the opinion proffered.'"   The court agrees with the EEOC that *Burleson*—which involved the exclusion of a toxicologist because his opinion "was based on speculation, guesswork, and conjecture"; his theory had never been submitted to peer review; and the potential rate of error for his theory was high and the theory was not generally accepted within the scientific community—bears no resemblance to the case at bar.   *See id.*

Dr. Martin's opinions are "premised on professional and medical publications, including the MROCC handbook and other professional resources he has been involved with drafting, overseeing, and teaching."  Indeed, as the EEOC notes, Dr. Martin consulted the MROCC handbook during his deposition.  The court is accordingly satisfied that Dr. Martin's opinions are reliable, given his references to relevant source material and his intimate familiarity with an MRO's role and responsibilities through his knowledge and experience as a practicing MRO, a leader in MRO-related organizations, and an author of MRO resources.

Defendants further complain that Dr. Martin's opinions relying on the American Pain Society ("APS") and the American Academy of Pain Medicine's ("AAPM") position statement regarding opioid users' fitness for duty, ADA recommendations on individualized assessments of fitness for duty, and ADA and DOT references to a worker's medication use and fitness for duty are unreliable and unsupported by any factual basis or indicia of scientific reliability.  Defendants claim that these opinions are unreliable because Dr. Martin did not, in fact, rely on the sources upon which he purports to rely in drafting his report.  To support this argument, Defendants point to a statement in Dr. Martin's deposition testimony where, when asked if he relied on "any type of medical publications or literature" in drafting his report, he responded:  "Just my general knowledge of what is in the medical review officer's manual and just my general knowledge of MRO training course information."

The court notes that because counsel for Defendants questioned Dr. Martin exclusively about "medical publications or literature," it is possible that Dr. Martin did not reference the ADA and DOT recommendations in his response because he did not consider these resources to be included in the category of "medical publications or literature."  Moreover, Dr. Martin explains

in his report that "[m]any of these recommendations and guidances" provided by MROCC and

AAMRO "are taken from the Federal Government DOT procedures that govern drug testing," so

it is plausible that Dr. Martin's reliance on "the medical review officer's manual" included some

or all of the DOT recommendations mentioned in his report.  Because the EEOC has established

that it is "more likely than not" that Dr. Martin's testimony "is based on sufficient facts or data,"[33]

while the court acknowledges that Defendants' arguments about the vagueness of Dr. Martin's

sources may provide fodder for cross-examination,[34] the court declines to strike Dr. Martin's

opinions on this basis.

Defendants also challenge Dr. Martin's opinion that an MRO "should never disclose to an

outside entity or party that the donor is taking prescriptions due to privacy concerns.  This is fairly

consistent with the HIPAA privacy rule wherein the MRO should limit disclosure of personal

health information to the minimum necessary to accomplish the intended purposes."  Defendants

argue that this opinion is unreliable because Dr. Martin "did not rely on the HIPAA privacy rule"

---

[33] In fact, it is not as if Defendants claim that Dr. Martin's sources are fabricated or do not support his opinions.  For example, the court located an article discussing the results of a study where the APS and the AAPM "commissioned a systematic review of the evidence on chronic opioid therapy [("COT")] for chronic noncancer pain."  Roger Chou et al., *Clinical Guidelines for the Use of Chronic Opioid Therapy in Chronic Noncancer Pain*, 10 J. OF PAIN 113, 113 (2009).  In relevant part, the article concluded that, "[i]n the absence of signs or symptoms of impairment, no evidence exists to suggest that patients maintained on COT should be restricted from driving or engaging in most work activities."  *Id*. at 122. Additionally, 49 C.F.R. § 40.141—a regulation dictating the steps an MRO must take when verifying drug test results for an employee or potential employee subject to DOT regulations—supports Dr. Martin's statement that the DOT "encourage[s] dialogue between the clinician doing the assessment and the prescriber . . . ."  *See* 49 C.F.R. § 40.141(b)(1) ("If the employee asserts that the presence of a drug or drug metabolite in his or her specimen results from taking prescription medication . . . . You may contact the employee's physician or other relevant medical personnel for further information.").

[34] *See* FED. R. EVID. 702 advisory committee's note to 2023 amendment ("[O]nce the court has found it more likely than not that the admissibility requirement has been met, any attack by the opponent will go only to the weight of the evidence.").

and "did not sufficiently review the HIPAA privacy rule to form the basis of his opinion." The EEOC responds that this argument is "nonsensical" because "[e]very licensed physician is required to know the requirements of HIPAA and the applicability of the st[a]tute to their practice." The court observes that Dr. Martin's opinion does not purport to describe HIPAA and its requirements, but instead merely references HIPAA as an illustrative example when discussing the limitations on the information that an MRO may disclose. Accordingly, the court detects no basis to deem this opinion unreliable.

Finally, Defendants criticize Dr. Martin's opinions regarding the limitations on the medical information that an MRO may disclose to an employer as being "likely inconsistent with the recommendations and guidance of MROCC and AAMRO, upon which Dr. Martin relies, that incorporate the [DOT] procedures governing drug testing." Defendants also rebuke Dr. Martin for opining that MROs are subject to the limitations of HIPAA because HIPAA does not apply to MROs acting under 49 C.F.R. § 40.327, a DOT regulation that is incorporated in the MROCC and AAMRO guidance. According to Defendants, this so-called "conflict" between Dr. Martin's opinions and the sources he relies upon should result in the exclusion of his opinions.

In response, the EEOC maintains that 49 C.F.R. § 40.327 is inapplicable because "[t]he welder position at issue in this case was not a DOT-regulated position."[35] Moreover, Dr. Martin acknowledged that he is familiar with the requirements of disclosing medical information under § 40.327, but he noted that the circumstances warranting disclosure are "extremely rare."[36] In

---

[35] As noted above, the regulation appears to be limited to certain transportation employers and employees. *See* 49 C.F.R. § 40.1(b) ("This part concerns the activities of transportation employers, safety-sensitive transportation employees . . ., and service agents.").

[36] Under 49 C.F.R. § 40.327(a), an MRO "must . . . report drug test results and medical information you learned as part of the verification process to third parties without the employee's consent

43

fact, in his 29 years of serving as an MRO, Dr. Martin has never disclosed medical information pursuant to § 40.327.  The EEOC also emphasizes that Dr. Martin is well-versed in the role of an MRO, including determining when DOT regulations do or do not apply to a particular position. The court is accordingly unconvinced that the parties' dispute over the applicability of DOT regulations to this case renders Dr. Martin's opinions unreliable.

c.      <u>Dr. Martin's Opinions Are Not "Unsubstantiated"</u>

Defendants next contend that Dr. Martin's personal experience and observations cannot lend sufficient support to render his opinions reliable.  Defendants specifically object to Dr. Martin's opinion that "many individuals who have been prescribed methadone for methadone maintenance purposes are actually able to do quite well in a variety of physically and mentally demanding occupations," as well as his closely related opinion that there are "many examples historically where individuals who are or were taking these types of medications were or are able to operate quite well within the context of a safety sensitive job."  They emphasize that Dr. Martin's opinions are based solely on his "experience with a few individuals" and that he does not reference any specific articles or publications that support these opinions.  Defendants cite non-binding authority—*Chapman v. Maytag Corp.*, 297 F.3d 682, 688 (7th Cir. 2002)—for the proposition that "[p]ersonal observation is not a substitute for scientific methodology and is insufficient to satisfy *Daubert*'s most significant guidepost," insisting that Dr. Martin's opinions "amount to nothing more than unverified statements unsupported by scientific methodology."

---

if you determine, in your reasonable medical judgment, that:  (1) The information is likely to result in the employee being determined to be medically unqualified under an applicable DOT agency regulation; or (2) The information indicates that continued performance by the employee of his or her safety-sensitive function is likely to pose a significant safety risk."  49 C.F.R. § 40.327(a).

At the outset, the court has already rejected the notion that experience alone cannot render an expert's opinion reliable, and Defendants' citation to *Chapman* does not convince the court otherwise.  In *Chapman*, the plaintiff filed a wrongful death lawsuit after a defective kitchen range electrocuted and killed her husband.  *Id.* at 684.  The pertinent issue in the case arose when the plaintiff's expert posited a theory about electrical "shorts," despite the expert's limited electrical engineering qualifications, his failure to "conduct any scientific tests or experiments in order to arrive at his conclusions," and his inability to demonstrate "that the scientific community recognizes the concept of [his theory] or the principles on which this purported phenomenon is based."  *Id.* at 687.  The United States Court of Appeals for the Seventh Circuit concluded that, because the expert failed to satisfy the "*Daubert* guideposts for reliability" in that he "presented no proof that his theory is generally accepted in the scientific community" and "his theory [was] novel and unsupported by any article, text, study, scientific literature or scientific data produced by others in his field," the district court erred in admitting his testimony.  *Id.* at 688.

As the EEOC points out, however, Dr. Martin's reliance on his clinical observations of his patients who work in safety-sensitive occupations does not involve asserting a novel, unproven theory that is "the only basis for establishing a methodology."  Rather, Dr. Martin's opinion that individuals with prescriptions akin to Dare's can work in safety-sensitive positions is rooted not only in his own experience with his patients, but is also, as the EEOC states, "supported by the numerous resources he has studied, authored, taught, and overseen."[37]  In short, Dr. Martin's

[37] Indeed, Dr. Martin's report includes the following quote from the MROCC Guide to Drug Testing:  "[D]rug tests are generally unreliable measures of drug related impairment.  Impairment is dependent upon the drug use, the dose, time since last use, route of administration, and is subject to individual variability among other factors."  While not specifically referencing the ability to work in a safety-sensitive position, this statement demonstrates that a patient's impairment is based upon

statement regarding his experience with patients who are taking medications like Dare's and able to perform in safety sensitive positions is not a "theory" that remains to be proven.  The court is thus unpersuaded by Defendants' arguments that Dr. Martin's references to his own experience render his opinions unreliable.[38]  For the reasons discussed above, the court is satisfied that Dr. Martin has provided a sufficient explanation of the bases for his experience-based testimony such that the court is not merely "taking [his] word for it."  *Andrews v. Rosewood Hotels & Resorts, LLC*, 575 F. Supp. 3d 728, 734-35 (N.D. Tex. 2021) (internal citations omitted) (quoting FED. R. EVID. 702 advisory committee's note to 2000 amendment).

In a similar vein, Defendants cite *Ueland v. United States*, 291 F.3d 993, 997 (7th Cir. 2002), to assert that Dr. Martin's testimony is inadmissible because he "has no rational baseline from which to work other than his subjective beliefs based upon his limited knowledge of the

---

individualized factors.  Thus, it indicates that mere knowledge of prescriptions is insufficient to evaluate the patient's level of impairment.  In turn, the concept that determining a patient's level of impairment requires an individualized assessment of his unique characteristics supports Dr. Martin's conclusion that some patients may be able to work in safety-sensitive positions despite taking certain medications.

[38] Defendants also rely on *O'Conner v. Commonwealth Edison Co.*, 13 F.3d 1090, 1107 (7th Cir.), *cert. denied*, 512 U.S. 1222 (1994), which is cited in *Chapman*.  *O'Conner* similarly bears little relevance to the case at bar, beyond the fact that it involved a physician who was designated as an expert witness.  *Id.* at 1094.  Like *Chapman*, the expert witness in *O'Conner* articulated a theory—specifically, that he could conclude, simply by observing the characteristics of the plaintiff's cataracts, whether the cataracts were caused by exposure to radiation—that the court determined was devoid of support, based on the expert's paucity of "personal study or experiments" and the fact that his method and conclusion were not supported by the authors on which he claimed to rely.  *Id.* at 1106-07.  The court further reasoned that the expert's treatment of five patients with radiation-induced cataracts over his twenty years of practice was insufficient to support his theory.  *Id.* at 1107 n.19.  In other words, the mere fact that the expert had previously treated patients whose cataracts had been caused by radiation did not logically confirm that he could determine the causation of the cataracts based upon nothing more than observing their characteristics.  Unlike *O'Conner*, however, in this case, Dr. Martin's "theory" is confirmed by the fact that he has actually treated patients who were or are taking both methadone and Xanax while working in safety-sensitive positions as construction workers, meat-packing workers, and transport drivers.  In short, there is no aspect of Dr. Martin's statement that remains "unproven" based upon his experience with his own patients.

objective medical evidence in Dare's medical record." In *Ueland*, a personal injury case arising from an automobile collision, the Seventh Circuit concluded that expert testimony regarding the causation of the plaintiff's injuries was not sufficiently reliable because neither expert had personal knowledge of the plaintiff's medical condition before the collision. *Id.* at 998. The court clarified that the experts' testimony about the plaintiff's medical condition prior to the collision would be admissible "only if based on sufficient facts, analyzed using medically appropriate methods by a person competent to give an opinion." *Id.* While the appellate court noted that one of the plaintiff's purported experts—a college-dropout-turned-acupuncturist—would likely "flunk[ ] this test" when the case was remanded for a new trial, the plaintiff's other expert, a physician, "may or may not pass, depending on what evidence he gathered and whether his fields of expertise include back and soft-tissue injuries." *Id.*

Importantly, *Ueland* does not stand for the proposition that a medical expert may never offer reliable testimony based upon medical records, as Defendants seem to suggest. Rather, applying the parallels of *Ueland* to this ADA case, Dr. Martin may opine as an expert so long as his testimony is "based on sufficient facts, analyzed using medically appropriate methods." *Id.* As the EEOC notes, Dr. Martin's opinions are supported by the facts of this case, as found in Dare's medical records and the testimony of Dare's treating physicians. The EEOC asserts that these facts are "of the type usually relied upon by experts."[39] Accordingly, the court is satisfied

---

[39] Although the EEOC does not provide support for the proposition of what experts in Dr. Martin's position "usually rely upon," Defendants likewise cite no germane authority indicating that Dr. Martin's sources are inadequate or that his methodology is unreliable. In fact, as a general matter, "[a] methodology often allowed under the *Daubert* rubric is for an expert to base his or her opinion on a review of records supplied by others (including other expert reports) and, based on the expert's professional training and knowledge, render an expert opinion within his or her area of expertise." *Rushing v. Yeargain*, No. 19-653-JWD-SDJ, 2022 WL 4545612, at *10 (M.D. La. June 10, 2022).

that Dr. Martin's consultation of Dare's medical records, the treating providers' testimony, and his own experience provide a "rational baseline" from which he may testify.[40]

> d.     Dr. Martin Does Not "Parrot" Dare's Treating Physicians

Defendants also argue that Dr. Martin's "opinions regarding Dare's psychological or physical abilities to work as a welder in a safety sensitive position at Dragon Rig" are unreliable because he impermissibly "parrots" Dare's treating providers.  The EEOC disagrees with these assertions, insisting that "Dr. Martin does not rely primarily or exclusively on the opinions of Dare's treating physicians" and "he certainly does not 'parrot' them."

"[E]xpert testimony based solely or primarily on the opinions of other experts is inherently unreliable."  *Hunt v. McNeil Consumer Healthcare*, 297 F.R.D. 268, 275 (E.D. La. 2014).  "It is only when the expert undertakes some independent investigation of the underlying opinions that his testimony may be considered reliable."  *Id.*  Simply put, a testifying expert may not "act as a mere conduit" for another expert's opinion.  *Ramirez v. Escajeda*, No. EP-17-CV-00193-DCG, 2021 WL 1131721, at *14 (W.D. Tex. Mar. 24, 2021).  The "[l]ack of [Dr. Martin's] originality is not dispositive," but "[t]he crucial issue is whether [he] independently evaluated or verified the opinions upon which he relies."  *United Servs. Auto. Ass'n v. Wells Fargo Bank, N.A.*, No. 2:18-CV-00366-JRG-RSP, 2019 WL 6896674, at *3 (E.D. Tex. Dec. 18, 2019) (quoting *Hunt*, 297 F.R.D. at 275).  An expert cannot parrot the opinions and conclusions of other experts whose testimony is not subject to cross-examination.  *Hunt*, 297 F.R.D. at 275.

---

[40] Moreover, as explained in more detail below, Dr. Martin does not purport to offer a definitive opinion that Dare himself could unquestionably be cleared to work in a safety-sensitive position as a welder.

As an initial matter, it is unclear precisely which opinions Defendants accuse Dr. Martin of "parroting." Indeed, his report does not discuss Dare's "psychological or physical abilities to work as a welder in a safety sensitive position at Dragon Rig." Instead, Dr. Martin cautions that "[o]ne should not automatically make an erroneous assumption that just because the individual is on these medications that this would necessarily be an automatic disqualifier." Such a generalized statement clearly does not comment on Dare's particular abilities.

Dr. Martin also opines in his addendum that "[i]t is possible" for a patient to take both methadone and Xanax and "not experience any of the above-listed side effects or, at least, not experience them to any significant degree." He continues: "From the records, and Dr. Hopper's testimony, this appears to be the case with Mr. Dare . . . ." These statements, however, are not parroting. While Dr. Martin relies on Dr. Hopper's testimony, he demonstrates that he independently evaluated Dr. Hopper's statement by also consulting Dare's medical records. In fact, his report states that he reviewed Dare's "medical documentations."

Moreover, Dr. Martin's opinion also explicitly relies on his own experience as an occupational medicine physician and licensed MRO, stating that "[t]here are many examples historically where individuals who are or were taking these types of medications were or are able to operate quite well within the context of a safety sensitive job." He elaborated in his deposition testimony that he has treated patients who worked in safety-sensitive positions—specifically, construction workers, meat-packing workers, and a transport driver—while concurrently taking such medications. Thus, Dr. Martin's testimony confirms that the statements in his report do not result from merely "taking Dr. Hopper's word for it." Rather, Dr. Martin references his personal experience with his own patients to corroborate his opinion.

49

Lastly, while Dr. Martin notes that "Dr. Hopper specifically testified that he believed [Dare] could perform the work of a welder while taking both alprazolam and methadone at the dosages he was prescribed in 2019 and 2022," nowhere does Dr. Martin authoritatively claim that Dare can work as a welder.  In fact, Dr. Martin acknowledges that in order to determine whether Dare could perform the essential functions of the welder position, a "medical professional must at a minimum examine [Dare], review his history, discuss with him the medication use and evaluate the potential effects of the medication(s)."  Thus, applying the standard that he espouses, because he has not personally examined Dare, Dr. Martin would not consider himself qualified to opine definitively on Dare's psychological or physical abilities to work as a welder.  The court is unconvinced that Dr. Martin contravenes his own protocol by unreservedly endorsing Dr. Hopper's opinion.[41]  In short, Dr. Martin does not appear to "recite" or "parrot" Dr. Hopper's opinions (or those of Dare's other providers).[42]  In sum, the court is satisfied that Dr. Martin's opinions have sufficient indicia for reliability.  *See Williams*, 898 F.3d at 625.

### 3.   Dr. Martin's Opinions Properly Apply the Facts in This Case

Next, Defendants argue that Dr. Martin improperly ignores certain factual evidence. Specifically, they argue that Dr. Martin's opinions fail to account for the following facts: (1) Dare

---

[41] Indeed, when asked if he would have disclosed a safety concern in this case, Dr. Martin replied:

I'm not sure I can answer that question because I have not done an MRO interview with Mr. Dare, so if I would have gone through that process, I would have asked him more questions about those medications, for example, how long have you been using them, do you have any issues with them, et cetera, et cetera.  I simply can tell you that I may or may not have made a safety-sensitive potential issue concern raised to the employer representative.

[42] Notably, neither Dr. Martin's report nor his addendum explicitly references Dr. Carroll, the medical director at Best Recovery Healthcare, or Mata, Dare's counselor at his MAT program.

was concurrently taking high-dose methadone and high-dose Xanax; (2) these drugs have sedating effects and, when taken concurrently, can have an exponential effect; (3) Dr. Starkey could not clear Dare to work in a safety-sensitive position; (4) the job description and work requirements for a welder; (5) Dragon Rig's pre-employment drug screening protocol; and (6) the fact that Dragon Rig's conditional offer of employment was contingent upon Dare's successfully passing a drug screen.

The court is unpersuaded by this argument.  It is apparent from Dr. Martin's opinion and testimony, including specific portions discussed above, that he is keenly aware of Dare's prescriptions and their potential effects.  As for Dr. Starkey's inability to clear Dare to work in a safety-sensitive position, Dr. Martin explicitly testified that an MRO's "forensic" role is distinct from a fitness-for-duty evaluation, demonstrating that he is cognizant of the limitations of Dr. Starkey's role as an MRO.  Next, while it is unclear whether Dr. Martin specifically reviewed Dragon Rig's job description, Dr. Martin nevertheless testified that he has treated welders in his practice, so his opinion appears to be supported by sufficient facts regarding the sort of physical labor that welding entails.  Lastly, it is not evident that Dr. Martin "fail[ed] to accurately account for" either Dragon Rig's drug screening protocol or its stipulation that Dare's employment was contingent on successfully passing a drug screen.  Indeed, in a technical sense, Dare "passed" the drug screen, in that Dr. Starkey specifically marked his drug screen as "negative:  has prescriptions."[43]

_____

[43] Defendants similarly assert that Dr. Martin's opinion should be excluded because he "takes into account legal conclusions regarding Dare's status as [a] 'qualified individual' and Dragon's judgment as to what functions of a job are essential."  The statement that Defendants identify, however, contains no conclusions regarding Dare's qualifications or the essential functions of the position.

Defendants also condemn Dr. Martin for failing to support this opinion with "reasons why it could not be concluded that it was just as possible that [Dragon Rig] was justified in withdrawing the conditional

Defendants also argue that Dr. Martin's opinion is not based on sufficient facts because he "cherry pick[s]" and "adopt[s]" the opinions of Dare's treating providers despite the fact that Dr. Carroll has never met Dare; Mata is not a physician, cannot prescribe medication, and admittedly has little knowledge of Xanax; and Dr. Hopper "did not know that Dare was taking methadone or why he was taking methadone."[44]  Defendants further argue that Dr. Martin "disregards the work by Dr. Starkey as an MRO to come to his recommendation and the deposition testimony of Dr. Starkey, who also cites multiple medical sources to support his decisions as an MRO."  As an initial matter, there is no indication that Dr. Martin ignores this evidence.  A review of the record reveals that he does not rely solely on either Dr. Carroll's or Mata's opinions, specifically also referencing a portion of testimony proffered by Dr. Hopper—who is a physician and had met with and examined Dare multiple times—that he "believed [Dare] could perform the work of a welder while taking both alprazolam and methadone at the dosages he was prescribed in 2019 and 2022."

Furthermore, Dr. Martin does not appear to "disregard" Dr. Starkey's work as an MRO or his deposition testimony.  Indeed, Dr. Martin's opinion demonstrates that he considered these factors, given that he observes in his report:

---

offer of employment," stating vaguely that excluding this opinion is "required by *Daubert*."  It is unclear to the court upon which aspect of *Daubert* Defendants rely.  The court accordingly rejects this argument.

[44] While Defendants make much of Dr. Hopper's initial unawareness of Dare's methadone prescription, they neglect to mention that Dr. Hopper also testified that, even if he had known that Dare was prescribed 90 milligrams of methadone per day, he would not have altered Dare's Xanax prescription because "[c]linically [Dare] was responding and doing well," and "[a]s a matter of fact, his clinical picture improved over the years . . . ."  Defendants also inaccurately state that Dr. Hopper admitted that, if he had known Dare was taking methadone, he would have encouraged Dare to take less Xanax.  Instead, Dr. Hopper stated that concurrent dosages of Xanax and methadone "could concern [him]" because "[s]ome people will report they can't function because of sedation or confusion or incoordination[;] other people do well. . . . So the clinical picture varies quite—quite greatly."

> [T]he MRO review documentation seems to be somewhat substandard insofar as I cannot tell when there was an attempt to contact from the MRO to the donor himself for the typical MRO review of the laboratory positive case[,] nor does it say where the information that is written on the MRO interpretation was obtained.

As for Dr. Starkey's deposition testimony, it is undeniable that Dr. Martin and Dr. Starkey have differing opinions as to the role of an MRO and the types of medical information that an MRO has the discretion to disclose.  Dr. Martin's disagreements with Dr. Starkey on these grounds do not persuade the court that Dr. Martin's opinions improperly apply the facts in this case.[45]

### 4.    Dr. Martin's Opinions Are Relevant

Defendants assert that several of Dr. Martin's opinions should be excluded as irrelevant. Specifically, Defendants criticize Dr. Martin's references to the APS and the AAPM's position statement on opioid users and fitness for duty, ADA recommendations on individualized assessments of fitness for duty, and ADA and DOT references to a worker's medication use and fitness for duty.  Defendants claim that these opinions are irrelevant because "[t]he relevant concern is the concurrent use of high-dose Methadone and Xanax and the ability to perform a safety sensitive position as a welder at Dragon."  The court is unpersuaded by this argument.  On the contrary, the views of certain medical societies, the ADA, and the DOT regarding how opioid prescriptions affect individuals' fitness for duty appear directly relevant to "help[ing] the trier of

---

[45] Defendants also claim that Dr. Martin's testimony should be stricken because his preparation was *de minimus*, and his opinions accordingly lack a sufficient factual basis.  Specifically, Defendants complain that "he did not sufficiently review any relevant medical information concerning pain management, addiction medicine, or the effects of concurrent use of high-dose methadone and high-dose Xanax."  Here, the court agrees with the EEOC that there is no evidence that Dr. Martin's preparation was *de minimus*.  Indeed, Defendants cite no portion of Dr. Martin's reports or testimony to support this contention.  Furthermore, as the EEOC points out, Defendants and Dr. Chen fail to identify the "relevant medical information" that they insist Dr. Martin was required to review.  The court thus rejects this argument.

fact to understand the evidence" or "determin[ing] [the] fact in issue" of whether Defendants acted properly in revoking Dare's conditional offer of employment.  FED. R. EVID. 702(a).

Defendants also argue that Dr. Martin's opinions concerning the role and scope of an MRO are irrelevant because they "do[ ] not make any of the required elements of [the EEOC's] *prima facie* case for disability discrimination under the ADA any more or less true"; "do not make the only legally relevant question—whether Dragon Rig withdrew Dare's conditional offer of employment because of his disability or record of disability—more or less true"; and "do[ ] not address whether Dragon Rig's decision was objectively reasonable based upon the information before it."  In response, the EEOC contends that Defendants themselves "have repeatedly put this issue front and center in this case by claiming that Dr. Starkey 'acted reasonably' or that his actions were 'rational.'"  The court agrees that understanding the role and scope of an MRO will assist the jury with "understand[ing] the evidence" regarding Dr. Starkey's assessment of Dare's drug screen and the role his assessment played in precipitating the present litigation.  Because the role and scope of an MRO are pertinent to understanding how the facts of this case developed, the court rejects Defendants' argument that Dr. Martin's opinions on these topics are irrelevant.

### 5. Defendants' Objections to Certain Conclusions in Dr. Martin's Reports

Defendants also raise objections to specific conclusions in Dr. Martin's report and addendum.  First, Defendants contend that Dr. Martin's statement that "[i]n this particular case, what we have is a laboratory positive report of the presence of methadone" is unreliable because it fails to indicate accurately that Dare's drug screen result was positive for the presence of concurrent high doses of methadone and Xanax.  Defendants express concern that this statement will confuse or unduly prejudice the trier of fact.  The court agrees that this statement is

incomplete because it omits that Dare also tested above the confirmation cutoff quantity for Xanax. While the court declines to find that Dr. Martin's entire opinion and testimony are unreliable as a result of this omission—indeed, it is evident from other sections of Dr. Martin's report, as well as his testimony, that he is aware that Dare was prescribed both methadone and Xanax and that both medications were indicated on Dare's drug screen—the court shares Defendants' concern that this singular statement is misleading and could confuse the fact-finder.  Such a statement certainly will not "help the trier of fact to understand the evidence," FED. R. EVID. 702, and the court may exclude evidence "if its probative value is substantially outweighed by a danger of . . . confusing the issues" or "misleading the jury." FED. R. EVID. 403.  As a result, the court concludes that the particular statement recited above should be stricken from Dr. Martin's report.[46]

In addition, Defendants maintain that Dr. Martin's opinion is unreliable "because there is too much of an analytical gap to transform Dr. Starkey's safety concern guidance into a determination of fitness for duty."  Although Defendants do not identify the specific opinion that this argument references, the court infers that Defendants are concerned with Dr. Martin's statement in his report that "[t]he fact here that the MRO seemed to make a judgment with regard to the fitness for duty is something that is not standard practice for a [MRO] to undertake."

The court is unconvinced that an analytical gap exists with regard to this issue.  The court has already described Dr. Martin's qualifications to opine on the role of an MRO, including his

---

[46] Defendants further allege that Dr. Martin's definition of "safety sensitive" is "fundamentally inconsistent with [his] opinion."  Defendants do not elaborate on this argument.  To the extent Defendants contend that Dr. Martin's definition of "safety sensitive" encompasses the welding position at issue, such a concept does not undermine Dr. Martin's opinion.  Indeed, he specifically states that it is possible for an individual with Dare's prescriptions to perform in a safety-sensitive position.  Accordingly, the court declines to strike Dr. Martin's opinion based on this argument.

three decades as a licensed MRO and his extensive experience with teaching, writing, and serving in leadership positions concerning the role of MROs.  Indeed, Defendants concede that Dr. Martin is qualified to testify about "his understanding of the role of the MRO and the duties and responsibilities of an MRO."  Furthermore, Dr. Martin has multiple facts at his disposal that support his opinion, namely, that Dr. Starkey did not merely communicate a "potential safety concern" to Defendants—as Dr. Martin explains is the standard practice for an MRO—but Dr. Starkey instead provided Defendants with considerably more information, including the precise medications that Dare was prescribed, their sedating effects, and a warning that Dare "cannot work in a safety sensitive position or operate equipment."  Dr. Martin also explains that a fitness-for-duty determination involves assessing multiple types of information "to make the determination of whether [an employee or potential employee is] fit for that job or not."

Thus, it is not too removed from the facts of this case for Dr. Martin to state that Dr. Starkey's warning seemed to constitute a judgment about Dare's fitness for duty, or a "determination of whether [Dare was] fit for that job or not."  Importantly, Dr. Martin does not assert that Dr. Starkey conducted a formal fitness-for-duty evaluation or made an official fitness-for-duty determination; rather, Dr. Martin merely opines that Dr. Starkey "seemed to make a judgment" or "made a judgment" about Dare's fitness for duty.  Accordingly, this statement does not suffer from an "analytical gap" that renders Dr. Martin's opinion unreliable.

Defendants next take issue with Dr. Martin's assertion that, in comparison to Dr. Chen's opinion that no one prescribed Dare's particular types and dosages of medications could be cleared to work in a safety-sensitive position, "[m]ore weight should be given to Dr. Hopper, Mr. Dare's psychiatrist's testimony."  Defendants complain that this is "an unsupported, conclusory statement

that impermissibly invades the province of the jury with empty rhetoric." In response, the EEOC retorts that it is a "logical conclusion that Dare's treating physicians are in a better position to assess his medication needs and symptoms and side effects than Dr. Chen."

Although not addressing this precise scenario, Fifth Circuit precedent makes clear that "[i]t is uniquely within the jury's province to weigh the evidence and make credibility determinations." *Wackman v. Rubsamen*, 602 F.3d 391, 404 n.5 (5th Cir. 2010) (citing *United States v. Parker*, 505 F.3d 323, 331 (5th Cir. 2007), *cert. denied*, 552 U.S. 1221 (2008); *Brennan's Inc. v. Dickie Brennan & Co., Inc.*, 376 F.3d 356, 362 (5th Cir. 2004)); *see Nale v. Finley*, 505 F. Supp. 3d 635, 645 (W.D. La. 2020) ("As a general rule, an expert may not opine on another witness's credibility because this testimony does not help the trier of fact, who can make its own credibility determinations." (quoting *Nagle v. Gusman*, No. 12-1910, 2016 WL 541436, at *4 (E.D. La. Feb. 11, 2016))). Indeed, "the jury acts as arbiter of the weight assigned to conflicting opinions." *Julius v. Luxury Inn & Suites, LLC*, 535 F. Supp. 3d 600, 604 (S.D. Miss. 2021) (quoting *Adams v. Ethyl Corp.*, 838 F. App'x 822, 831-32 (5th Cir. 2020)). Bearing this standard in mind, the court agrees that Dr. Martin's statement that "[m]ore weight should be given to Dr. Hopper" improperly encroaches on the jury's responsibility to weigh the evidence. Accordingly, this statement must be stricken from Dr. Martin's report.

Lastly, Defendants argue that Dr. Martin's opinion that "there is no indication from the records [he] reviewed that either Best Recovery Healthcare or Dr. Hopper treated Mr. Dare or monitored his medication use in a manner that was inconsistent with best medical practices or standards of patient care" is unreliable because "it fails to state, include, or otherwise articulate or establish the medical practices or standards of patient care referenced by Dr. Martin," and

57

"expert testimony is generally required to prove the applicable standard of care." *Quijano v. United States*, 325 F.3d 564, 567 (5th Cir. 2003).   The EEOC explains in response that Dr. Martin's statement was merely intended to rebut Dr. Chen's criticisms of Dare's treating physicians in his own report.   The EEOC further elaborates that testimony regarding the standard of medical care that Dare received from his treating providers is unnecessary because "the ADA required Defendants to consider Dare's ability to perform the job regardless of the nature of his disabilities or his treatment."   The court agrees.   Therefore, because Dr. Martin's statement merely counters an opinion that was first mentioned in Defendants' own expert's report, and the salient issues in this ADA case do not implicate questions of the appropriate standard of medical care, the court will not strike Dr. Martin's opinion on this basis.[47]

### 6.    Defendants' Complaint that Dr. Martin Asserts Legal Conclusions

Finally, Defendants complain that the following statements in Dr. Martin's report constitute impermissible legal conclusions:  (1) "It is therefore not scientifically possible to make a determination of impairment based upon an MRO interview as this would require an in-person evaluation . . . ."; (2) "[t]he ADA recommends individualized assessments of fitness for duty. Both the [ADA] and the [DOT] encourage dialogue between the clinician doing the assessment and the prescriber about the worker's medication use and fitness for duty issues"; and (3) "This

---

[47] Defendants also complain that Dr. Martin's opinion that "[t]here are many problems with respect to the MRO review, how it was interpreted as well as the decision process that was made here," should be stricken as a bare conclusion.  The court disagrees with Defendants' characterization.  In the paragraphs following this statement, Dr. Martin elaborates on the issues that he perceives with Dr. Starkey's MRO review, specifically criticizing:  the lack of documentation regarding how and when Dare's prescription information was obtained; Dr. Starkey's disclosure of Dare's prescriptions; Dr. Starkey's deviation from "standard practice" by "seem[ing] to make a judgment with regard to [Dare's] fitness for duty"; and Defendants' making "a determination of impairment based upon an MRO interview."

longstanding relationship also does not alter or negate the potential employer's duties to individually assess the prospective employee under the [ADA]."

The EEOC responds that the first statement is not a legal conclusion, but "a medical and factual conclusion" that Dr. Martin is qualified to make.  The court agrees that this statement is an opinion drawn from Dr. Martin's extensive experience with conducting both MRO interviews and fitness-for-duty evaluations.   The court accordingly declines to strike this statement.

The remaining two statements, however, are more dubious.  While the EEOC asserts that these statements are "based on both [Dr. Martin's] experience and his knowledge of the applicable laws and MRO procedures," the court is nevertheless concerned that these opinions stray too far into the territory of improperly expounding legal conclusions, specifically regarding whether the ADA requires individualized assessments and whether and to what extent an employer's duty under the ADA is affected by its relationship with its MRO.  "[T]he Fifth Circuit has made clear that while experts can opine on factual issues, 'our legal system reserves to the trial judge the role of deciding the law for the benefit of the jury.'"  *Babin v. Plaquemines Parish*, 421 F. Supp. 3d 391, 397 (E.D. La. 2019) (quoting *Askanase v. Fatjo*, 130 F.3d 657, 673 (5th Cir. 1997)).  The court accordingly agrees that Dr. Martin's second and third opinions, as stated above, should be stricken as impermissible legal conclusions.

III.   Conclusion

In accordance with the foregoing analysis, the EEOC's Motion to Exclude Defendants' Expert Witness (#64) is GRANTED in part and DENIED in part.  Dr. Chen may continue as an expert witness, but he may not testify that Defendants' reliance on Dr. Starkey's recommendation was "justified."  The court accordingly strikes the corresponding phrase from Dr. Chen's report.

Additionally, Dr. Chen may not testify regarding Dare's possible diversion of his medication, and the corresponding conclusions are stricken from his reports.

Likewise, Defendants' Motion to Exclude the Testimony of Plaintiff's Expert (#66) is GRANTED in part and DENIED in part. Dr. Martin may continue as an expert witness, but his statements that "[i]n this particular case, what we have is a laboratory positive report of the presence of methadone" and "[m]ore weight should be given to Dr. Hopper" are stricken from his report. Additionally, Dr. Martin may not testify as to the following legal conclusions, and they are accordingly stricken from his reports: "[t]he ADA recommends individualized assessments of fitness for duty. Both the [ADA] and the [DOT] encourage dialogue between the clinician doing the assessment and the prescriber about the worker's medication use and fitness for duty issues"; and "This longstanding relationship also does not alter or negate the potential employer's duties to individually assess the prospective employee under the [ADA]."

SIGNED at Beaumont, Texas, this 25th day of March, 2024.

_____
MARCIA A. CRONE
UNITED STATES DISTRICT JUDGE