| UNITED STATES DISTRICT COURT | EASTERN DISTRICT OF TEXAS |
|---|---|

EQUAL EMPLOYMENT OPPORTUNITY §
COMMISSION, §
§
          Plaintiff, §
§
versus §   CIVIL ACTION NO. 1:21-CV-451
§
THE MODERN GROUP, LTD., and §
DRAGON RIG SALES & SERVICE, LLC, §
§
          Defendants. §

## MEMORANDUM AND ORDER

Pending before the court is Defendants The Modern Group, Ltd. ("Modern") and Dragon Rig Sales & Service, LLC's ("Dragon Rig") (collectively, "Defendants") Motion for Summary Judgment (#63). Plaintiff Equal Employment Opportunity Commission ("EEOC") filed a response (#92), Defendants filed a reply (#105), and the EEOC filed a sur-reply (#108). Also pending before the court is the EEOC's Motion for Partial Summary Judgment (#69). Defendants filed a response (#96), and the EEOC filed a reply (#106). Having considered the pending motions, the submissions of the parties, the record, and the applicable law, the court is of the opinion that Defendants' motion should be denied and the EEOC's motion should be granted in part and denied in part.

I.    Background

The EEOC filed this lawsuit on behalf of Alexander Dare ("Dare"), alleging that Defendants discriminated against Dare in violation of the Americans with Disabilities Act of 1990 ("ADA"), 42 U.S.C. § 12112(a), when they revoked his conditional offer of employment. On February 27, 2019, Dare, who had previously worked as a welder, applied for a welding position

with Dragon Rig at its main location in Victoria, Texas.  Dragon Rig, a manufacturer and service company that constructs and provides oilfield service equipment, is a wholly owned subsidiary of Modern.  It is undisputed that Dragon Rig and Modern are separate legal entities.

Dragon Rig's foreman, John Blaylock ("Blaylock"), interviewed Dare and conditionally offered him a position as a welder.  Blaylock then requested that Dare complete a pre-employment drug screen, which is mandatory for all of Dragon Rig's new hires.  Dare disclosed his prescriptions for both methadone and Xanax to the third-party drug testing facility.  Dare suffers from opioid use disorder and is prescribed methadone as part of a medically assisted therapy ("MAT") program.  Dare is also prescribed Xanax to treat his anxiety disorder.  At the time he applied for a welding position with Dragon Rig, Dare was prescribed 90 milligrams per day of methadone and 8 milligrams per day of Xanax.  It is undisputed that Dare never disclosed his impairments to Blaylock or anyone else at Dragon Rig.  Dare also never directly communicated to anyone at Dragon Rig that he was taking methadone and Xanax.

Defendants' Medical Review Officer ("MRO"), Dr. J. Taylor Starkey ("Dr. Starkey"), reviewed Dare's drug screen and prescriptions.  Dare's drug screen indicated quantities of methadone and Xanax above the confirmation cutoff quantities for both medications.  Dr. Starkey marked Dare's drug screen as "negative:  has prescriptions" but included the following note:  "His drug screen is negative but both the methadone and especially the high dose Xanax are SEDATING so he cannot work in a safety sensitive position or operate equipment."  Dr. Starkey did not communicate with or examine Dare or his medical records before submitting the drug screen results and his appended note to Dragon Rig.

Dragon Rig's General Manager, Eric Brown ("Brown"), reviewed Dare's drug test results and Dr. Starkey's safety warning.  As far as Brown could recall, this was the first time that Dr. Starkey—who had served as Dragon Rig's primary occupational doctor for fifteen years—had included a note on an applicant's drug test results, so Brown considered Dr. Starkey's note to be a "red flag."  Brown called Modern's Vice President of Human Resources, Richmond Bennett ("Bennett"), to confer about Dr. Starkey's comments.  Brown and Bennett "jointly" decided to withdraw Dare's conditional offer of employment.

Brown then informed Blaylock that Dragon Rig could not hire Dare.  According to Blaylock, he was told that Dragon Rig could not hire Dare because "[h]e was on medication that we couldn't have in the shop because of the dosage he was taking."  Blaylock notified Dare that Dragon Rig was rescinding his conditional offer of employment.  Blaylock advised Dare that if he could get off of his medications, he could complete another drug screen and then be reconsidered for employment with Dragon Rig.

Dare later filed a charge of discrimination with the EEOC.  On September 8, 2020, the EEOC issued Defendants a Letter of Determination finding reasonable cause to believe that they had violated the ADA.  After the EEOC and Defendants were unable to resolve the matter through informal methods of conciliation, the EEOC filed this lawsuit in August 2021, alleging that Defendants discriminated against Dare on the basis of his actual disabilities and his record of a disability.  Notably, Dare never requested an accommodation from Dragon Rig; in fact, the EEOC asserts that Dare could perform the essential functions of the welding job at Dragon Rig without an accommodation.

Now, Defendants seek summary judgment, asserting that there is no genuine dispute of material fact and they are entitled to judgment as a matter of law on the following issues:  (1) the EEOC cannot establish its *prima facie* case of disability discrimination under the ADA; (2) Defendants did not operate as an integrated enterprise, and Modern is thus not a proper defendant in this case; (3) the EEOC cannot assert a failure-to-accommodate cause of action at this juncture; (4) the EEOC cannot allege an independent claim for "failure to engage in an interactive process"; and (5) the EEOC cannot present any evidence to support an award of punitive damages against Defendants.  In addition to opposing Defendants' motion, the EEOC seeks partial summary judgment as to liability because, it contends, there is no genuine dispute of material fact as to its *prima facie* case, Defendants have waived any direct threat defense, and Defendants cannot proffer any evidence to create a genuine dispute of material fact as to whether they revoked Dare's offer of employment for a legitimate, nondiscriminatory reason.  In the alternative, the EEOC requests that the court enter summary judgment on the following issues:  (1) the EEOC has established its *prima facie* case of disability discrimination; (2) Defendants cannot produce evidence demonstrating that they revoked Dare's offer of employment for a legitimate, nondiscriminatory reason; (3) Defendants operated as an integrated enterprise; and (4) Defendants cannot offer evidence to create a genuine dispute of material fact regarding their affirmative defenses of failure to mitigate damages, failure to state a claim, failure to exhaust administrative remedies, and statute of limitations/laches.[1]

---

[1] The court addresses the parties' pending motions to exclude the testimony of expert witnesses in a separate Memorandum and Order.

4

II.    <u>Analysis</u>

A party may move for summary judgment without regard to whether the movant is a claimant or a defending party.  *See Union Pac. R.R. Co. v. Palestine*, 41 F.4th 696, 703 (5th Cir. 2022), *cert. denied*, 143 S. Ct. 579 (2023); *Parrish v. Premier Directional Drilling, L.P.*, 917 F.3d 369, 380 (5th Cir. 2019); *Apache Corp. v. W&T Offshore, Inc.*, 626 F.3d 789, 793 (5th Cir. 2010).  Rule 56(a) of the Federal Rules of Civil Procedure provides that summary judgment shall be granted "if the movant shows that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law."  FED. R. CIV. P. 56(a); *Union Pac. R.R. Co.*, 41 F.4th at 703; *United Steel, Paper & Forestry, Rubber Mfg., Energy, Allied Indus. & Serv. Workers Int'l Union v. Anderson*, 9 F.4th 328, 331 (5th Cir. 2021); *Smith v. Harris County*, 956 F.3d 311, 316 (5th Cir. 2020); *Parrish*, 917 F.3d at 378; *Hefren v. McDermott, Inc.*, 820 F.3d 767, 771 (5th Cir. 2016).  The parties seeking summary judgment bear the initial burden of informing the court of the basis for their motions and identifying those portions of the pleadings, depositions, answers to interrogatories, and admissions on file, together with the affidavits, if any, which they believe demonstrate the absence of a genuine issue of material fact.  *Celotex Corp. v. Catrett*, 477 U.S. 317, 323 (1986); *MDK Sociedad De Responsabilidad Limitada v. Proplant Inc.*, 25 F.4th 360, 368 (5th Cir. 2022); *Goldring v. United States*, 15 F.4th 639, 644-45 (5th Cir. 2021); *Playa Vista Conroe v. Ins. Co. of the W.*, 989 F.3d 411, 416-17 (5th Cir. 2021); *Jones v. United States*, 936 F.3d 318, 321 (5th Cir. 2019).

"A fact issue is 'material' if its resolution could affect the outcome of the action." *Hemphill v. State Farm Mut. Auto. Ins. Co.*, 805 F.3d 535, 538 (5th Cir. 2015) (quoting *Burrell v. Dr. Pepper/Seven Up Bottling Grp., Inc.*, 482 F.3d 408, 411 (5th Cir. 2007)), *cert. denied*, 578

U.S. 945 (2016); *see MDK Sociedad De Responsabilidad Limitada*, 25 F.4th at 368; *Lexon Ins. Co., Inc. v. Fed. Deposit Ins. Corp.*, 7 F.4th 315, 321 (5th Cir. 2021); *Dyer v. Houston*, 964 F.3d 374, 379 (5th Cir. 2020).   "Factual disputes that are irrelevant or unnecessary will not be counted." *Tiblier v. Dlabal*, 743 F.3d 1004, 1007 (5th Cir. 2014) (quoting *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 248 (1986)); *accord Valencia v. Davis*, 836 F. App'x 292, 296 (5th Cir. 2020); *see Dyer*, 964 F.3d at 379; *Parrish*, 917 F.3d at 378.   "An issue is '*genuine*' if it is real and substantial, as opposed to merely formal, pretended, or a sham." *Gerhart v. Barnes*, 724 F. App'x 316, 321 (5th Cir. 2018) (quoting *Bazan ex rel. Bazan v. Hidalgo County*, 246 F.3d 481, 489 (5th Cir. 2001)), *cert. denied*, 139 S. Ct. 1239 (2019); *accord Johnson v. City of San Antonio*, No. 22-50196, 2023 WL 3019686, at *6 n.7 (5th Cir. Apr. 20, 2023); *Nall v. BNSF Ry. Co.*, 917 F.3d 335, 340 (5th Cir. 2019).   Thus, a genuine dispute of material fact exists "if the evidence is such that a reasonable jury could return a verdict for the nonmoving party." *Hefren*, 820 F.3d at 771; *accord MDK Sociedad De Responsabilidad Limitada*, 25 F.4th at 368; *Sanchez Oil & Gas Corp. v. Crescent Drilling & Prod., Inc.*, 7 F.4th 301, 309 (5th Cir. 2021); *Dyer*, 964 F.3d at 379; *Tiblier*, 743 F.3d at 1007.

Once a proper motion has been made, the nonmoving parties may not rest upon mere allegations or denials in the pleadings but must present affirmative evidence, setting forth specific facts, to demonstrate the existence of a genuine issue for trial.  *Celotex Corp.*, 477 U.S. at 322 n.3; *see Beard v. Banks*, 548 U.S. 521, 529 (2006) (quoting Fed. R. Civ. P. 56(e)); *Flowers v. Wal-Mart Inc.*, 79 F.4th 449, 452 (5th Cir. 2023); *MDK Sociedad De Responsabilidad Limitada*, 25 F.4th at 368; *Clark v. CertainTeed Salaried Pension Plan*, 860 F. App'x 337, 340-41 (5th Cir. 2021); *Acadian Diagnostic Lab'ys, L.L.C. v. Quality Toxicology, L.L.C.*, 965 F.3d 404, 410 (5th

Cir. 2020). The court "should review the record as a whole." *Black v. Pan Am. Lab'ys, LLC*, 646 F.3d 254, 273 (5th Cir. 2011) (quoting *Reeves v. Sanderson Plumbing Prods., Inc.*, 530 U.S. 133, 150 (2000)); *see Hacienda Recs., L.P. v. Ramos*, 718 F. App'x 223, 234 (5th Cir. 2018); *City of Alexandria v. Brown*, 740 F.3d 339, 350 (5th Cir. 2014). All the evidence must be construed in the light most favorable to the nonmoving party, and the court will not weigh the evidence or evaluate its credibility. *Reeves*, 530 U.S. at 150; *Seigler v. Wal-Mart Stores Tex., L.L.C.*, 30 F.4th 472, 476 (5th Cir. 2022); *Batyukova v. Doege*, 994 F.3d 717, 724 (5th Cir. 2021); *Lyons v. Katy Indep. Sch. Dist.*, 964 F.3d 298, 302 (5th Cir. 2020).

Additionally, in reviewing "cross-motions for summary judgment, [the court] examine[s] 'each party's motion independently' and view[s] 'the evidence and inferences in the light most favorable to the nonmoving party.'" *Springboards To Educ., Inc. v. Hous. Indep. Sch. Dist.*, 912 F.3d 805, 811 (5th Cir. 2019) (quoting *Morgan v. Plano Indep. Sch. Dist.*, 589 F.3d 740, 745 (5th Cir. 2009), *cert. denied*, 561 U.S. 1025 (2010)); *accord Siplast, Inc. v. Emps. Mut. Cas. Co.*, 23 F.4th 486, 492 (5th Cir. 2022). Cross-motions for summary judgment will not, in and of themselves, warrant the granting of summary judgment unless one of the parties is entitled to judgment as a matter of law. *Joplin v. Bias*, 631 F.2d 1235, 1237 (5th Cir. 1980); *Bricklayers, Masons & Plasterers Int'l Union of Am. v. Stuart Plastering Co.*, 512 F.2d 1017, 1023 (5th Cir. 1975); *Newell-Davis v. Phillips*, 592 F. Supp. 3d 532, 545 (E.D. La. 2022), *aff'd*, No. 22-30166, 2023 WL 1880000 (5th Cir. Feb. 10), *cert. denied*, 144 S. Ct. 98 (2023); *Wilson v. Tessmer L. Firm, PLLC*, 483 F. Supp. 3d 416, 423 (W.D. Tex. 2020). The rationale for this rule is that each party may move for summary judgment using different legal theories that rely upon different sets of material facts. *Bricklayers, Masons & Plasterers Int'l Union of Am.*, 512 F.2d at 1023; *Smith*

7

*v. Twin Vill. Mgmt. LLC*, No. 1:19-CV-406-DAE, 2021 WL 2772811, at *3 (W.D. Tex. Apr. 26, 2021); *Wilson*, 483 F. Supp. 3d at 423.  Nonetheless, cross-motions for summary judgment may be probative of the absence of a factual dispute when they reveal a basic agreement concerning what legal theories and material facts are dispositive.  *Petro Harvester Operating Co., L.L.C. v. Keith*, 954 F.3d 686, 700 (5th Cir. 2020); *Bricklayers, Masons & Plasterers Int'l Union of Am.*, 512 F.2d at 1023; *Penn-Am. Ins. Co. v. Dominguez*, No. 6:21-CV-211-JDK, 2021 WL 5578684, at *2 (E.D. Tex. Nov. 30, 2021); *Wilson*, 483 F. Supp. 3d at 423.

 A. <u>Issues Upon Which Defendants and the EEOC Both Seek Summary Judgment</u>

  1. <u>Whether Defendants Operated as an Integrated Enterprise</u>

 In their summary judgment motions, Defendants and the EEOC both request summary judgment on whether Defendants—Modern and Dragon Rig—constitute an integrated enterprise. In particular, Defendants argue that it is undisputed that Modern and Dragon Rig are distinct legal entities, and the EEOC cannot put forth any evidence to demonstrate that the two have more than the ordinary parent-subsidiary relationship.  Defendants emphasize that Dare applied for a position at Dragon Rig, Dare received a conditional offer of employment from Dragon Rig, Dr. Starkey reviewed Dare's drug screen for a position with Dragon Rig, and Dragon Rig withdrew Dare's conditional offer of employment.  Defendants accordingly contend that, as a matter of law, Modern is not a proper defendant in this litigation.  In both its response to Defendants' motion and its own summary judgment motion, however, the EEOC proffers evidence demonstrating that, as a matter of law, Defendants operated as an integrated enterprise.

 "[T]he doctrine of limited liability creates a strong presumption that a parent corporation is not the employer of its subsidiary's employees."  *Long v. BDP Int'l, Inc.*, 919 F. Supp. 2d 832,

840 (S.D. Tex. 2013) (quoting *Lusk v. Foxmeyer Health Corp.*, 129 F.3d 773, 778 (5th Cir. 1997)).   Accordingly, "the mere existence of common management and ownership are not sufficient to justify treating a parent corporation and its subsidiary as a single employer."  *Id.* (quoting *Lusk*, 129 F.3d at 778).   Thus, "[e]vidence suggesting a level of control that departs significantly from the ordinary relationship between a parent and its subsidiary is required to rebut this presumption."  *LeBlanc v. AEP Elmwood LLC*, 946 F. Supp. 2d 546, 553 (E.D. La. 2013) (citing *Lusk*, 129 F.3d at 778).

"We use a four-part test to determine whether 'superficially distinct entities may be exposed to liability upon a finding they represent a single, integrated enterprise:  a single employer.'"  *Nicholson v. Securitas Sec. Servs. USA, Inc.*, 830 F.3d 186, 189 (5th Cir. 2016) (quoting *Trevino v. Celanese Corp.*, 701 F.2d 397, 403-04 (5th Cir. 1983)).   When determining whether legally distinct entities constitute an integrated enterprise, courts consider the following factors:  (1) interrelation of operations; (2) centralized control of labor operations; (3) common management; and (4) common ownership or financial control.  *Trevino*, 701 F.2d at 404.   "[N]o one of these factors is controlling, nor need all criteria be present."  *Alcoa, Inc. v. Nat'l Lab. Rels. Bd.*, 849 F.3d 250, 255 (5th Cir. 2017) (quoting *Nat'l Lab. Rels. Bd. v. DMR Corp.*, 699 F.2d 788, 791 (5th Cir.), *cert. denied*, 464 U.S. 852 (1983)).[2]   "[T]he critical question to be answered then is:  What entity made the final decisions regarding employment matters related to the person claiming discrimination?"  *Perry v. Pediatric Inpatient Critical Care Servs., P.A.*, 611 F. Supp. 3d 363, 380 (W.D. Tex. 2020) (quoting *Trevino*, 701 F.2d at 404), *aff'd*, 990 F.3d 918

---

[2] The integrated enterprise analysis was "originally adopted by the Supreme Court in the context of labor disputes" before being "extended to civil rights actions by [the United States Court of Appeals for the Fifth Circuit] in [*Trevino*, 701 F.2d at 397]."  *Lusk*, 129 F.3d at 777.

(5th Cir.), *cert. denied*, 142 S. Ct. 563 (2021); *see Lusk*, 129 F.3d at 777 ("This analysis ultimately focuses on the question whether the parent corporation was a final decision-maker in connection with the employment matters underlying the litigation . . . .").

a.   <u>Interrelated Operations</u>

"[O]nly evidence of control suggesting a significant departure from the ordinary relationship between a parent and its subsidiary—domination similar to that which justifies piercing the corporate veil—is sufficient to rebut this presumption [of limited liability], and to permit an inference that the parent corporation was a final decision-maker in its subsidiary's employment decisions." *Perry*, 611 F. Supp. 3d at 382 (quoting *Lusk*, 129 F.3d at 778). "Relevant factors suggesting the existence of interrelated operations include evidence that the parent:  (1) was involved directly in the subsidiary's daily decisions relating to production, distribution, marketing, and advertising; (2) shared employees, services, records, and equipment with the subsidiary; (3) commingled bank accounts, accounts receivable, inventories, and credit lines; (4) maintained the subsidiary's books; (5) issued the subsidiary's paychecks; or (6) prepared and filed the subsidiary's tax returns." *Id.* (citing *Lusk*, 129 F.3d at 778).

Here, the EEOC has marshaled significant evidence of "interrelated operations" between Modern, the parent company, and Dragon Rig, its subsidiary.  As the EEOC points out, Dragon Rig employee Patricia Schaefer ("Schaefer") described Modern as Dragon Rig's "corporate office."  Indeed, Defendants acknowledge that Modern provides "back-office support"—including

10

accounting, human resources ("HR"),[3] information technology ("IT"), banking, and security—to Dragon Rig.  As further evidence of the connected operations between the two entities, the EEOC emphasizes that in his deposition, Brown, the general manager of Dragon Rig, described "our HR" as being "based out of" and "headquartered out of" Modern's office.

Modern also conducts quarterly "routine inspections" of Dragon Rig's facilities and operations and supervises Dragon Rig's safety coordinator to ensure that Dragon Rig's practices and facilities comply with Modern's safety policies.  Moreover, in addition to providing marketing services for its subsidiaries, including Dragon Rig, Modern's employees also handle Dragon Rig's accounts payable, process Dragon Rig's payroll and new-hire paperwork, and administer Dragon Rig's health insurance and other employee benefits programs.  In terms of shared records, Bennett confirmed that his department maintains the personnel files of all Dragon Rig employees.[4] Furthermore, although the EEOC proffered no evidence related to the filing of Dragon Rig's tax returns, Bennett testified that his team prepares and files Dragon Rig's EEO-1 reports with the federal government.  After considering this evidence, the court finds that the first factor weighs in favor of finding that Defendants operated as an integrated enterprise.[5]

---

[3] In their reply brief, Defendants note that Modern's subsidiaries, including Dragon Rig, have "on-site" HR.  Nevertheless, Defendants acknowledge in their own motion that Modern provides HR services to Dragon, and it is undisputed that, in this case, Brown called Bennett, a Modern employee, to discuss Dare's situation without involving any on-site HR staff at Dragon Rig.

[4] Defendants' reply makes much of the fact that Brown, Dragon Rig's general manager, testified that personnel files are kept at Dragon Rig, and he merely "believes" that "some" files or records are kept at Modern.  Bennett, however, confirmed that his office maintains records of Dragon Rig's personnel files.  In addition, Schaefer, Dragon Rig's administrative assistant and "on-site HR resource," confirmed in her own deposition testimony that "all the new hire paperwork" is sent to Modern "for further processing."

[5] Defendants emphasize in their reply brief that Brown testified that Dragon Rig does not share any facilities or offices with Modern.  Defendants fail to explain, however, the significance of this point, beyond perhaps demonstrating that the two entities do not appear to share the same equipment.

b.    Centralized Control of Labor Operations

Next, the EEOC chiefly relies upon Bennett's testimony discussing the entities' weekly operations meetings as evidence that the relationship between Defendants involves "centralized control of labor operations."  Bennett described how Casey Crenshaw ("Crenshaw"), the CEO of both Modern and Dragon Rig, holds weekly operations meetings that are attended by the companies' officers, Modern executives, and the general managers of Modern's subsidiaries, including Dragon Rig.  At these meetings, the attendees discuss the subsidiary companies' business matters, such as supply chain issues, sales, and revenue, as well as issues related to HR and payroll.  Bennett explained that Modern and the general managers of the subsidiaries (including Dragon Rig) jointly make most decisions impacting operations at these meetings.

As further evidence of the "centralized control" that Modern exercises over Dragon Rig, the EEOC notes that Modern's Human Resources Management Policy Manual ("Manual") governs Dragon Rig's workplace and is known to Dragon Rig employees as the "employee handbook." The EEOC emphasizes that Dragon Rig has also implemented Modern's safety manual; environmental, accounting and IT policies; new hire "orientation curriculum"; new hire packets and forms; pre-employment drug screening and prescription drug policies; and workplace discrimination policies and procedures.  Although Defendants argue that Dragon Rig also has its own separate policies and procedures, such as its New Hire Policy & Procedure (#63-29), their citation to this singular policy does not negate the breadth of the general policies and procedures that are set out in Modern's Manual and applied to Dragon Rig.

In addition, the EEOC focuses on Bennett's role in Dragon Rig's hiring decisions, citing *Lusk* for the proposition that "[s]uitable evidence of centralized labor and employment decisions

12

includes parental control of hiring, firing, promoting, paying, transferring, or supervising employees of the subsidiary." 129 F.3d at 780 n.8. Generally, Bennett testified that, as a Modern employee, he does "not necessarily" review potential hires and that Brown makes most routine, day-to-day employment decisions at Dragon Rig. Brown testified, however, that he involves Bennett if there is an unusual issue, such as the circumstances presented by Dr. Starkey's warning about Dare. While there are some discrepancies as to who has the authority to override Brown's employment decisions,[6] it is nevertheless undisputed that Bennett, as a Modern employee, occasionally provides input in Dragon Rig's hiring decisions. Most importantly, it is likewise undisputed that Brown called Bennett to consult with him about Dare's situation, giving rise to the present litigation. This involvement of Bennett indicates that he, as an employee of the parent company, exercises some level of control over the hiring of employees at the subsidiary. Taking all of this evidence into account, the court concludes that there is sufficient evidence of "centralized control of labor operations" such that the second factor weighs in favor of finding that Modern and Dragon Rig operated as an integrated enterprise.

c.   <u>Common Management, Common Ownership, and Common Financial Control</u>

As for the third and fourth factors, the EEOC emphasizes that, as confirmed by Bennett, both Modern and Dragon Rig are owned by the Crenshaw family, and the two entities share the

---

[6] Bennett testified that, while he can make a recommendation against hiring an applicant, the hiring manager can nevertheless "override [his] recommendation." Bennett explained that "it would probably have to be a pretty good reason," and the hiring manager would "probably have to go to [Crenshaw]," the CEO, in order to override Bennett's recommendation. Brown testified, on the other hand, that he has the authority to hire, promote, and terminate employees without seeking approval from anyone else, including Crenshaw.

same officers and directors.[7]  In fact, Crenshaw is the president and CEO of both Dragon Rig and Modern, and the two entities also share the same COO, Doug Fierce, and the same CFO, Ben Broussard.  Finally, the EEOC asserts that Modern "exercises financial control over Dragon Rig in that [Modern] finances the [companies'] various shared business and employee services," including HR, payroll, IT, and accounting, through what Bennett described in his deposition testimony as "corporate allocations."  Specifically, Bennett explained that Dragon Rig pays Modern "a monthly amount" for these shared services.  Defendants do not refute any of this evidence.  Thus, the third and fourth factors weigh in favor of finding that Modern and Dragon Rig operated as an integrated enterprise.

Lastly, the court bears in mind that the "critical question" at the heart of this inquiry is "[w]hat entity made the final decisions regarding employment matters related to the person claiming discrimination?"  *Perry*, 611 F. Supp. 3d at 380.  The record is clear on this point. Although Defendants argue that Brown had already decided that Dragon Rig could not hire Dare before he called Bennett because he stated that "[t]he decision to not hire [Dare] was made after I read Dr. Starkey's message on that drug screen . . . . At that point I made that decision," both Bennett and Brown confirm that they made this decision together.  Specifically, when Bennett was asked who made the decision not to hire Dare, he testified:  "Eric [Brown] and I consulted with each other about it, and I guess, ultimately, it was our decision."  Then, when Brown was asked

---

[7] In their reply brief, Defendants argue that the EEOC fails to present legal support for the contention that Crenshaw's status as the CEO of Dragon Rig and one of several owners of Modern is sufficient to find that the two entities act as an integrated enterprise.  Defendants apparently ignore, however, that "common management" and "common ownership or financial control" are two of the four factors that courts consider in determining whether an integrated enterprise exists.  *Trevino*, 701 F.2d at 404.  Moreover, as described above, the EEOC cites substantial evidence beyond the mere fact that Defendants share common management and common ownership.

at another point in his deposition who made the decision to withdraw Dare's offer, he responded: "Richmond Bennett and myself jointly." Another employee, Dragon Rig's Environmental Health and Safety Coordinator, Heather Benavides, likewise confirmed: "It was Eric Brown and Richmond Bennett that made that decision." In fact, as the EEOC points out, Defendants themselves assert in their own summary judgment motion that Brown and Bennett *jointly* arrived at this decision. ("Brown and Bennett discussed Dr. Starkey's warning . . . . They *jointly* decided to withdraw the conditional offer of employment . . . ." (emphasis added)). The evidence demonstrates that Brown and Bennett decided together to revoke Dare's offer of employment. Thus, both Dragon Rig and Modern were involved in the "final decisions regarding employment matters related to the person claiming discrimination." *Id.*

Upon consideration of the proffered evidence, the court determines that the EEOC has conclusively established that Defendants operated as an integrated enterprise in this instance. As a result, the EEOC is entitled to summary judgment on this issue, as the court concludes that Modern and Dragon Rig operated as an integrated enterprise as a matter of law. Defendants have failed to establish that, as a matter of law, they did not operate as an integrated enterprise. Defendants' motion for summary judgment is thus denied as to this issue.

2.     Dare's Summary Judgment Declaration

a.     Whether Dare's Declaration Is a "Sham"

Before turning to the remaining issues in the parties' cross-motions for summary judgment, the court must first determine whether the declaration executed by Dare (#69-8), which the EEOC attached to its summary judgment motion, is competent summary judgment evidence. Dare's declaration provides a variety of information, including how he developed opioid use disorder,

how his opioid use disorder and anxiety impact him when untreated, how his medications affect him, and his work history as a welder.  Defendants challenge Dare's declaration as a "sham," arguing that the court should not consider it because it contradicts several of Dare's statements in his deposition without explaining the conflicts.  Additionally, Defendants also argue that Dare's declaration contains impermissible legal conclusions.  The EEOC contends that Dare's declaration merely supplements his deposition testimony and does not contradict it.

It is well settled that the Fifth Circuit "does not allow a party to defeat a motion for summary judgment using an affidavit that impeaches, without explanation, sworn testimony." *Seigler*, 30 F.4th at 477 (quoting *S.W.S. Erectors, Inc. v. Infax, Inc.*, 72 F.3d 489, 495 (5th Cir. 1996)); *accord Benedetti v. Wal-Mart Stores Tex., L.L.C.*, 788 F. App'x 945, 949 (5th Cir. 2019); *Fornah v. Schlumberger Tech. Corp.*, 737 F. App'x 677, 682 n.3 (5th Cir. 2018).  Simply put, a declaration that contradicts the declarant's deposition testimony is not sufficient evidence to create a fact issue.  *Free v. Wal-Mart La., L.L.C.*, 815 F. App'x 765, 766 (5th Cir. 2020) (citing *Doe ex rel. Doe v. Dall. Indep. Sch. Dist.*, 220 F.3d 380, 386 (5th Cir. 2000), *cert. denied*, 531 U.S. 1073 (2001)).  "Conflicts between deposition testimony and subsequent affidavits or declarations are resolved in favor of the deposition testimony unless the conflict is explained." *Colindres v. Quietflex Mfg.*, 427 F. Supp. 2d 737, 746 (S.D. Tex. 2006) (citing *Valleza v. City of Laredo*, 331 F. Supp. 2d 579, 582-83 (S.D. Tex. 2004)).

The sham affidavit doctrine, however, "'is applied sparingly' and may be invoked only where there is 'some inherent inconsistency between an affidavit and a deposition.'"  *Aqrawi v. Am. Mod. Prop. & Cas. Co.*, 555 F. Supp. 3d 467, 473 (S.D. Tex. 2021) (quoting *Guerrero v. Total Renal Care, Inc.*, 932 F. Supp. 2d 769, 776 (W.D. Tex. 2013)); *Cruz v. R2Sonic, LLC*, 405

F. Supp. 3d 676, 684 (W.D. Tex. 2019) (quoting *Eure v. Sage Corp.*, 61 F. Supp. 3d 651, 658 (W.D. Tex. 2014)).  When a subsequent affidavit "merely supplements rather than contradicts prior deposition testimony, the court may consider the affidavit when evaluating genuine issues in a motion for summary judgment." *Durant v. Brooks*, 826 F. App'x 331, 336 (5th Cir. 2020) (quoting *S.W.S. Erectors, Inc.*, 72 F.3d at 496).  An affidavit is supplementary if it clarifies or provides additional facts not given in the prior deposition and when the prior deposition "only glanced upon the disputed issue." *Sabre Indus. Inc. v. Module X Sols., L.L.C.*, 845 F. App'x 293, 298 (5th Cir. 2021).

"The inquiry, as a whole, is aimed at gleaning whether the later affidavit is 'so markedly inconsistent with the affiant's prior deposition as to constitute an obvious sham.'" *Id.* (quoting *Clark v. Resistoflex Co.*, 854 F.2d 762, 766 (5th Cir. 1988)); *Winzer v. Kaufman County*, 916 F.3d 464, 472 (5th Cir. 2019), *cert. denied*, 141 S. Ct. 85 (2020).  Indeed, "the bar for applying the [sham affidavit] doctrine is a high one, typically requiring affidavit testimony that is 'inherently inconsistent' with prior testimony." *Seigler*, 30 F.4th at 477; *Winzer*, 916 F.3d at 472.  If the court finds that an affidavit or sworn statement contradicts prior deposition testimony, it is properly excluded from consideration in connection with a motion for summary judgment.  *Free*, 815 F. App'x at 767 (affirming district court's exclusion of plaintiff's affidavit where she provided no explanation for its contradictory statements); *Bouvier v. Northrup Grumman Ship Sys., Inc.*, 350 F. App'x 917, 920-21 (5th Cir. 2009) (affirming district court's exclusion of plaintiff's sworn statement, which was inconsistent with her prior deposition testimony).

"Although the court must resolve all factual inferences in favor of the nonmovant, the nonmovant cannot manufacture a disputed material fact where none exists." *Klocke v. Watson*,

597 F. Supp. 3d 1019, 1025 (N.D. Tex. 2022) (citing *Albertson v. T.J. Stevenson & Co., Inc.*, 749 F.2d 223, 228 (5th Cir. 1984)), *aff'd*, No. 22-10348, 2023 WL 2823060 (5th Cir. Apr. 7, 2023); *see Seigler*, 30 F.4th at 477 ("[A] nonmoving party may not manufacture a dispute of fact merely to defeat a motion for summary judgment." (quoting *Doe*, 220 F.3d at 386)).  "If a party who has been examined at length on deposition could raise an issue of fact simply by submitting an affidavit contradicting his own prior testimony, this would greatly diminish the utility of summary judgment as a procedure for screening out sham issues of fact." *Seigler*, 30 F.4th at 477 (quoting *Doe*, 220 F.3d at 386); *see Cleveland v. Pol'y Mgmt. Sys. Corp.*, 526 U.S. 795, 806 (1999) (recognizing that lower courts "have held with virtual unanimity that a party cannot create a genuine issue of fact sufficient to survive summary judgment simply by contradicting his or her own previous sworn statement (by, say, filing a later affidavit that flatly contradicts that party's earlier sworn deposition) without explaining the contradiction or attempting to resolve the disparity").

In the case at bar, Defendants identify three categories of statements in Dare's declaration that they contend inexplicably contradict Dare's previous statements in his deposition:  statements pertaining to Dare's work history, statements discussing the substantial limitations of Dare's impairments, and statements related to Dare's self-weaning off his medications.

### i.   Dare's Work History

First, Defendants argue that Dare's assertion in ¶ 2 of his declaration—"I started welding at the age of 17 and I have worked as a welder all my adult life"—is contradicted by various

statements in his deposition testimony.[8]   Specifically, Defendants point to Dare's testimony that:

he had not worked for any company as a "full W-2 employee" in the past ten years; he has not

filed a tax return since 2012; he voluntarily chose to be unemployed from 2017-2018, even though

---

[8] Defendants also cite other so-called "record evidence"—specifically, the deposition testimony of Dare's MAT counselor, Magdalene Mata ("Mata") and Dare's psychiatrist, Dr. John Hopper ("Dr. Hopper"), an Itemized Statement of Earnings from the Social Security Administration, and correspondence and discovery responses from several of Dare's purported former employers—to argue that Dare's declaration is a "sham" because it conflicts with these exhibits.  Defendants, however, fail to establish that the court may compare a declaration to such evidence in order to determine if the declaration is a "sham." While Defendants contend that the plaintiff's affidavit in *Sivertson v. Citibank, N.A.*, No. 4:18-CV-169-ALM-CAN, 2019 WL 2519222, at *4-5 (E.D. Tex. Apr. 22, 2019), *adopted by* No. 4:18-CV-169, 2019 WL 5091991 (E.D. Tex. Oct. 11, 2019), was struck because it contradicted both the plaintiff's prior deposition testimony and "undisputed records in evidence," Defendants overlook that the relevant evidentiary records in *Sivertson* were a home equity affidavit and fair market value acknowledgment that the plaintiff himself had previously signed and affirmed under oath.  Thus, for purposes of a "sham affidavit" analysis, the prior attestations by the plaintiff himself in *Sivertson* are not comparable to the statements and testimony of other individuals that Defendants allege contradict Dare's declaration.

Defendants' reliance on *In re Hinsley*, 201 F.3d 638, 643 (5th Cir. 2000), is similarly misplaced. While Defendants' brief describes *In re Hinsley* as standing for the proposition that "a party's self-serving and unsupported statement in an affidavit will not defeat summary judgment where the evidence in the record is to the contrary," the case actually states much more narrowly that, because intent to defraud "can be decided as a matter of law," "a party's self-serving and unsupported claim that she lacked the requisite intent is not sufficient to defeat summary judgment where the evidence otherwise supports a finding of fraud." *Id.* (quoting *BMG Music v. Martinez*, 74 F.3d 87, 90 (5th Cir. 1996)).  Thus, the rule articulated in *In re Hinsley* appears narrowly cabined to the fraudulent intent context, or, at the very least, to declarations concerning the declarant's intent.  Here, no aspect of Dare's declaration purports to provide self-serving statements regarding his intent—indeed, Dare's intentions are utterly irrelevant to the analysis of his ADA discrimination claim—rendering *In re Hinsley* inapplicable to the case at bar.

As a result, the court is unconvinced that it may compare Dare's declaration to third parties' deposition testimony or discovery responses for the purposes of determining whether Dare's declaration constitutes competent summary judgment evidence under the "sham affidavit" analysis.  Indeed, at the summary judgment stage, while the court may note the existence of a conflict between various pieces of evidence for the sole purpose of determining whether genuine disputes of material fact exist, the court may not weigh the evidence or evaluate its credibility.  *Reeves*, 530 U.S. at 150; *Seigler*, 30 F.4th at 476.  An analysis of whether Dare's declaration conflicts with the statements of other individuals strays perilously close to requiring the court to weigh the evidence or to determine whose version of events is more credible. *See Winzer*, 916 F.3d at 473 ("At most, the affidavit creat[ed] a credibility issue for [the affiant's] version of the facts.  Such credibility determinations, however, are for the trier of fact, not the district court."). Thus, for purposes of the "sham affidavit" analysis, the court will not address Defendants' arguments that rely on evidence other than Dare's prior deposition testimony.

he admitted that he was capable of working at that time; and he was voluntarily unemployed at the time of his deposition in July 2022 and only "contracted out a little job" in 2020.

The EEOC responds that Dare's declaration does not contradict his prior statements about his work history.  The EEOC emphasizes that, when Dare was asked during his deposition at what age he began welding, Dare responded:  "17"—consistent with his declaration. Similarly, when Dare was asked during his deposition about his work in his late teens and early twenties, he answered:  "I've welded all my life."  Finally, the EEOC notes that Dare "testified extensively" during his deposition about his history as a welder, including his experience with full-time employment, self-employment, working as a contractor, and performing a "little spot welding."

The court agrees that Defendants fail to identify an irreconcilable inconsistency between Dare's declaration and his deposition testimony.  Dare's declaration does not contradict his prior testimony by stating, for example, that he has worked solely or consistently as a full-time or "W-2 employee" performing welding since the age of 17.  Moreover, Dare's statement in his declaration that he has "worked as a welder all [his] adult life" does not preclude the possibility of some (or all) of his work being comprised of sporadic odd jobs, contract work, or self-employment.  Dare's declaration likewise does not definitively assert that he has never experienced periods of unemployment (whether voluntary or involuntary) throughout his adult life.  Nor does Dare's declaration contradict his deposition testimony by claiming that he filed tax returns in years that he previously testified that he had not.  Thus, because these purported discrepancies between

Dare's declaration and his deposition testimony can be reconciled, the court is unpersuaded that Dare's statement about his work history renders his declaration a "sham."[9]

### ii.  The Substantial Limitations of Dare's Impairments

Defendants next argue that Dare's statements in ¶ 5 of his declaration—"Untreated, my [opioid use disorder] causes substantial limitations of my ability to perform major life activities, including caring for myself, learning, concentrating, thinking, communicating, and working"—and ¶ 8 of his declaration—"When untreated, my anxiety causes substantial limitations of my ability to perform major life activities, including both emotional and physical abilities to function, to learn, to concentrate, to think, to communicate, and to work"—are contradicted by various statements in Dare's deposition testimony.  In particular, Defendants emphasize that Dare testified that he did not have memory issues and that he had never been diagnosed with a learning disability or "functional disorder."  Defendants also note that Dare testified that, prior to and following his application to Dragon Rig, he was "physically," "mentally," and "emotionally" ready to work.

---

[9] Defendants also note a discrepancy between Dare's statement in his declaration that he was currently 47 and had "worked as a welder all [his] adult life" since "start[ing] welding at the age of 17" and the allegation in the EEOC's complaint that "[a]t the time he applied for the position [with Dragon Rig in 2019], Dare had 13 years' experience as a welder."  Whether Dare had 13 years of experience or 26 years of experience as a welder at the time of his application to Dragon Rig in 2019, however, does not have any material effect on the analysis of Dare's qualifications for the welding position.  Defendants do not assert that Dare's having only 13 years of experience would have rendered Dare unequipped with the requisite skills and experience and thus unqualified for the welding position with Dragon Rig.  In other words, Dare's statement in his declaration that he has been welding "all [his] adult life" does not alone "manufacture a dispute of fact" that enables Dare to "defeat a motion for summary judgment."  *Seigler*, 30 F.4th at 477.  Thus, this purported conflict does not implicate the evil that the "sham affidavit" doctrine is intended to prevent.  *See id.*  Therefore, to the extent that a discrepancy exists between the years of Dare's work history as described in Dare's declaration and the EEOC's complaint, Dare's declaration may present questions of credibility for the jury to consider, but it does not create any genuine dispute of material fact and thus does not warrant the striking of Dare's declaration.  *See Winzer*, 916 F.3d at 472-73 (citing *Kennett-Murray Corp. v. Bone*, 622 F.2d 887, 893-94 (5th Cir. 1980)).

The EEOC responds by arguing that Dare is not required to be diagnosed with a learning disorder or so-called "functional disorder"[10] in order to be considered "actually disabled" under the ADA.   The EEOC also maintains that Dare's declaration does not contradict his prior testimony because Dare has "never claimed to have a learning disability, a functional disorder, or memory issue."   The court agrees with the EEOC as to both arguments.   Dare's confirmation that he has not been formally diagnosed with a learning disability or "functional disorder" does not negate his assertion that, when left untreated, his impairments may cause him to experience difficulty with learning, concentrating, or performing other major life activities.   Defendants cite no authority to convince the court otherwise.

In addition, the EEOC explains that while Dare's declaration describes how his impairments affect him when *"untreated,"* Dare was in treatment and stable on medications that alleviated the effects of his opioid use disorder and anxiety at the time he applied to Dragon Rig. Thus, because Dare was medicated and in treatment at the time he applied to Dragon Rig, he was, consistent with his testimony, "physically," "mentally," and "emotionally" able to work.[11]   Dare's declaration merely supplements his deposition testimony by describing how he is impacted by his

---

[10] The court, like the EEOC, is unsure what Defendants mean by the term "functional disorder." The court observes, however, that counsel for Defendants specifically referenced "ADHD" (Attention-Deficit/Hyperactivity Disorder) when asking Dare during his deposition if he had "ever been diagnosed with any type of functional disorder."

[11] Specifically, Dare enrolled in his MAT program for the treatment of his opioid use disorder in October 2014, meaning he began his methadone prescription well over four years before applying to Dragon Rig in February 2019.  Similarly, Dare sought treatment for his anxiety in August 2015, thus being prescribed Xanax over three years before he applied to Dragon Rig.

impairments when untreated—a topic that was not discussed during his deposition.  The court is thus unconvinced that the identified statements demonstrate that Dare's declaration is a "sham."[12]

### iii.   Dare's Self-Weaning from Methadone and Xanax

Lastly, Defendants take issue with numerous statements in Dare's declaration regarding his stability on his methadone and Xanax prescriptions.[13]  Defendants assert that these statements conflict with Dare's testimony that he was, at the time of his deposition in July 2022, self-weaning from his medications, and that he had last taken methadone ten days prior to the deposition and Xanax eleven days prior to the deposition.  Dare's declaration does not, however, contradict his testimony that he has attempted to self-wean; in fact, he states in his declaration that his "goal is to wean [himself] off methadone and be completely opioid-free," but because he does not wish to relapse, he is "committed to continuing in the MAT program and do[ing] as [his] doctor and counselor direct."  As the EEOC argues in an attempt to explain the apparent contradiction:  "All the evidence shows that Dare is, in fact, compliant with his treatment plans, although, as stated in both his declaration and his depositions, he hopes to wean himself off his medications

---

[12] Defendants also maintain that the EEOC's complaint stated only that "Dare is a qualified individual with two disabilities . . . which substantially limit a major life activity, brain function."  Dare does not purport to contradict this statement in his declaration, however.  In fact, many of the limitations that he identifies in his declaration, such as learning, concentrating, thinking, communicating, and working, implicate "brain function."  To the extent Dare's declaration differs from this statement in the EEOC's complaint, Dare's declaration merely supplements, rather than contradicts, the mention of "brain function" in the pleading.  Defendants' argument on this point is thus unavailing.

[13] Specifically, Defendants identify the following paragraphs of Dare's declaration:  ¶ 11—"I have been stable at my prescribed [methadone] dose for several years, and I was stable at that dose in February 2019"; ¶ 12—"I have followed all rules mandated by the [methadone] clinic"; ¶ 14—"I am currently prescribed 8 mgs. of Xanax daily, and this is the same dose I was taking in February 2019"; and ¶ 16—"I have been taking both medications for several years and I am stable on these medications."

23

eventually." Furthermore, neither Dare's statements nor his testimony indicates that he has ever been "unstable," whether he was taking his medication as prescribed or self-weaning.

Most importantly, none of these statements involve facts material to the court's analysis of the EEOC's disability discrimination claim. For purposes of this litigation, the only time frame when Dare's stability on his medication is pertinent is the time period when Dare applied for employment with Dragon Rig in 2019. None of these contentions about whether Dare was self-weaning at the time of his deposition in July 2022 call into question his stability on his medications at the time of his application in 2019. Neither Dare's deposition testimony nor his declaration states that he was undertaking any form of self-weaning in 2019.

Because Dare's statements regarding his attempted self-weaning or stability on his medications three or five years after he applied to Dragon Rig are not material to this litigation, the court does not rely upon them in this Memorandum and Order. Dare's statements in his declaration regarding his current stability on his medications therefore do not create a genuine dispute of material fact that enables Dare to "defeat a motion for summary judgment." *Seigler*, 30 F.4th at 477. Thus, this purported conflict does not implicate the type of situation that the "sham affidavit" doctrine is intended to prevent. *See id.*; *Cardenas v. Amato*, No. 1:19-CV-177, 2021 WL 1701258, at *1 n.2 (S.D. Tex. Apr. 29, 2021) (rejecting the defendants' "sham affidavit" argument because "[t]he challenged statements . . . [were] not material to the resolution of the Motion, and in this Order and Opinion, the Court does not rely on these statements."). Defendants thus fail to assert any argument that justifies striking Dare's declaration as a "sham."

b.     Whether Dare's Declaration States Impermissible Legal Conclusions

Defendants also maintain that Dare's declaration improperly contains conclusions of law, particularly regarding Dare's claims in ¶¶ 5-6, 8, and 14-15 of his declaration that he is "substantially limited in major life activities."  Defendants point out that, in order to prove that Dare is disabled under the "actual disability" prong of the ADA, the EEOC must show that Dare has "a physical or mental impairment that *substantially limits* one or more [of his] *major life activities* . . . ."  42 U.S.C. § 12102(1)(A) (emphasis added).  Defendants cite *Clark v. America's Favorite Chicken Co.* for the proposition that the court may not consider Dare's conclusory statements because "[u]nsupported allegations or affidavit or deposition testimony setting forth ultimate or conclusory facts and conclusions of law are insufficient to defeat a motion for summary judgment."  110 F.3d 295, 297 (5th Cir. 1997).

In response, the EEOC retorts that "the fact that Dare views his impairments as substantially limiting . . . is his opinion; it is not a legal conclusion."[14]  Here, Defendants correctly observe that the court may not consider bare conclusions of law when deciding summary judgment motions.  *See La. State ex rel. La. Dep't of Wildlife & Fisheries v. Nat'l Oceanic & Atmospheric Admin.*, 70 F.4th 872, 883 (5th Cir. 2023) (quoting *Clark*, 110 F.3d at 297); *D'Onofrio v. Vacation Publ'ns, Inc.*, 888 F.3d 197, 208 (5th Cir. 2018) ("The objected-to statements [in affidavits] are legal conclusions and thus are not competent summary judgment evidence." (citing *Cutting Underwater Techs. USA, Inc. v. Eni U.S. Operating Co.*, 671 F.3d 512,

---

[14] The EEOC also appears to confuse this issue of whether Dare's declaration states impermissible legal conclusions with the separate issue of whether Dare's declaration is a "sham."  It asserts that "Defendants have presented no legal authority for finding an affidavit or declaration to be a 'sham' because it states what could be a legal conclusion."

515 (5th Cir. 2012))); *Shultz v. Nat'l Union Fire Ins. Co. of Pittsburgh*, ___ F. Supp. 3d ____, No. 23-678, 2023 WL 7329093, at *3 (E.D. La. Nov. 7, 2023) ("[A]ffidavits setting forth 'ultimate or conclusory facts and conclusions of law' are insufficient to either support or defeat a motion for summary judgment." (quoting *Galindo v. Precision Am. Corp.*, 754 F.2d 1212, 1216 (5th Cir. 1985))).

The court therefore agrees that Dare may not rely on legal conclusions to establish that the issues he identifies constitute "substantial limitations" on one or more of his "major life activities" because this is a key component of the EEOC's *prima facie* case of disability discrimination and thus one of the questions that must be decided either on summary judgment or, if genuine disputes of material fact remain, by the trier of fact.  Accordingly, the court will not consider Dare's bare assertions of "substantial limitations" on "major life activities" when deciding the current motions. The court will, however, consider the underlying facts that Dare mentions in support of these ultimate legal conclusions—such as that his ability to function, learn, concentrate, think, communicate, and work are impacted when his impairments are untreated—as such statements are not legal conclusions and are thus not improper.

### 3.   The EEOC's *Prima Facie* Case of Disability Discrimination

The ADA is a federal antidiscrimination statute designed to remove barriers which prevent qualified individuals with disabilities from enjoying the same employment opportunities that are available to individuals without a disability.  *See* 42 U.S.C. §§ 12101-12113; *PGA Tour, Inc. v. Martin*, 532 U.S. 661, 674-75 (2001); *Clark v. Dep't of Pub. Safety*, 63 F.4th 466, 470 (5th Cir. 2023); *EEOC v. LHC Grp., Inc.*, 773 F.3d 688, 696 (5th Cir. 2014); 29 C.F.R. § 1630.1.  The ADA was amended in 2008 by the ADA Amendments Act ("ADAAA"), which "primarily focuses

on broadening the definition of 'disability.'"  *Neely v. PSEG Tex., Ltd. P'ship*, 735 F.3d 242, 245

(5th Cir. 2013); *see* ADA Amendments Act, Pub. L. No. 110-325, 122 Stat. 3553 (2008) (codified

as amended at 42 U.S.C. §§ 12101-12117); *Clark v. Champion Nat'l Sec., Inc.*, 952 F.3d 570,

578 n.15 (5th Cir.) ("Congress expanded the definition of 'disability' and instructed courts to

construe that definition 'broadly.'" (quoting *Patton v. eCardio Diagnostics LLC*, 793 F. Supp. 2d

964, 968 (S.D. Tex. 2011))), *cert. denied*, 141 S. Ct. 662 (2020).

Title I of the Act, which covers employment discrimination, provides that "[n]o covered

entity shall discriminate against a qualified individual on the basis of disability in regard to job

application procedures, the hiring, advancement, or discharge of employees, employee

compensation, job training, and other terms, conditions, and privileges of employment."  42

U.S.C. § 12112(a); *see Hosanna-Tabor Evangelical Lutheran Church & Sch. v. EEOC*, 565 U.S.

171, 179-80 (2012); *Raytheon Co. v. Hernandez*, 540 U.S. 44, 46 (2003); *Mueck v. La Grange

Acquisitions, L.P.*, 75 F.4th 469, 483 (5th Cir. 2023).  "The ADA seeks to eliminate unwarranted

discrimination against disabled individuals in order both to guarantee those individuals equal

opportunity and to provide the Nation with the benefit of their consequently increased

productivity."  *Cleveland*, 526 U.S. at 801 (citing 42 U.S.C. § 12101(a)(8), (9)); *see Ariza v.

Loomis Armored US, LLC*, 132 F. Supp. 3d 775, 786-87 (M.D. La. 2015).  Employees asserting

claims under Title I of the ADA are required to follow the procedures applicable to Title VII

actions, including the timely filing of an EEOC charge.  *See* 42 U.S.C. § 12117(a); *Melgar v.

T.B. Butler Publ'g Co., Inc.*, 931 F.3d 375, 378 (5th Cir. 2019).

The plaintiff may present either direct evidence of disability discrimination or employ the

indirect method of proof utilized in other types of employment discrimination cases.  *Gosby v.*

*Apache Indus. Servs., Inc.*, 30 F.4th 523, 525 (5th Cir. 2022) (citing *Nall*, 917 F.3d at 340); *see McDonnell Douglas Corp. v. Green*, 411 U.S. 792, 802 (1973).  "In cases in which the plaintiff produces only circumstantial evidence, we proceed under the *McDonnell Douglas* burden shifting framework," which "first requires the employee to establish a *prima facie* case of discrimination." *Gosby*, 30 F.4th at 525-26 (citing *Goudeau v. Nat'l Oilwell Varco, L.P.*, 793 F.3d 470, 474 (5th Cir. 2015); *LHC Grp., Inc.*, 773 F.3d at 694); *see Clark*, 952 F.3d at 582.  To establish a *prima facie* case of employment discrimination under Title I of the ADA, the plaintiff must demonstrate that:

(1)     he has a "disability";

(2)     he was qualified for the position; and

(3)     he was subject to an adverse employment action because of his disability.

*Gosby*, 30 F.4th at 526 (citing *Nall*, 917 F.3d at 341); *Clark*, 952 F.3d at 582.

a.     The EEOC Cannot Establish Its Case Through Direct Evidence

In its response to Defendants' motion, the EEOC alleges that Defendants' concession that they revoked Dare's offer based on his prescription medications constitutes direct evidence of discrimination because the decision-makers—Bennett and Brown—admitted that they knew the medications in question were used to treat opioid use disorder and anxiety.  The Fifth Circuit defines "direct evidence" as "evidence which, if believed, proves the fact without inference or presumption." *Clark*, 952 F.3d at 579 (quoting *Brown v. E. Miss. Elec. Power Ass'n*, 989 F.2d 858, 861 (5th Cir. 1993)).  "A statement or document which shows 'on its face that an improper criterion served as a basis—not necessarily the sole basis, but a basis—for the adverse employment action [is] direct evidence of discrimination.'" *Id.* (quoting *Herster v. Bd. of Supervisors of La.*

28

*State Univ.*, 887 F.3d 177, 185 (5th Cir. 2018)).  In *Clark*, the Fifth Circuit held that, where the plaintiff "fail[ed] to point to any statement or document that directly and expressly link[ed] his disability to a decisionmaker's choice to terminate him," and instead relied on "generalized knowledge about his diabetes and the termination itself," his evidence required the fact-finder "to make an inference."  *Id.* at 580-81; *see Kitchen v. BASF*, 952 F.3d 247, 252 (5th Cir. 2020) (holding that "[f]iring [the plaintiff] for arriving to work under the influence of alcohol is not equivalent to firing [the plaintiff] because of a prejudice against alcoholics," as "[a]n inferential leap is required to arrive at the conclusion [the employer] discharged [the plaintiff] out of discriminatory animus against him as an alcoholic"); *Nall*, 917 F.3d at 341 (determining that the comment "people with Parkinson's don't get better" did not constitute direct evidence of disability discrimination because it "could simply be an observation about the disorder" and, in order "[t]o be evidence of animus, the comment requires an inference that the irreversible nature of Parkinson's disease was the reason why [the plaintiff] would not be returning to work").

The EEOC argues that the present case involves direct evidence of discrimination because Defendants' conclusion that Dare posed a safety risk due to his medication use, in spite of the fact that Bennett, Brown, and Dr. Starkey had never spoken with or examined Dare, "*implicates* that the decision was based on Dare's disabilities and the unsubstantiated fears associated with the medications used to treat those disabilities" (emphasis added).  Defendants maintain, however, that the EEOC relies on evidence that contains "no reference or connection to Dare's alleged disabilities."   Instead, Defendants argue, the EEOC's evidence requires inferences that: (1) Bennett's and Brown's general knowledge of Dare's medications and their potential uses enabled them to deduce Dare's precise impairments that required him to take these medications;

and (2) Bennett and Brown further extrapolated that Dare's impairments were severe enough to limit one or more of his major life activities.  Indeed, Defendants point out that the EEOC itself states that an "implication" is necessary to reach this conclusion.[15]  The court thus agrees with Defendants that the EEOC fails to demonstrate that the evidence connects Defendants' revocation of Dare's offer to his purported disabilities without requiring one or more inferential leaps.  As a result, the EEOC has not established that it can prove its case through direct evidence.

### b.   Whether Dare Has a Disability

The ADA defines a disability as:  "(A) a physical or mental impairment that substantially limits one or more of the major life activities of such individual; (B) a record of such an impairment; or (C) being regarded as having such an impairment."[16]  42 U.S.C. § 12102(1); *Lyons*, 964 F.3d at 302 n.11; *Delaval v. PTech Drilling Tubulars, L.L.C.*, 824 F.3d 476, 479 n.2 (5th Cir. 2016); 29 C.F.R. § 1630.2(g)(2) (describing these as the "actual disability," "record of," and "regarded as" prongs).

---

[15] The EEOC's reliance on *United States Equal Employment Opportunity Commission v. T&T Subsea, LLC* ("*T&T*") is unavailing.  457 F. Supp. 3d 565, 570-71 (E.D. La. 2020).  In *T&T*, there was no dispute that the employer was aware of the plaintiff's disability because the plaintiff specifically informed his employer's HR director "of his diagnosis [of colorectal cancer] and treatment plan."  *Id.* at 569; *see id.* at 574 ("[The employer] admits that it terminated [the plaintiff] and refused to rehire him because of his cancer and treatment.").  In contrast, the present case hinges on a dispute as to whether Defendants' decision-makers—Bennett and Brown—were aware of Dare's specific disabilities and revoked his offer because of these disabilities.  Specifically, in order for the EEOC to succeed in proving its disability discrimination claim, the fact-finder must infer that, because Bennett and Brown admitted that they were generally aware that methadone and Xanax could be used to treat addiction and anxiety, they deduced that Dare was prescribed these medications to treat these specific impairments and revoked his offer as a result.  Thus, *T&T* does not support the EEOC's direct-evidence argument.

[16] The EEOC agrees in its response to Defendants' motion for summary judgment that it is not alleging that Dare was "regarded as" disabled.

i.    <u>Whether Dare Has an Actual Disability</u>

The ADA regulations further restrict the meaning of physical and mental impairment to:

(1)    Any physiological disorder or condition, cosmetic disfigurement, or anatomical loss affecting one or more body systems, such as neurological, musculoskeletal, special sense organs, respiratory (including speech organs), cardiovascular, reproductive, digestive, genitourinary, immune, circulatory, hemic, lymphatic, skin, and endocrine; or

(2)    Any mental or psychological disorder, such as an intellectual disability (formerly termed "mental retardation"), organic brain syndrome, emotional or mental illness, and specific learning disabilities.

29 C.F.R. § 1630.2(h)(1)-(2).  Furthermore, the ADA instructs that "[a]n impairment that is episodic or in remission is a disability if it would substantially limit a major life activity when active."  42 U.S.C. § 12102(4)(D).

"[N]ot every impairment will constitute a disability."  29 C.F.R. § 1630.2(j)(1)(ii); *see Mueck*, 75 F.4th at 479 ("Neither the Supreme Court nor this court has recognized the concept of a *per se* disability under the ADA, no matter how serious the impairment; the plaintiff still must adduce evidence of an impairment that has actually and substantially limited the major life activity on which he relies." (quoting *Griffin v. United Parcel Serv., Inc.*, 661 F.3d 216, 223 (5th Cir. 2011))); *Burch v. Coca-Cola Co.*, 119 F.3d 305, 316 (5th Cir. 1997) (holding that alcoholism is not a disability *per se*), *cert. denied*, 522 U.S. 1084 (1998).  "Thus, even a plaintiff who suffers from a condition such as alcoholism or drug addiction—or is perceived as suffering from such a condition—must demonstrate that the condition substantially limits, or is perceived by his employer as substantially limiting, his ability to perform a major life function."  *Zenor v. El Paso Healthcare Sys., Ltd.*, 176 F.3d 847, 860 (5th Cir. 1999); *see Mueck*, 75 F.4th at 482-83 (holding that the plaintiff had "put forth evidence raising a triable issue of fact as to whether his alcoholism

amount[ed] to a disability" where he testified that "[w]hen he drank, he drank excessively, either to the point of passing out or to where he was too sick to drink any more," and "during these binges, his major life activities of thinking, concentrating, and caring for himself would be substantially impacted—he would not shower, brush his teeth, clean, eat healthily, or follow a consistent sleep schedule, and would often drink to the point of unconsciousness").  Furthermore, "[t]he determination of whether an impairment substantially limits a major life activity shall be made without regard to the ameliorative effects of mitigating measures such as . . . medication . . . ."  42 U.S.C. § 12102(4)(E)(i)(I); *see* 29 C.F.R. § 1630.2(j)(1)(vi); *see also MX Grp., Inc. v. City of Covington*, 293 F.3d 326, 339 (6th Cir. 2002) (holding the fact that methadone treatment ameliorated drug addiction as it was meant to did not deprive recovering drug addicts of the ADA's protection).

Importantly, "the relevant time for assessing the existence of a disability is the time of the adverse employment action."  *Jennings v. Towers Watson*, 11 F.4th 335, 344 (5th Cir. 2021) (quoting *EEOC v. Chevron Phillips Chem. Co., L.P.*, 570 F.3d 606, 618 (5th Cir. 2009)). Moreover, "the term 'qualified individual with a disability,' as used in the ADA, does not refer to an employee's future ability to perform the essential functions of his position.  Instead, the provisions of the ADA are "formulated entirely in the present sense, framing the precise issue as whether an individual 'can' (not 'will be able to') perform the job with reasonable accommodation."  *Ellis v. Shannon Med. Ctr.*, No. Civ. A. 6:01-CV-091-C, 2002 WL 31947822, at *4 (N.D. Tex. Oct. 25, 2002) (quoting *Myers v. Hose*, 50 F.3d 278, 283 (5th Cir. 1995)).

The ADA defines major life activities as "includ[ing], but not limited to, caring for oneself, performing manual tasks, seeing, hearing, eating, sleeping, walking, standing, lifting,

bending, speaking, breathing, learning, reading, concentrating, thinking, communicating, and working." 42 U.S.C. § 12102(2)(A).  It also specifies that "a major life activity also includes the operation of a major bodily function, including but not limited to, functions of the immune system, normal cell growth, digestive, bowel, bladder, neurological, brain, respiratory, circulatory, endocrine, and reproductive functions." *Id.* § 12102(2)(B).

The ADA, however, does not define "substantially limits," but the EEOC's regulations under the ADA provide significant guidance. *Hale v. King*, 642 F.3d 492, 500 (5th Cir. 2011) (citing *Chevron Phillips Chem. Co.*, 570 F.3d at 614).  Under those regulations, an impairment is considered a disability if it "substantially limits the ability of an individual to perform a major life activity as compared to most people in the general population." 29 C.F.R. § 1630.2(j)(1)(ii). A disability need not, however, "prevent, or significantly or severely restrict, the individual from performing a major life activity." *Id.*  Indeed, the term "'[s]ubstantially limits' is not meant to be a demanding standard" and "shall be construed broadly in favor of expansive coverage." *Id.* § 1630.2(j)(1)(i). "[D]istrict courts within this circuit routinely consider a plaintiff's testimony, without more, sufficient to create a genuine dispute of material fact regarding substantial limitation." *Williams v. Tarrant Cnty. Coll. Dist.*, 717 F. App'x 440, 448 (5th Cir. 2018).

Defendants and the EEOC both seek summary judgment on the EEOC's disability discrimination claim.  Defendants first argue that they are entitled to summary judgment because the EEOC cannot demonstrate that Dare is actually disabled.  Specifically, Defendants argue that the EEOC has failed to provide any evidence to corroborate the allegation in its complaint that Dare's opioid use disorder and anxiety "substantially limit a

major life activity, brain function."[17]  Defendants contend that neither the testimony of Dare's medical providers nor his medical records demonstrate that Dare was substantially limited in "brain function" or any other major life activities.[18]  Additionally, Defendants claim that the EEOC cannot establish that Dare is actually disabled because, during his deposition, Dare testified that he had not been diagnosed with a learning disability or functional disorder and that he did not have any memory issues.  Defendants also maintain that the EEOC cannot show that Dare's "brain function" was substantially limited because he "actively denied any such insinuation" by testifying that he was "physically" and "emotionally and mentally able to

---

[17] Defendants assert no argument regarding whether either of Dare's diagnosed conditions—anxiety and opioid use disorder—are "impairments" under the ADA.  Instead, the thrust of Defendants' argument is that Dare cannot establish the first element of his *prima facie* case because he has failed to provide any evidence that either of his impairments substantially limits a major life activity.

[18] Defendants also argue that because the only "major life activity" that the EEOC pleaded in its complaint was "brain function," "any statements or arguments about other alleged limitations [are] irrelevant."  Defendants cite no authority for the proposition that the EEOC may only provide evidence regarding major life activities that are specifically enumerated in the complaint.  In response, the EEOC attempts to circumvent Defendants' argument by contending that all of the activities referenced in Dare's declaration—such as his abilities to function, learn, concentrate, think, communicate, and work—are "driven by 'brain function,' and the ability of the brain to regulate thought processes and emotions."

In any event, the Fifth Circuit has indicated that, at the summary judgment stage, a plaintiff may properly present evidence related to major life activities that were not specifically identified in the complaint.  In *Mueck*, the district court held that the plaintiff's failure "to specify in his complaint which specific major life activities were impacted by his alcoholism" provided an "alternative ground on which to grant summary judgment" in favor of the defendant.  75 F.4th at 482 n.8.  The Fifth Circuit rejected the district court's reasoning, noting that "typically a deficiency in the pleadings results in the dismissal of the case—and an opportunity to amend—not a decision on the merits in favor of the defendant."  *Id.* The Fifth Circuit went on to hold that because the plaintiff's response to the motion for summary judgment had "both articulated the major life activities in which he was substantially limited and provided evidence demonstrating that he was so limited," "any deficiency in the complaint did not warrant summary judgment on the merits in favor of [the defendant]."  *Id.*  In other words, the Fifth Circuit indicated that even where a complaint does not specifically identify the "major life activities" at issue, the plaintiff may remedy this defect at the summary judgment stage by specifying and providing evidence of the limitations.  Thus, particularly in light of Defendants' dearth of evidence to support their argument, the court concludes it may appropriately consider the portions of the EEOC's evidence that pertain to major life activities beyond "brain function."

work" in both the year prior to and the year following his application to Dragon Rig in 2019. Lastly, Defendants claim that Dare cannot demonstrate that he was "actually disabled" because his methadone and Xanax prescriptions alleviated the impacts of his impairments.

The EEOC retorts that, during his deposition testimony, Dare did not "actively den[y] any such insinuation" that his brain function was substantially limited.  In fact, it maintains, Dare never testified that he was not disabled or that his impairments did not impact a major life activity. The EEOC then relies upon Dare's declaration to rebut Defendants' summary judgment motion and to provide support for its own summary judgment motion.[19]

Specifically, in his declaration, Dare states that when untreated, his anxiety impacts his abilities to function, learn, concentrate, think, communicate, and work.  The EEOC argues that

---

[19] The additional evidence that the EEOC cites in support of this issue generally fails to explain how Dare is substantially limited in major life activities.  For example, although the EEOC argues that Dare's medical records constitute "indisputable evidence of his disabilities," as Defendants point out, the EEOC fails to provide any specific citations to Dare's medical records or otherwise explain how their contents demonstrate that Dare's impairments substantially limit any major life activities.  Additionally, in its sur-reply, the EEOC cites portions of Dare's deposition testimony where he briefly discussed his impairments, but neither of these sections sheds light on any "substantial limitations" that Dare might experience as to his brain function (or any other major life activity).  *See* (#92-6, at 11:23-12:10; 65:8-17). Although the EEOC also references sections of deposition testimony from Dare's treating physicians, specifically Dr. Natalie Carroll ("Dr. Carroll"), the medical director at Dare's MAT program, and Dr. Hopper, Dare's psychiatrist, the cited testimony does not appear to discuss any substantial limitations that Dare personally experiences as a result of his impairments.  Instead, the testimony merely confirms that Dare had "panic disorder" and "severe anxiety" and receives "addiction treatment."  While the EEOC identifies portions of Dr. Hopper's testimony where he describes how anxiety can affect patients as a general matter, it is unclear whether Dr. Hopper is specifically describing how Dare's anxiety specifically impacts him.  *See* (#92-10, 114:12-115:9) ("A lot of people don't know that anxiety is actually a more disabling diagnosis than is depression.  More people with anxiety become impaired and unable to live a life than people with depression, typically. . . . [P]eople with overwhelming anxiety simply quit living life. They don't go anywhere.  They don't do anything.").  The only portion of Dr. Hopper's testimony where he appears to describe specifically any substantial limitations that Dare himself experiences because of his anxiety is when he mentions Dare's experience with nightmares.  *See* (#92-10, 115:14-17 ("Look at how many times [Dare] refers to intrusive memories or nightmares about finding his dead father.  You know that—that kind of anxiety is often right underneath the surface all day every day.").  The medical providers' testimony is, thus, largely unrevealing in regard to how Dare is substantially limited in major life activities as a result of his opioid use disorder and anxiety.

"[a]ll of these activities are driven by 'brain function,' and the ability of the brain to regulate thought processes and emotions." Furthermore, Dare avers in his declaration that when untreated, his anxiety can cause him to hyperventilate, sweat, tremble, suffer gastrointestinal issues, have difficulty concentrating or thinking, experience a sense of impending danger or doom, suffer panic attacks, feel weak or tired, have difficulty sleeping, and experience urges to avoid his anxiety triggers. Dare's declaration further indicates that his "anxiety has improved while [he has] been in treatment, but [he] still need[s] Xanax to treat [his] anxiety and to allow [him] to function without the symptoms" detailed above.

As for his opioid use disorder, Dare explains in his declaration that when untreated, this disorder affects his ability to care for himself, learn, concentrate, think, communicate, and work because he has difficulty concentrating and learning new things, experiences trouble sleeping, and feels restless, agitated, and volatile, in addition to suffering diarrhea, nausea, and vomiting. Dare's methadone treatment, however, "has decreased or eliminated [his] symptoms related to opioid withdrawal." Dare also notes that "without treatment and without the use of both methadone and Xanax, [he has] and would still experience" the effects of his impairments. He avers that "[w]hen untreated, [his] [opioid use disorder] contributes substantially to [his] anxiety and vice versa."

The court first addresses Defendants' assertion that the EEOC cannot establish that Dare is actually disabled due to his testimony that he does not have a learning disability, a functional disorder, or memory issues. Defendants' argument on this point misapprehends the standard for determining whether an impairment "substantially limits" a major life activity. Indeed, the "substantially limits" standard "is not meant to be a demanding standard," and "shall be construed

broadly in favor of expansive coverage."  29 C.F.R. § 1630.2(j)(1)(i).  Defendants' apparent attempt to add a requirement that the substantial limitation on a major life activity results in a formal diagnosis of either a "functional disorder" or a learning disorder—which can, under certain circumstances, be a disability in and of itself—is both circular and inconsistent with the expansive standard for determining whether a disability exists.  Thus, Defendants' argument that Dare cannot demonstrate that he suffers "substantial limitations" because he has not been diagnosed with a learning disability or "functional disorder" is baseless.

Next, Defendants argue that Dare's declaration presents an "irreconcilable juxtaposition" because Dare avers that he has "worked as a welder all [his] adult life" without causing any "incident, accident, or injury" while simultaneously claiming that he suffered substantial limitations to major life activities, including his ability to work, until he began taking methadone and Xanax in 2014 and 2015, respectively.  Defendants maintain that the EEOC "cannot have it both ways."  They claim that if Dare was able to work as a welder before he began taking medication for his impairments, then he could not have been substantially limited in brain function.  If, on the other hand, Dare could not work before he began taking methadone and Xanax about nine years ago, Defendants contend that the EEOC "has repeatedly and significantly misrepresented Dare's work history."

The EEOC responds that Defendants fail to understand that "the ability to work and being an individual with disabilities are not mutually exclusive," emphasizing that "[t]he evidence that Dare's disabilities were substantially limiting to his ability to work does not mean he was prevented from working at all."  The court agrees with the EEOC.  As the EEOC points out elsewhere, an individual's impairment "need not prevent, or significantly or severely restrict, the

individual from performing a major life activity in order to be considered substantially limiting." 29 C.F.R. § 1630.2(j)(1)(ii). Therefore, because "working" is a "major life activity," an individual can still have the ability to work while simultaneously having an impairment that is "substantially limiting."[20] *See id*. § 1630.2(i)(1)(i), (j)(1)(ii). In other words, while Dare might have found it difficult to work due to the unmitigated effects of his opioid use disorder and anxiety before he began taking methadone and Xanax, this does not necessarily mean that he could not work at all. Indeed, the fact that Dare's work history apparently consists of a patchwork of sporadic odd jobs, contract work, and periods of self-employment appears consistent with his claims that he found it difficult to work as a result of his impairments.

Additionally, Defendants insist that Dare was not "actually disabled" at the time he applied to Dragon Rig because the court must consider the mitigating effects of Dare's medications, and Dare avers that his methadone and Xanax prescriptions have "decreased or eliminated" the symptoms that purportedly limit his major life activities. Defendants are, however, mistaken as to the law regarding the role that mitigating measures play in the disability analysis. As explained above, "[t]he determination of whether an impairment substantially limits a major life activity shall be made *without regard* to the ameliorative effects of mitigating measures such as . . . medication . . . ." 42 U.S.C. § 12102(4)(E)(i)(I) (emphasis added); *see* 29 C.F.R. § 1630.2(j)(1)(vi). Thus, in order to determine whether Dare's opioid use disorder and anxiety are "disabilities," the fact-finder must consider how these impairments substantially limit Dare's major life activities when he is unmedicated and thus unaided by the ameliorative benefits of

---

[20] Notably, this rule also undercuts Defendants' related argument that Dare could not have been "actually disabled" at the time he applied to work for Dragon Rig because he testified that he was physically, mentally, and emotionally prepared to work.

methadone and Xanax.[21]  *See Cerda de Ruiz v. Almanza Villarreal Forwarding, LLC*, No.
7:22-CV-00434, 2024 WL 420150, at *6 n.8 (S.D. Tex. Feb. 5, 2024) (rejecting the defendant's
argument that "diabetes cannot be a disability if the plaintiff takes corrective measures, such as
insulin," as "run[ning] strictly against [the] instructions" in the EEOC's regulations); *Palardy v.
AT&T Servs., Inc.*, No. 4:21-CV-00626-SDJ-CAN, 2022 WL 21783976, at *4 (E.D. Tex. May
31, 2022) (explaining that, where the plaintiff was deaf or, at a minimum, had suffered hearing
loss, "[t]he Court may not consider the ameliorative effects of Plaintiff's cochlear implant in
determining whether he is disabled."); *Fulbright v. Union Pac. R.R. Co.*, No. 3:20-CV-2392-
BK, 2022 WL 975603, at *2-4 (N.D. Tex. Mar. 31, 2022) (concluding that plaintiff's sleep
disorder constituted a disability in part because the court could not consider the ameliorative

---

[21] The cases upon which Defendants rely to suggest otherwise are outdated and inapposite.
Defendants apparently overlook that in 2008, the ADAAA "explicitly overrule[d]" the prior requirement
that mitigating measures be considered when evaluating the existence of a disability and instead
"mandate[d] that the 'determination of whether an impairment substantially limits a major life
activity . . . be made without regard to the ameliorative effects of mitigating measures . . . ."  *Kemp v.
Holder*, 610 F.3d 231, 236 (5th Cir. 2010) (quoting ADAAA, sec. 2(b)(3), sec. 4(a), § (4)(E)(i), 122 Stat.
3553 (2008)).  The cases that Defendants cite apply pre-ADAAA precedent.

In particular, Defendants rely upon *Milton v. Texas Department of Criminal Justice* for the
proposition that the determination of whether an impairment is substantially limiting is "an individualized
assessment that considers the effects of any mitigating measures taken by the individual."  707 F.3d 570,
573 (5th Cir. 2013).  Defendants ignore, however, the critical footnote in *Milton* where the Fifth Circuit
explained that because "[t]he events giving rise to [the plaintiff's] case all took place before the enactment
of [the ADAAA]" and the ADAAA does not apply retroactively, it analyzed the plaintiff's disability
discrimination claim under pre-ADAAA precedent.  *Id.* at 573 n.2; *see Mueck*, 75 F.4th at 481
(characterizing *Milton* as "inapposite" because "it applied pre-ADAAA law").  The same rule applies in
*Chevron Phillips Chemical Co.*, the other case cited by Defendants.  570 F.3d at 606.  Indeed, the plaintiff
initially filed *Chevron Phillips Chemical Co.* in September 2005—nearly four years before the ADAAA
took effect.  *Id.* at 612; *see* ADAAA, sec. 8, 122 Stat. 3553 (2008) ("This Act and the amendments made
by this Act shall become effective on January 1, 2009.").

In the case at bar, Dare applied for the position with Dragon Rig in 2019, approximately a decade
after the ADAAA took effect.  Thus, there is no dispute that the ADAAA applies to this case.  Because
the ADAAA requires that determinations of disability be made "without regard to the ameliorative effects
of mitigating measures," Defendants' argument that the court should consider the effects of Dare's
medications directly contradicts the controlling law and is thus unavailing.

effects of the plaintiff's Trazodone prescription).   As a result, Dare's statements in his declaration about how his opioid use disorder and anxiety impacted him when untreated (and would continue to impact him without the benefit of his medications) provide salient evidence of how his impairments affect him absent "the ameliorative effects of mitigating measures."[22]

In the same vein, because the court may not consider the ameliorative effects of Dare's methadone and Xanax prescriptions, Dare's testimony that he was physically, mentally, and emotionally prepared to work when he applied to Dragon Rig does not prevent him from proving that he was "actually disabled."   Importantly, Dare never stated that he would have been prepared to work as a welder without the benefit of his medications.   Rather, Dare testified that he was stable on both of his medications during this time period.   Therefore, in order to determine whether Dare was "actually disabled," the court must consider how, *without* the ameliorative effects of methadone and Xanax, Dare would have been impacted by his impairments at the time he applied to Dragon Rig.[23]

---

[22] As a related point, the EEOC correctly notes that the mere fact that Dare was receiving treatment from an MAT (and thus was not suffering withdrawal symptoms or other effects of his impairment) does not preclude him from establishing that he was "actually disabled" as a result of his opioid disorder at the time he applied to Dragon Rig.   Indeed, while coverage under the ADA does not extend to individuals "currently engaging in the illegal use of drugs," the statute covers an individual who "has successfully completed a supervised drug rehabilitation program and is no longer engaging in the illegal use of drugs, or has otherwise been rehabilitated successfully and is no longer engaging in such use," as well as an individual who "is participating in a supervised rehabilitation program and is no longer engaging in such [illegal drug use]."   42 U.S.C. § 12114(a), (b)(1)-(2); *see* 29 C.F.R. § 1630.3(b)(1)-(2). Accordingly, Dare's participation in an MAT program—and the fact that he was not experiencing symptoms of either withdrawal or addiction as a result of his treatment—at the time he applied to Dragon Rig does not prevent him from establishing that he was "actually disabled."

[23] Dare's testimony that he was prepared to work at the time he applied to Dragon Rig also does not prevent him from establishing that he was "actually disabled" because, "following the ADAAA's passage, an impairment need not be 'permanent or long-term' to qualify as a disability."   *Mueck*, 75 F.4th at 480-83 (determining that the plaintiff had produced sufficient evidence to raise "a triable issue of fact as to whether his alcoholism amount[ed] to a disability," despite the fact that "the impairments [the plaintiff] suffered during a drinking binge were short-term and not permanent").   Thus, an impairment

Accordingly, upon consideration of the aforementioned arguments, the EEOC has provided sufficient evidence, specifically in the form of Dare's declaration, to overcome Defendants' motion for summary judgment.  Nevertheless, because the court may not consider Dare's legal conclusions in his declaration that he experienced "substantial limitations" as a result of his impairments, viewing the evidence in the light most favorable to Defendants, genuine disputes of material fact remain as to the existence and extent of the effects of Dare's impairments.  In other words, fact issues persist as to whether the issues that Dare attributes to his impairments—*e.g.*, difficulty learning, concentrating, thinking, sleeping, feeling nervous, and experiencing gastrointestinal issues—in fact exist or constitute "substantial limitations" on major life activities.  Accordingly, the court concludes that whether Dare is disabled under the ADA is a disputed issue of material fact best left for the trier of fact to determine.

### ii.      Whether Dare Has a Record of a Disability

"An individual has a record of a disability if the individual has a history of, or has been misclassified as having, a mental or physical impairment that substantially limits one or more major life activities."  29 C.F.R. § 1630.2(k)(1); *see Cruz*, 405 F. Supp. 3d at 689 n.7 (noting that the EEOC's regulations apply "the same broad definition of 'substantially limits' to the 'record of' prong" (citing 29 C.F.R. § 1630.2(k)(2)).  "There are many types of records that could potentially contain this information, including but not limited to, education, medical, or employment records."  29 C.F.R. Pt. 1630, App. § 1630.2(k).  Although an individual may "be protected under the 'record of' prong . . . even if a covered entity does not specifically know about

_____

need not constantly or consistently affect an individual in order to constitute a disability under the ADA.

the relevant record," in order for the covered entity to be liable for discrimination, the individual asserting an ADA claim under the "record of" prong "must prove that the covered entity discriminated on the basis of the record of the disability." *Id.*

Here, the EEOC claims that Dare has a "record of diagnosis and treatment for [opioid use disorder]." To argue that Dare is not disabled under the "record of" a disability prong, Defendants rely on their aforementioned contentions that Dare cannot establish that he "has a record of being substantially limited" in any major life activities. As explained above, a genuine issue of material fact exists as to whether Dare's opioid use disorder substantially limited one or more of his major life activities. This genuine issue of material fact likewise precludes summary judgment on the question of whether Dare can establish that he has a record or history of an impairment that limits a major life activity.

        c.     <u>Whether Dare Was Qualified for the Position</u>

          i.     <u>Whether Dare Possessed the Experience and Skills to Qualify Him for the Position</u>

On an ADA claim, it is the EEOC's burden to prove that Dare was qualified. *Moss v. Harris Cnty. Constable Precinct One*, 851 F.3d 413, 418 (5th Cir. 2017) (quoting *Jenkins v. Cleco Power, LLC*, 487 F.3d 309, 315 (5th Cir. 2007)). The ADA defines a "qualified individual" as "an individual who, with or without reasonable accommodation, can perform the essential functions of the employment position that such individual holds or desires." 42 U.S.C. § 12111(8); *see Weber v. BNSF Ry. Co.*, 989 F.3d 320, 323 (5th Cir. 2021); *Neely*, 735 F.3d at 245-46. "The ADA prohibits discrimination on the basis of disability 'to ensure that [such] individuals are not denied jobs or other benefits because of the prejudiced attitudes or the ignorance of others.'" *Deas v. River W., L.P.*, 152 F.3d 471, 482 (5th Cir. 1998) (quoting *Sch.*

*Bd. of Nassau Cnty. v. Arline*, 480 U.S. 273, 284 (1987)), *cert. denied*, 527 U.S. 1035 (1999).

Nevertheless, "[t]he ADA is not read as 'requiring affirmative action in favor of individuals with

disabilities, in the sense of requiring that disabled persons be given priority in hiring or

reassignment over those who are not disabled." *Allen v. Babcock & Wilcox Tech. Servs. Pantex,

LLC*, No. 2:12-CV-00225-J, 2013 WL 5570192, at *8 (N.D. Tex. Oct. 9, 2013) (quoting

*Daugherty v. City of El Paso*, 56 F.3d 695, 700 (5th Cir. 1995), *cert. denied*, 516 U.S. 1172

(1996)); *accord Toronka v. Cont'l Airlines, Inc.*, 411 F. App'x 719, 726 n.7 (5th Cir. 2011);

*Foreman v. Babcock & Wilcox Co.*, 117 F.3d 800, 810 (5th Cir. 1997), *cert. denied*, 522 U.S.

1115 (1998); *see Turco v. Hoechst Celanese Corp.*, 101 F.3d 1090, 1094 (5th Cir. 1996) ("The

law does not require affirmative action in favor of individuals with disabilities.  It merely prohibits

employment discrimination against qualified individuals with disabilities, no more and no less.").

Hence, "[w]hile the ADA focuses on eradicating barriers, the ADA does not relieve a

disabled employee or applicant from the obligation to perform the essential functions of the job."

*Foreman*, 117 F.3d at 808 (citing 29 C.F.R. § 1630, App. Background); *see Burch v. City of

Nacogdoches*, 174 F.3d 615, 621 (5th Cir. 1999); *Franklin v. City of Slidell*, 969 F. Supp. 2d 644,

655 (E.D. La. 2013); *Galvan v. City of Bryan*, 367 F. Supp. 2d 1081, 1090 (S.D. Tex. 2004).

"To the contrary, the ADA is intended to enable disabled persons to compete in the work-place

based on the same performance standards and requirements that employers expect of persons who

are not disabled." *Foreman*, 117 F.3d at 808; *see Franklin*, 969 F. Supp. 2d at 655; *Galvan*, 367

F. Supp. 2d at 1090.  "The determination of qualification is two-fold:  (1) whether the individual

meets the necessary prerequisites for the job, such as education, experience, skills, and the like;

and (2) whether the individual can perform the essential job functions, with or without reasonable

43

accommodation." *Foreman*, 117 F.3d at 810 n.14 (citing 42 U.S.C. § 12111(8); 29 C.F.R.

§ 1630.2(m)); *see Hammel v. Eau Galle Cheese Factory*, 407 F.3d 852, 862 (7th Cir.), *cert.*

*denied*, 546 U.S. 1033 (2005); *Hebert v. Ascension Par. Sch. Bd.*, 396 F. Supp. 3d 686, 699

(M.D. La. 2019).  Therefore, to be considered a qualified individual, the plaintiff must show that:

(1) he can perform the essential functions of the job despite his disability; or (2) if he is unable to

perform the essential functions of the job, that a reasonable accommodation by the employer would

enable him to perform those functions.  *Weber*, 989 F.3d at 324 (citing *Turco*, 101 F.3d at 1093);

*Clark v. Charter Commc'ns, L.L.C.*, 775 F. App'x 764, 766 (5th Cir. 2019).

The essential functions of a job "are those that 'bear more than a marginal relationship to

the job at issue.'" *Thompson v. Microsoft Corp.*, 2 F.4th 460, 467 (5th Cir. 2021) (quoting

*Chandler v. City of Dallas*, 2 F.3d 1385, 1393 (5th Cir. 1993), *cert. denied*, 511 U.S. 1011

(1994)); *Nall*, 917 F.3d at 342; *LHC Grp., Inc.*, 773 F.3d at 697.  In determining the essential

functions of a position, "consideration shall be given to the employer's judgment as to what

functions of a job are essential, and if an employer has prepared a written description before

advertising or interviewing applicants for the job, this description shall be considered evidence of

the essential functions of the job." 42 U.S.C. § 12111(8); *see Clark*, 952 F.3d at 582 n.48; *Nall*,

917 F.3d at 342.  Evidence of whether a particular function is essential includes, but is not limited

to:  (1) the employer's judgment as to which functions are essential; (2) written job descriptions

prepared before advertising or interviewing applicants for the job; (3) the amount of time spent

on the job performing the function; (4) the consequences of not requiring the incumbent to perform

the function; (5) the terms of a collective bargaining agreement; (6) the work experience of past

incumbents in the job; and/or (7) the current work experience of incumbents in similar jobs.

*Credeur v. Louisiana*, 860 F.3d 785, 792 (5th Cir. 2017) (quoting 29 C.F.R. § 1630.2(n)(3)); *see*

*Thompson*, 2 F.4th at 467.

Defendants and the EEOC both argue that there is no genuine dispute of material fact as to whether Dare possessed the requisite experience and skills to qualify him for the welding position when he applied to Dragon Rig in 2019.  In their motion, Defendants contend that the EEOC has failed to present evidence that Dare actually had thirteen years of experience as a welder as alleged in the EEOC's complaint.  In fact, Defendants assert that the information they obtained from Dare's alleged employers (including individuals or entities that Dare purportedly worked for on a contracted basis) "disproves this allegation."[24]  Defendants further insist that Dare's statement in his declaration that he worked as a welder for thirty years is "contradicted by his own deposition testimony, employment records, and tax records," including an Itemized Statement of Earnings from the Social Security Administration (#63-7) stating that the administration has "no record of earnings" for Dare from the years 2017-2021.[25]

The EEOC responds to Defendants' motion by emphasizing that Blaylock, as Dragon Rig's foreman and the employee who extended the conditional offer of employment to Dare, testified

---

[24] The court's analysis of this issue neither references nor relies upon Defendants' evidence regarding employers for whom Dare allegedly worked following his application to Dragon Rig in 2019. Dare's employment history subsequent to his application is irrelevant to the determination of whether Dare was qualified for the position at the time he applied.

[25] Defendants also argue that the EEOC failed to provide evidence regarding Dare's welding qualifications, work performance, or history of on-the-job accidents.  In response, the EEOC points to Dare's statement in his declaration that he "[has] not been discharged or disciplined from any welding job for cause and [he has] never had an incident, accident, or injury, no[r] [has he] caused any injury to anyone else while working as a welder."  The EEOC claims that it is "self-evident" that no other records or documentation exist to confirm Dare's lack of workplace accidents or to prove that Dare has not been disciplined or fired from welding positions.  Defendants do not identify any contradictory evidence that creates a genuine dispute of material fact on this particular point.

that he thought Dare possessed the necessary skills and experience to qualify him for the job. Blaylock also noted that Dare's resume indicated that Dare had "specialized" skills in steel welding and stainless steel welding.[26]  In its own summary judgment motion, the EEOC likewise relies upon Dare's statement in his declaration that he has "worked as a welder all [his] adult life," as well as Blaylock's confirmation that he considered Dare to be qualified for the welding position at Dragon Rig.

Upon consideration of the aforementioned evidence, the court concludes that genuine disputes of material fact exist as to Dare's experience as a welder and, thus, whether he was qualified for the position with Dragon Rig.  In particular, the Social Security Administration's statement of no record of earnings for at least two years before Dare applied to work at Dragon Rig, as well as Dare's testimony that he had not filed a tax return since 2012 and that he voluntarily chose to be unemployed from 2017-2018, is difficult to square with both Dare's testimony that he has "welded all [his] life" and his statement in his declaration that he has "worked as a welder all [his] adult life."  As another example, while Dare's resume lists Oilfield Repair Specialists as his employer from September 2007 to January 2014,[27] an email from a representative for this company (#63-9) states vaguely that "[a]t one point [Dare] was contracted [there] as a VENDOR an independent welder but that was over 8 years ago" and that the company "NEVER had [Dare] as an employee."  In other words, there appear to be discrepancies between

---

[26] Defendants contend that Blaylock's initial assessment of Dare's qualifications should be discounted because Blaylock "did not have the benefit of Dare's drug test results or Dr. Starkey's safety warning."  The court also observes that Blaylock was, at the time, presumably unaware of the discrepancies with regard to Dare's employment history that Defendants later discovered.

[27] Notably, Dare testified in his deposition that although he could not recall precise dates, his best memory of when he worked for Oilfield Repair Specialists was from 2013 until 2016 or 2017.  (#63-6, at 79:1-17).

Dare's characterization of his work history and Defendants' evidence of his employment-related records that preclude the court from reaching a conclusion as a matter of law regarding Dare's qualifications to work for Dragon Rig as a welder in 2019.  As a result, neither Defendants nor the EEOC are entitled to summary judgment on the issue of whether Dare possessed the requisite skills and experience to be qualified for the welding position.

ii.    Whether Dare Was Qualified to Perform the Essential Functions of a Safety-Sensitive Position

Beyond arguing that Dare did not meet the necessary prerequisites for the welding position at Dragon Rig, Defendants also maintain that Dare is not qualified to perform the essential functions of a safety sensitive position.[28]  An employee is not "qualified" for a position if, in occupying that position, he would pose a direct threat, or "a significant risk of substantial harm to the health or safety of [himself] or others that cannot be eliminated or reduced by reasonable accommodation."  29 C.F.R. § 1630.2(r); *see* 42 U.S.C. § 12111(3); *EEOC v. E.I. Du Pont de Nemours & Co.*, 480 F.3d 724, 731 (5th Cir. 2007) ("The ADA does not protect an employee who poses a direct threat to the health and safety of [himself] or others in the workplace.").  By regulation,

---

[28] Defendants' evidence establishes that they consider the welding job at Dragon Rig to be a safety-sensitive position.  In particular, Defendants cite Dragon Rig's Welder Job Position (#63-27), which describes the position as requiring, *inter alia*, "work[ing] with radiant heat sources in hot temperatures and heavy humidity with no air circulation for long periods of time"; maintaining "awkward body postures" while welding in various directions, including "flat, horizontal, vertical, overhead"; "operat[ing] heavy equipment"; "climb[ing] up and down a ladder or work structure"; and being "[m]entally aware and competent."  Defendants further note that Dragon Rig's New Hire Policy & Procedure (#63-29) states that "the legal use of prescribed drugs is permitted on the job only if it does not impair the employee's ability to perform the essential functions of the job effectively and in a safe manner that does not endanger other individuals in the workplace."  The EEOC does not dispute that Defendants consider the welding position to be safety sensitive.

47

> [t]he determination that an individual poses a "direct threat" shall be based on an individualized assessment of the individual's present ability to safely perform the essential functions of the job. This assessment shall be based on a reasonable medical judgment that relies on the most current medical knowledge and/or on the best available objective evidence.

29 C.F.R. § 1630.2(r); *see Chevron U.S.A. Inc. v. Echazabal*, 536 U.S. 73, 86 (2002); *Nall*, 917 F.3d at 342. In its interpretive guidance, the EEOC notes that "relevant evidence" that an individual poses a direct threat "may include input from the individual with a disability, the experience of the individual with a disability in previous similar positions, and opinions of medical doctors, rehabilitation counselors, or physical therapists who have expertise in the disability involved and/or direct knowledge of the individual with the disability." 29 C.F.R. Pt. 1630, App. § 1630.2(r).

The Fifth Circuit has explained that an "individualized assessment" is "not a categorical conclusion that an employee with a particular disability cannot safely perform a job." *Nall*, 917 F.3d at 344. "The jurisprudence on individualized assessments cautions employers against relying on 'perceptions of a disability based on myth, fear or stereotype' and requires them to evaluate employees in their 'actual state.'" *Sutherland v. Edison Chouest Offshore, Inc.*, No. 19-414, 2020 WL 5436654, at *8 (E.D. La. Sept. 10, 2020) (quoting *Rodriguez v. ConAgra Grocery Prods. Co.*, 436 F.3d 468, 481 (5th Cir. 2006)). "Whether an employer has properly determined that a person poses a direct threat depends on 'the objective reasonableness of [the employer's] actions.'" *Nall*, 917 F.3d at 342 (quoting *Bragdon v. Abbott*, 524 U.S. 624, 650 (1998)). Notably, "a correct conclusion is not required to satisfy the objective reasonableness standard." *Id.* at 346 n.8.

48

A dispute has arisen among the Circuit Courts of Appeals regarding which party bears the burden of proof on this issue.  *See Branham v. Snow*, 392 F.3d 896, 906 n.5 (7th Cir. 2004) (observing the split); *Hutton v. Elf Atochem N. Am., Inc.*, 273 F.3d 884, 893 & n.5 (9th Cir. 2001) ("Because it is an affirmative defense, the employer bears the burden of proving that an employee constitutes a direct threat."); *EEOC v. Amego, Inc.*, 110 F.3d 135, 144 (1st Cir. 1997) ("[I]t is the plaintiff's burden to show that he or she can perform the essential functions . . . and is therefore 'qualified.'  Where those essential job functions necessarily implicate the safety of others, plaintiff must demonstrate that she can perform those functions in a way that does not endanger others.").  The Fifth Circuit has declined to address the issue.  *See Nall*, 917 F.3d at 342 n.5 ("In *Rizzo v. Children's World Learning Ctrs., Inc.*, 213 F.3d 209 (5th Cir. 2000) (en banc), we declined to reach the question of which party bears the burden of establishing that an individual's disability poses a direct health or safety threat to the disabled employee or others.  We do so again here.").

(a).   <u>If Direct Threat Is an Affirmative Defense,
Defendants Have Not Waived It</u>

In its response to Defendants' motion and in its own motion, the EEOC first argues that direct threat is an affirmative defense, and Defendants have waived this defense by failing either to plead it in their answer or raise it within a "pragmatically sufficient time" under Federal Rule of Civil Procedure 8(c).  Defendants respond that—even if direct threat is considered an affirmative defense, which they contest—Rule 8(c) does not require them to have explicitly used the phrase "direct threat" in their answer.  Instead, they argue, the question is whether their answer provided the EEOC with "fair notice of their contention that Dare was a safety risk and could not safely perform the essential functions of a welder."  Defendants cite various paragraphs

49

of their answer that, they contend, provide sufficient notice of this contention.  In response, the EEOC insists that Defendants did not provide fair notice of their direct threat defense because "they failed to plead any facts to support such a defense, such as the steps they took to make such an assessment."

"Failure to timely plead an affirmative defense may result in waiver and the exclusion of the defense from the case."  *Wise v. Wilkie*, 955 F.3d 430, 439 n.37 (5th Cir. 2020) (quoting *LSREF2 Baron, L.L.C. v. Tauch*, 751 F.3d 394, 398 (5th Cir. 2014)); FED. R. CIV. P. 8(c); *see W. Tex. Agriplex v. Mid-Continent Cas. Co.*, No. 5:03-CV-199-C, 2004 WL 1515122, at *7-8 (N.D. Tex. July 7, 2004) (striking defenses where defendant did not cite specific insurance policy exclusions in its answer).  Nevertheless, "a technical failure to comply precisely with Rule 8(c) is not fatal."  *Levy Gardens Partners 2007, L.P. v. Commonwealth Land Title Ins. Co.*, 706 F.3d 622, 633 (5th Cir. 2013); *see Skipper v. A&M Dockside Repair, Inc.*, 430 F. Supp. 3d 170, 177 (E.D. La.), *aff'd*, 829 F. App'x 1 (5th Cir. 2020), *cert. denied*, 141 S. Ct. 2569 (2021).  Instead, so long as the defendant raises an affirmative defense at a "pragmatically sufficient time" and the plaintiff is not prejudiced in its ability to respond, a district court has discretion to consider the affirmative defense.  *Taylor v. HD & Assocs., L.L.C.*, 45 F.4th 833, 838 (5th Cir. 2022) (quoting *Tauch*, 751 F.3d at 398).  As the Fifth Circuit has explained, "[t]he main concern is 'unfair surprise,' so we do not permit litigants to be able to 'lie behind a log' and 'ambush a plaintiff.'" *Crown Castle Fiber, L.L.C. v. City of Pasadena*, 76 F.4th 425, 439 (5th Cir. 2023) (quoting *Rogers v. McDorman*, 521 F.3d 381, 385 (5th Cir. 2008)), *cert. denied*, ___ S. Ct. ___, No. 23-698, 2024 WL 674840 (U.S. Feb. 20, 2024).  District courts should look at "the overall context of the litigation" to determine whether a defendant can raise affirmative defenses not

50

pleaded in its answer.  *Smith v. Travelers Cas. Ins. Co. of Am.*, 932 F.3d 302, 309 (5th Cir. 2019) (quoting *Pasco ex rel. Pasco v. Knoblauch*, 566 F.3d 572, 577 (5th Cir. 2009)).

In some instances, courts within the Fifth Circuit have concluded that an affirmative defense is properly before the court when raised for the first time in response to a motion for summary judgment.  *See Bradberry v. Jefferson County*, 732 F.3d 540, 553 (5th Cir. 2013) (holding that the affirmative defense raised in the defendant's response was not waived where the plaintiff filed a reply and "had the opportunity to respond and made no objection"); *Word of Life Church of El Paso v. State Farm Lloyds*, EP-17-CV-00049-DCG, 2017 WL 9292185, at *1 (W.D. Tex. Nov. 8, 2017) (reasoning that the affirmative defense raised for the first time in the defendant's *reply* in support of its own motion for summary judgment was not waived in part because trial was still over five months away and the plaintiffs had the opportunity to respond by filing a sur-reply); *In re Hensley*, 551 B.R. 792, 805-06 (Bankr. E.D. Tex. 2015) (indicating that the defendant could have avoided waiving his affirmative defenses if he had included them in his response to the plaintiffs' motion for summary judgment); *Van Alstyne v. GC Servs., LP*, No. H-08-3175, 2009 WL 10695068, at *14 (S.D. Tex. Dec. 11, 2009) (determining that, by including the affirmative defense in its response to the plaintiff's motion for summary judgment, the defendant raised its defense "at a pragmatically sufficient time" and did not prejudice the plaintiff's ability to respond).

Here, assuming *arguendo* that direct threat is an affirmative defense, the court concludes that the EEOC had sufficient notice of the application of the direct threat analysis to this case despite Defendants' failure to reference "direct threat" explicitly in their answer.  As Defendants point out, their answer denied that Dare was a "qualified individual" in ¶ 20 and admitted that

"the MRO noted that Dare's medications have a sedating effect which precluded him from working in a safety sensitive position or operating equipment" in ¶¶ 23-24.  Furthermore, the EEOC alleged in its own complaint at the outset of this litigation that "the MRO informed Defendants that . . . [Dare's] prescribed medications and their dosages would impair his ability to perform a safety-sensitive position or to operate equipment."  Thus, the EEOC was on notice that, given the MRO's warning explicitly mentioning safety concerns, this case would implicate a direct threat analysis, which evaluates an employee's or potential employee's "risk of substantial harm to the health or *safety* of the individual or others."  29 C.F.R. § 1630.2(r) (emphasis added).  In addition, the court observes that in the parties' Joint Rule 26(f) Conference Report (#6), filed on January 5, 2022, Defendants explicitly asserted that "Dare's condition and prescriptions . . . posed a direct threat of harm to Dare and his potential coworkers."

Indeed, although Defendants' answer never expressly uses the phrase "direct threat," the EEOC nevertheless anticipated the application of the direct threat analysis to this case, as evidenced by its inclusion of an argument addressing the concept of direct threat in its own summary judgment motion.  Notably, the EEOC prefaces this argument by emphasizing that it was "not clear if Defendants [were] attempting to 'back door' a direct threat defense since they did not plead this defense."  Nevertheless, the EEOC gleaned enough information from Defendants' contentions about Dare's purported inability to perform a safety-sensitive job—coupled with Defendants' clear discussion of "direct threat" in their contribution to the Rule 26(f) report—that it had the foresight to address the direct threat analysis proactively in its own motion.

Moreover, the EEOC had ample opportunity to respond to Defendants' direct threat arguments not only in its reply brief, but also in its response and sur-reply.  Although the EEOC

complained that it could not determine from Defendants' answer what "steps" Defendants alleged that they took to complete the "individualized assessment" required to determine that Dare was a direct threat, the EEOC was supplied with this information in Defendants' reply brief, and the EEOC explicitly addressed and challenged these allegations in its sur-reply.

Additionally, as in *Word of Life Church of El Paso*, Defendants raised the direct threat "defense" in a "pragmatically sufficient time" because they asserted it in their summary judgment motion when trial was still months away.  2017 WL 9292185, at *1.  Specifically, Defendants filed their summary judgment motion on July 19, 2023.  Under the Sixth Amended Scheduling Order (#58) then in effect, the Final Status Conference was not set to occur until over four months later, on December 1, 2023.  Notably, under the present scheduling order (#112), the Final Status Conference is now set for May 3, 2024, providing the EEOC with an additional five months to prepare to counter this defense at trial.

Thus, even if the court were to conclude definitively that direct threat is an affirmative defense for which Defendants bear the burden of proof, the court is satisfied that the EEOC had sufficient notice of the defense to prevent it from being unfairly surprised.  Therefore, to the extent direct threat is an affirmative defense, Defendants have not waived it.

(b).    The Court Need Not Decide Who Bears the Burden
of Proof on the Direct Threat Issue

In any event, the court need not address which party bears the burden of proof in this situation.  Even if the EEOC has the burden of proving that Dare was qualified to perform this job safely, the EEOC has presented sufficient evidence to, at a minimum, create a genuine dispute of material fact on this issue.  In its summary judgment motion, the EEOC points out that Defendants have not produced any evidence controverting Dare's statements in his declaration that he has

never been disciplined or discharged from any welding job for cause; he has never had an incident, accident, or injury while working as a welder; and he has never caused injury to anyone else during his experience as a welder.  Likewise, the EEOC argues that Defendants cannot provide any evidence to contradict Dare's statements in his declaration that he has never experienced any significant side effects from his medications and that his medications neither sedate him nor negatively impact his ability to perform as a welder.

As further support for its position, the EEOC references testimony from Dare's treating providers concerning their observations of Dare's affect and capabilities while taking his medications.  First, both Dr. Carroll and Dr. Hopper testified that, as a general matter, individuals taking both methadone and Xanax can perform safety-sensitive jobs, including welding.  Dr. Hopper also testified that Dare has never exhibited "an impaired mental status that could be attributed to either a mental illness or a medication problem," confirming that Dare has never appeared sedated, impaired, or uncoordinated.  Mata, who observes Dare at his monthly visits to his MAT program, testified that Dare does not exhibit or report any side effects from his medications and that he is "not sedated when he comes in" to the clinic.[29]  The EEOC also notes that Blaylock—Defendants' only employee who met with Dare in person—testified that nothing stood out to him about Dare's appearance, Dare did not exhibit any signs of sedation, and nothing

---

[29] Defendants attempt to discredit the EEOC's evidence by emphasizing that Dare's providers' opinions were based on little to no interactions with Dare in an office setting and were not informed by personal knowledge of Dragon Rig's workplace, the essential functions of a welder at Dragon Rig, a "deep understanding of what welders do," observations of Dare working, or speaking with any of Dare's employers.  Such criticisms, however, challenge the weight that should be afforded to the providers' testimony, and the court may not weigh the evidence or evaluate its credibility at the summary judgment stage.  *Reeves*, 530 U.S. at 150; *Seigler*, 30 F.4th at 476.

about his interactions with Dare gave him pause about hiring him or indicated that Dare would pose a safety threat in the workplace.

Thus, the EEOC argues that it has proffered evidence demonstrating that Dare "did not pose a significant risk of substantial bodily harm to himself or others."  As discussed in more detail below, the court concludes that, assuming *arguendo* that the EEOC bears the burden of proof on this issue, it has provided sufficient evidence to create a genuine dispute of material fact.

(c).   Whether Dare Posed a "Direct Threat"

Turning now to the substance of the direct threat analysis, the EEOC does not dispute that Defendants considered the welding job at Dragon Rig to be a safety-sensitive position.  Instead, the EEOC argues that Defendants may not rely upon the direct threat analysis because their decision to revoke Dare's employment offer was entirely dependent upon the opinion of Dr. Starkey, Defendants' MRO, despite the fact that Dr. Starkey "did not examine Dare [and] did not discuss the effects [Dare's] medications had on him or even review the requirements of the position before declaring Dare should not be hired for the position."  The EEOC emphasizes that no one—including Dr. Starkey—interacted with, examined, or "specifically assess[ed] [Dare's] present ability to perform the job duties on the medications" before Defendants revoked his offer. In fact, both Bennett and Brown confirmed during their depositions that they personally had no knowledge or information regarding:  whether Dare's medications impaired his ability to perform the essential functions of the welding job in an effective and safe manner; Dare's ability to perform the job; Dare's workplace accident history; or Dare's experiences with previous employers. Bennett and Brown's decision was instead influenced solely by Dr. Starkey's opinion and warning, which, the EEOC argues, was not based on an individualized assessment.

55

In response, Defendants criticize the EEOC for "distort[ing]" an "individualized assessment" to require a medical exam, arguing that the EEOC cites no authority mandating a "more stringent assessment" than the analysis that Dr. Starkey performed.  Instead, Defendants urge, the individualized assessment requirement merely obligates employers to consider an individual's specific circumstances, rather than making a "blanket" or "categorical" determination.  Defendants distinguish their situation from *Rodriguez*, where the Fifth Circuit held that a company's "blanket determination that it would not hire any diabetic . . . regardless [of] whether the particular diabetic might be able to perform the essential functions of the job at issue" failed to assess the effect of the plaintiff's diabetes in an individualized manner.  436 F.3d at 482-84.  Unlike the employer in *Rodriguez*, Defendants argue, they did not have "a blanket policy of denying employment to anyone on a combination of prescription methadone and Xanax."[30]

---

[30] The EEOC argues that the opinion that no one taking Dare's dosages of medications could work in a safety-sensitive position in Defendants' workplace—which Dr. Starkey apparently believed and which Defendants' expert witness, Dr. Andre Chen ("Dr. Chen"), endorsed—amounts to Defendants' implementation of an illicit "general or blanket policy."  It cites persuasive authority for the proposition that a blanket policy of mandating a drug test and rejecting those who test positive for methadone without further inquiry would violate the ADA.  *See Godwin v. George Washington, LP*, No. 22-1066, 2022 WL 18027827, at *2 (W.D. Pa. Dec. 30, 2022) (concluding that "an employer who has a blanket policy of requiring all applicants to take a drug test (which they 'had to pass or else') and then rejecting those who tested positive for methadone, without further inquiry, would violate the ADA"); *EEOC v. Hussey Copper Ltd.*, 696 F. Supp. 2d 505, 520-21 (W.D. Pa. 2010) (determining that genuine disputes of material fact remained regarding whether the employer conducted an individualized assessment because the employer relied on the recommendation of a doctor who did not meet with or personally examine the job applicant, based his opinion on "speculation that there may be future manifestations of side effects from [the applicant's] use of methadone," and "failed to ask [the applicant] himself whether he had ever experienced methadone-related complications or inquire with his drug counselor . . . and treating doctor . . . about their opinions concerning the effects of his methadone use," and it was "disputed" whether the doctor considered the applicant's "complete medical and work history").  Defendants refute this accusation by insisting that Dr. Starkey's consideration of Dare's drug test results and prescriptions constituted an individualized assessment because he took Dare's personal circumstances into account.  Due to the court's determination  that genuine disputes of material fact remain as to the direct threat issue based on other grounds, it need not reach the question of whether Defendants' decision was based on a prohibited "blanket" policy.

Instead, Defendants assert that they conducted an individualized assessment because Dr. Starkey reviewed Dare's drug test results and Dare's prescriptions for methadone and Xanax, which showed the dosage and frequency of intake for each medication, and applied his knowledge of these medications and the duties of workers at Dragon Rig to provide a safety warning to Defendants.[31]

The EEOC maintains that Dr. Starkey's review of Dare's drug test results and prescriptions does not constitute an individualized assessment.  The EEOC emphasizes that the key question on summary judgment is "whether there is any evidence in the record that creates a genuine issue of material fact as to whether [the employer] meaningfully assessed [the plaintiff's] ability to perform his job safely and reasonably concluded that he posed a direct threat."  *T&T*, 457 F. Supp. 3d at 575 (quoting *Nall*, 917 F.3d at 344).  At most, the EEOC argues, the information that Dr. Starkey gleaned from Dare's drug test results and prescriptions "might lead a reasonable employer to conclude that Dare could possibly pose a direct threat, thereby requiring an individualized assessment, not that [Dare] actually posed such a threat."  The EEOC criticizes Defendants for

---

[31] As an alternative argument, Defendants contend that Dr. Starkey's work in family medicine and occupational medicine since 1988, his experience as an MRO for over ten years and as Dragon Rig's occupational medicine doctor for approximately fifteen years, as well as his knowledge about methadone, Xanax, and their respective effects and interactions demonstrate that "it was reasonable for [Defendants] to rely" on Dr. Starkey's warning.  In response, the EEOC asserts that it is "immaterial" that Defendants and the MRO had a longstanding relationship, as the ADA's prohibition on discriminating against a qualified individual with a disability extends to any "participat[ion] in a contractual or other arrangement or relationship that has the effect of subjecting a covered entity's qualified applicant or employee with a disability to . . . discrimination . . . ."  *See* 41 U.S.C. § 12112(b)(2).  Thus, the EEOC argues, the contractual relationship between Defendants and Dr. Starkey did not obviate Defendants' responsibility to comply with the ADA, including making an individualized assessment of Dare in order to determine whether he posed a direct threat.  The court concurs.  The mere fact that Dr. Starkey's experience and the longevity of their contractual relationship might have rendered Defendants' reliance on his opinion "reasonable" does not obviate the requirement that Defendants' determination be based upon an "individualized assessment" that "relie[d] on the most current medical knowledge and/or on the best available objective evidence," as required under 29 C.F.R. § 1630.2(r).

"deferr[ing] to Dr. Starkey's opinion without first pausing to assess the objective reasonableness of his conclusion," emphasizing that Bennett and Brown testified that they had no knowledge about whether Dare could safely perform the essential functions of the welding job and considered Dr. Starkey's recommendation for only about fifteen minutes before concluding that they could not hire Dare.  The EEOC also identifies various portions of Bennett's and Brown's testimony demonstrating that the two decision-makers were not knowledgeable about the role of an MRO or the information upon which Dr. Starkey based his safety warning.

The EEOC likens the present case to *T&T*, where, before terminating the plaintiff, the employer asked its own physician if an employee would be qualified to continue working as a commercial diver following his cancer treatment, "and the physician, without reviewing [the employee's] medical records or examining him, concluded that [the employee] would be disqualified from diving." *Id.* at 571.  The court concluded that there were "genuine issues of material fact regarding whether [the employer] meaningfully assessed [the employee's] ability to perform his job safely based on the best available objective evidence and reasonably concluded that [the employee] posed a direct threat" in part because the employer's "reli[ance] on the advice of a physician who did not examine [the employee] or his medical records before firing him" could lead a reasonable jury to "find that [the employer] did not make an individualized assessment of [the employee's] actual ability to perform safely the essential functions of the job." *Id.* at 576. The court further elaborated that "[w]hether [the employer] relied on the best available objective evidence of [the employee's] condition is a disputed issue of material fact because [the employee's] treating physician cleared him for diving shortly after [the employer] fired him and [the employer] refused to rehire [the employee] based upon the treating physician's clearance." *Id.*

58

As the EEOC points out, like the employer in *T&T*, Defendants relied solely on the advice of a physician who did not examine Dare or his medical records.  Notably, however, Dr. Starkey's assessment was based on slightly more information about Dare than the company physician's assessment in *T&T*, in that he reviewed Dare's prescriptions, whereas the company physician in *T&T* was merely informed that the employee was undergoing "cancer treatment."  *Id.* at 571.[32] Nevertheless, *T&T* indicates that a court may find a physician's failure to examine an employee or review his medical records raises a genuine dispute of material fact regarding whether the employer based its decision on an individualized assessment of the employee's actual ability to perform safely the essential functions of the job.

Notably, while Defendants make much of the fact that the EEOC fails to point to any authority holding that an individualized assessment requires a medical exam, Defendants similarly do not cite any cases where courts have concluded as a matter of law that the direct threat defense was satisfied by an employer's evidence that it relied upon an MRO's opinion that considered solely an employee's drug test results and prescriptions.  In fact, the very cases upon which Defendants rely for the propositions that "the question is not whether the employer was correct about the risk the employee posed, but instead concerns whether the employer's decision was objectively reasonable based upon the information before it" and "[r]easonable doctors of course can disagree . . . . [t]hat is why the law requires only that the employer rely on an 'objectively reasonable' opinion, rather than an opinion that is correct" involved far more thorough

---

[32] *T&T*'s facts are also distinguishable in that, here, although Dare's treating physicians testified that they believed Dare could perform the job of a welder and nothing in his affect or physical presentation gave them cause for concern, they did not perform any particular official assessment to "clear" Dare to work in a welding position.

assessments of the plaintiffs and their abilities. *See Michael v. City of Troy Police Dep't*, 808 F.3d 304, 309 (6th Cir. 2015); *Goode v. BNSF Ry., Inc.*, No. 4:18-CV-319-Y, 2020 WL 1527864, at *6 (N.D. Tex. Mar. 20, 2020).

For example, in *Michael*, the employer relied on the opinions of two physicians, one of whom examined the plaintiff "for more than seven hours in her office and spent another nine hours reviewing her test data and preparing her report," in addition to reviewing the job description for the plaintiff's position. 808 F.3d at 308. The second physician similarly "examined [the plaintiff] for 90 minutes in his office, reviewed [the other doctor's] report and her entire file, including her test results," and prepared his own report. *Id.* Furthermore, beyond the medical opinions, the employer also based its decision on the plaintiff's "own conduct" that "raised grave concerns regarding [the plaintiff's] judgment." *Id.* at 309. Notably, in upholding the district court's conclusion that the medical opinions upon which the employer relied were objectively reasonable, the United States Court of Appeals for the Sixth Circuit distinguished a prior case "where the doctor's opinion was only 'two scribbled lines at the bottom of a boilerplate evaluation form.'" *Id.* at 308 (quoting *Holiday v. City of Chattanooga*, 206 F.3d 637, 646 (6th Cir. 2000)). *Michael* is, thus, distinguishable from the facts of the case at bar, where no physician examined Dare or his medical records and it is undisputed that Defendants' decision was not based on Dare's conduct, as Dr. Starkey, Brown, and Bennett never interacted with Dare prior to revoking his offer and Blaylock did not observe any behavior during Dare's interview that gave him any reservations about hiring Dare.

In *Goode*, the court determined that there was no genuine dispute of material fact on the direct-threat issue in part because the plaintiff "presented no contrary evidence demonstrating that

[the employer's] doctors' conclusions were incorrect, much less objectively unreasonable." 2020 WL 1527864, at *6.  One of the employer's doctors based her opinion upon a review of the plaintiff's medical records, and the other doctor averred in his declaration that, had he known that the plaintiff had an implantable cardioverter-defibrillator ("ICD") at the time of hiring, "he would have determined that [the plaintiff] was not medically qualified for the . . . position." *Id.* at *2, *4.  The plaintiff's only medical evidence to rebut the employer's doctors' conclusions was his cardiologist's "general return-to-work release form, indicating that [the plaintiff] may 'work with a pacemaker in a safety sensitive situation.'" *Id.* at *6.  Yet, as the district court noted, the plaintiff had both a pacemaker and an ICD, and his cardiologist's generic release failed to mention his ICD "or the risks it presents." *Id.*  As a result, when "[j]uxtaposed against" the other doctors' declarations, the plaintiff's cardiologist's release was "simply insufficient" to create a genuine dispute of material fact as to whether the employer's decision was objectively unreasonable. *Id.*

The case at bar is distinct from *Goode* because, here, the EEOC has proffered evidence that could lead a reasonable jury to conclude that Dr. Starkey's opinion was not objectively reasonable. In particular, the EEOC relies on the opinions of its rebuttal expert, Dr. Douglas Martin ("Dr. Martin"), as well as Dare's psychiatrist, Dr. Hopper, who both agree that an evaluation of how a drug (or combination of drugs) affects an individual must be made on an "individualized basis." Dr. Hopper testified that such an analysis considers factors like the individual's metabolism, "weight, age, height, other medical conditions, [and] the status of [the individual's] liver." Indeed, the EEOC points out that Defendants' own expert witness, Dr. Chen, admitted during his deposition that not everyone who takes Xanax and methadone together will experience the side effects that he ascribed to the medications, and he conceded that a patient's side effects can be

dependent upon the dosages of the medications, as well as the patient's metabolism, weight, and tolerance to the medications. The EEOC emphasizes that, in making his determination that Dare could not safely work in a safety-sensitive position, Dr. Starkey did not consider, much less have information about, any of these factors—such as Dare's weight, age, height, liver status, metabolism rate, and tolerance to his medications—beyond the dosages of Dare's medications.[33] Instead, Dr. Starkey relied solely on Dare's drug test results and prescriptions, which, as the EEOC points out, "did not indicate how Dare's prescribed medications affected him or if they rendered him unable to safely perform the essential functions of the job."[34]

The court thus concludes that, as in *T&T*, because Dr. Starkey did not examine Dare or review his medical records before reaching his conclusion that Dare was unable to perform the position safely, Defendants' reliance on Dr. Starkey's opinion could cause a reasonable jury to "find that [Defendants] did not make an individualized assessment of [Dare's] actual ability to

---

[33] The other cases that Defendants cite as support that a "more stringent assessment" is not required are inapposite. *See Armitage v. BNSF Ry. Co.*, No. 4:20-cv-00209, 2021 WL 2805860, at *5 (N.D. Tex. July 6, 2021) (determining that a reasonable jury could conclude that the plaintiff was a qualified individual before noting that the plaintiff's arguments that the employer's physician "could have conducted neuropsychological testing, field tests, or peer to peer consultations" could not establish the plaintiff's *prima facie* case or show pretext); *Teague v. Williamson County*, No. 1:18-CV-1098-RP, 2020 WL 2542869, at *10 (W.D. Tex. May 19, 2020) (making no mention of the direct threat analysis and instead determining that the plaintiff's allegation that a medical examination "would have cleared [her] of any further disability" did not demonstrate that the employer "denied her a position because of her disability").

[34] While the EEOC also maintains that Defendants do not "have a shred of evidence that the MRO's conclusion was accurate," citing testimony from Dare's medical providers and Blaylock in an attempt to argue why Dr. Starkey's conclusion about Dare's abilities is inaccurate, Defendants correctly note that it is "immaterial" whether Dr. Starkey's assessment of Dare's ability to perform in a safety-sensitive position was "correct." *See Nall*, 917 F.3d at 346 n.8. Rather, the court concludes that genuine disputes of material fact exist as to the direct threat issue not because it is of the opinion that Dr. Starkey's conclusion was inaccurate, but rather because a reasonable jury could determine that Dr. Starkey did not perform an individualized assessment and did not consider the best available objective evidence, such as how other factors (like Dare's weight, tolerance, etc.) impacted Dare's response to his medications and thus his ability to perform safely as a welder.

62

perform safely the essential functions of the job," particularly in light of the evidence offered by the EEOC that other physicians believe an "individualized assessment" involves considering other factors specific to the patient beyond merely his medications and dosages.  457 F. Supp. 3d at 576. The court further concludes that the EEOC's evidence could also lead a reasonable jury to find that Dr. Starkey did not rely on the "best available objective evidence" because he did not consider the aforementioned factors and their effect on Dare before rendering his opinion.  Thus, genuine disputes of material fact remain as to the direct threat issue in this case.

> d.    Whether Dare Was Subject to an Adverse Employment Action Because of His Alleged Disabilities

Under the ADA, the plaintiff must prove that an adverse employment decision was made "because of his disability."  *Nall*, 917 F.3d at 341; *Williams v. J.B. Hunt Transp., Inc.*, 826 F.3d 806, 811 (5th Cir. 2016).  The ADA does not prohibit adverse action due to a consequence of a disability, such as being unable to report to work regularly or to perform essential job duties as a result of an injury or illness.  *See Weber*, 989 F.3d at 325-26; *Credeur*, 860 F.3d at 793; *LHC Grp., Inc.*, 773 F.3d at 697; *Hypes ex rel. Hypes v. First Com. Corp.*, 134 F.3d 721, 726-27 (5th Cir. 1998) (citing 42 U.S.C. § 12112(a)).

Defendants argue in their summary judgment motion that the EEOC has presented no evidence that their decision-makers—Brown and Bennett—had knowledge of Dare's purported disabilities or based their decision to withdraw Dare's conditional offer of employment on such knowledge.  Defendants point out that Dare never mentioned his drug addiction or any alleged disability to Blaylock.  Additionally, Brown testified that he did not know why Dare was taking methadone or Xanax and that he was unaware of any disabilities that Dare might have had. Defendants extrapolate that, because Bennett's only knowledge about Dare was drawn from his

phone call with Brown, Bennett likewise was not aware of Dare's alleged disabilities.  As a result, Defendants argue, the decision to revoke Dare's offer was based solely on Dr. Starkey's safety warning and was not because of Dare's purported disabilities.

In response, the EEOC asserts that Dr. Starkey disclosed Dare's two medications, Xanax and methadone, to Defendants, and Brown and Bennett testified that they knew what impairments these medications were used to treat.  Specifically, Brown testified that he was aware through "[p]ublic knowledge" that methadone is commonly used to treat drug addiction and his general understanding was that Xanax was "used for anxiety or something to that effect."  Similarly, Bennett testified that he "know[s] Xanax is for anxiety" and "know[s] methadone is used to get off of, I believe, it's opiates or maybe, you know, heroin."[35]  The EEOC also insists in its own motion that "[d]iscriminatory animus is further evidenced by the fact that no one ever asked Blaylock—the only person associated with Defendants who had ever seen or met with Dare—about Dare as a candidate for the job."  Blaylock testified that, after he was informed that Dare "was on medication that we couldn't have in the shop because of the dosage he was taking," Blaylock told Dare that "if [he] could get off the medications, [Defendants] could send [Dare] back for another drug screening."  The EEOC argues that Blaylock's testimony demonstrates that "the withdrawal of the job offer was undisputedly linked to Dare's disability," as, according to the EEOC, Blaylock specifically instructed Dare that "he would have to stop taking the medications he needed to treat his disabilities in order to be able to work as a welder for Defendants."

---

[35] Although Defendants minimize these statements by characterizing Brown and Bennett as having merely "general, superficial understandings of what methadone and Xanax are used to treat," an employer need not have an in-depth understanding of a disability in order to discriminate on the basis of it.

In an effort to argue that the EEOC's evidence is insufficient to create a genuine dispute of material fact, Defendants rely on persuasive authority to assert that "[n]umerous courts" have declined to find actual knowledge of a disability where the employer knew only of a plaintiff's injury, symptoms, impairment, or medications underlying the alleged disability. These cases, however, involved factual circumstances distinct from the current case.[36] The court is thus of the

---

[36] The court discusses only the cases that involved an employer's knowledge of a plaintiff's prescription medications, as those are the most pertinent to the case at bar. These cases are, nonetheless, inapposite. For example, in *Prince v. Coca-Cola Bottling Co. United, Inc.*, where the plaintiff had failed a drug test at least five years prior to his termination, the court held that "[o]ther than unsubstantiated speculation," the plaintiff failed to "produce any evidence establishing that his employer had any knowledge of a disability, aside from the fact that [the plaintiff] failed a drug test because of prescribed medication that he was taking." No. 2:18-CV-1076, 2020 WL 1312467, at *9 (W.D. La. Mar. 18, 2020). Importantly, it is unclear whether the employer was informed of the plaintiff's specific prescription medication. *See generally id.* The employer instead attributed the plaintiff's termination to causes completely unrelated to his drug test, including documented instances of "insubordination," as well as the plaintiff's "engag[ing] in threatening, false, offensive, malicious, and intimidating conduct." *Id.* at *4.

Here, in contrast, the adverse employment action immediately followed and resulted from Dare's drug test, and Defendants acknowledge that Brown and Bennett were informed of Dare's precise medications because Dr. Starkey specifically mentioned methadone and "high dose Xanax" in his warning. As a final distinguishing characteristic, whereas the plaintiff in *Prince* also failed to produce any evidence that he was disabled or regarded as disabled under the ADA, *id.* at *9, as discussed above, the EEOC has presented evidence that creates a genuine issue of material fact as to whether Dare was actually disabled. Thus, *Prince* fails to persuade the court that the EEOC's evidence is insufficient to create a genuine dispute of material fact as to whether Defendants revoked Dare's offer "because of" his alleged disabilities.

Defendants' reliance on *Bahan v. Louisiana Chapter National Multiple Sclerosis Society* is similarly unavailing. No. 97-2052, 1998 WL 1020797, at *4 (E.D. La. Apr. 29, 1998). In *Bahan*, although the plaintiff claimed that "the fact that she suffered from depression and was prescribed anti-depressant medication was common knowledge" at her place of employment, she failed to offer any evidence that her employer's "knowledge of this impairment . . . led to her termination." *Id.* The court determined that the employer's reasons for her termination—"her poor work performance, poor management of staff, violations of Chapter policies, and questionable handling of Chapter finances"—were "fully supported by the evidence." *Id.* at *1, *4. *Bahan* is likewise inapplicable to the case at bar because Defendants' basis for revoking Dare's offer—Dr. Starkey's safety warning—is inextricably bound up with Dare's prescription medications and connected to his alleged disabilities in a manner that the employer's references to discrete examples of the plaintiff's "poor work performance" in *Bahan* simply were not. *Id.*

Finally, *Moreno v. Sanderson Farms, Inc.*, is also distinguishable. No. 6:21-cv-00450, 2022 WL 14365901, at *4-5 (E.D. Tex. Oct. 4, 2022), *adopted by* No. 6:21-cv-00450, 2022 WL 14318618 (E.D. Tex. Oct. 24, 2022). In *Moreno*, the court held that "Defendant's mere knowledge of Plaintiff's prior hospitalization for a pulmonary embolism and current prescription to prevent future blood clots does not support an inference that Defendant regarded her as disabled," particularly where the plaintiff had failed to provide any evidence of a disability. *Id.* In actuality, the employer terminated her because she failed

opinion that Brown's and Bennett's deposition testimony, coupled with Defendants' acknowledgment that their decision was based entirely on Dr. Starkey's warning that specifically named Dare's medications, raises a fact question.

The present case is instead more akin to *Breaux v. Bollinger Shipyards, LLC*, where the defendant "refused to allow [the plaintiff] to return to work [as a welder] because of his use of Suboxone"—medication that the plaintiff took to manage his opioid dependency.  No. 16-2331, 2018 WL 3329059, at *10, *14 (E.D. La. July 5, 2018).  The court determined that this evidence was sufficient "to allow a reasonable trier of fact to conclude that [the defendant] refused to allow [the plaintiff] to return to work because of an alleged or perceived disability," and thus the defendant was not entitled to summary judgment.  *Id.* at *14.  Importantly, the court reached this conclusion in part because "[t]he disability alleged here [was] not just Plaintiff's opioid dependency, but the fact that he must take certain medications, namely Suboxone, to manage the condition."  *Id.*  Here, while it is not clear that the EEOC is alleging that the fact that Dare must take certain medications—namely, methadone to manage his opioid use disorder and Xanax to manage his anxiety—is itself a disability, Dare nevertheless avers in his declaration that "without

---

to disclose her prescription medications on her "post-offer pre-employment medical form."  *Id.*  In other words, the plaintiff's act of deceit by denying her use of prescription medication, rather than the nature of the medication itself, led to her termination.  *See id.*  In fact, the defendant's corporate representative explicitly stated that the plaintiff's medication "would not affect . . . [the plaintiff's] work."  *Id.*

Importantly, as in *Prince* and *Bahan*, *Moreno* likewise involved no evidence that the employer was aware that the plaintiff's prescription medication could be used to treat a particular disability, in direct contrast to the EEOC's evidence here that both Bennett and Brown knew that Xanax was prescribed to treat anxiety and methadone was prescribed for addiction disorders.  *See id.* at *4.  Here, Defendants were directly influenced by the nature of Dare's prescription medications and Dr. Starkey's description of these medications as "highly sedating."  This evidence presents a much closer factual question than *Moreno* as to whether Defendants rescinded Dare's offer because of his alleged disabilities, particularly given Bennett's and Brown's acknowledgment that they were aware of the particular impairments that Dare's medications were ordinarily used to treat.

treatment and without the use of both methadone and Xanax, [he has] and would still experience the substantial limitations to [his] major life activities," and he "still need[s] Xanax to treat [his] anxiety and to allow [him] to function." The court concludes that the current case is analogous to *Breaux* because Defendants' basing their decision on Dare's prescription medication usage while having knowledge of the impairments those medications can be used to treat is so closely linked to Dare's purported disabilities that the court is unable to determine, as a matter of law, whether Defendants revoked Dare's offer because of his alleged disabilities.[37]

A comparison of the present case to *Equal Employment Opportunity Commission v. Steel Painters* further bolsters this conclusion. 433 F. Supp. 3d 989, 1004 (E.D. Tex. 2020). Notably, the parties dispute the applicability of *Steel Painters* to this case. In particular, the EEOC maintains that *Steel Painters* demonstrates that, contrary to Defendants' assertion, a plaintiff can show that an employer discriminated on the basis of an individual's disability even where the employer's decision-maker was not explicitly informed of the individual's disability. Defendants argue in response that "there is no factual evidence or legal foundation" indicating that "Brown and Bennett somehow divined that Dare had a disability" and contend that *Steel Painters* is distinguishable because it involved statements related to the employee's methadone usage that are not present in the case at bar.

In *Steel Painters*, the employer terminated a certified industrial painter who was prescribed methadone to treat his opioid addiction. *Id.* at 995-96. At the time of his hiring, the painter

---

[37] The EEOC also cites persuasive authority to argue that Defendants "concede that they rescinded Dare's job offer because of his disability-based medications," and such a concession that they took an adverse employment action because of Dare's medications "is necessarily acting on the basis of the impairments." The court declines to reach such a conclusion as a matter of law, as such a question regarding Defendants' motivation for their decision is better posed to the trier of fact.

disclosed his methadone prescription on his medical history form.  *Id.* at 996.  Subsequently, the painter's physician refused to sign the employer's "Safety Sensitive Employee Medication Approval Form for Prescription Medication," citing his clinic's policy against disclosing patient information.  *Id.* at 996-97.  Although the physician provided the painter with a letter verifying that it prescribed him methadone and listing a phone number that the employer could call for additional information, the employer rejected the painter's request to have the company doctor evaluate him and ultimately terminated the painter's employment.  *Id.*  The court determined that "a jury could reasonably conclude that [the painter] was terminated because of his disability" based on evidence that the employer's decision-maker informed the painter that "we don't normally hire people on methadone" and acknowledged in an email that "she was aware that methadone is used to treat a disability covered by the ADA."  *Id.*  at 1004.  Other evidence also demonstrated that the decision-maker "had personal experience with a family member who used or uses methadone to treat addiction."  *Id.*  Notably, no evidence indicated that the employer's decision-maker was notified of the specific disability for which the painter was prescribed methadone; in fact, the decision-maker claimed during her deposition that "she still did not know the purpose for which methadone is prescribed."  *Id.* at 1007.

Here, Defendants correctly point out that the record in this case contains no evidence that, at the time they decided to revoke Dare's offer, Brown and Bennett made any statements similar to the decision-maker's remarks in *Steel Painters* regarding methadone usage or Defendants' willingness to hire methadone users.  Nonetheless, the EEOC is also correct that this case is comparable to *Steel Painters* in that, while Brown and Bennett were never directly informed of Dare's disabilities, evidence exists to indicate that they were aware of the disabilities that Dare's

prescription medications could be used to treat.  Specifically, Brown's and Bennett's admissions in their deposition testimonies that they were aware that methadone was prescribed to treat addiction and Xanax was prescribed to treat anxiety is akin to the evidence in *Steel Painters* that indicated that the decision-maker equated methadone usage with opioid addiction, such as the decision-maker's relative's experience with taking methadone to treat addiction and the decision-maker's acknowledgment in an email that methadone was "used to treat a disability covered by the ADA." *Id.* at 1004.  In sum, the evidence in the case at bar is sufficient to create a genuine dispute of material fact as to whether Brown and Bennett's knowledge of Dare's prescription medications and awareness of the disabilities they could be used to treat led them to perceive Dare's disabilities and revoke his offer because of those disabilities.

In reaching this conclusion, the court is guided by the principle that summary judgment is generally inappropriate when inferences the parties seek to draw deal with questions of motive and intent.  *Autobahn Imps., L.P. v. Jaguar Land Rover N. Am., L.L.C.*, 896 F.3d 340, 350 n.23 (5th Cir. 2018); *see Perry v. H.J. Heinz Co. Brands, L.L.C.*, 994 F.3d 466, 476 (5th Cir. 2021) ("[S]ummary judgment is rarely proper when an issue of intent is involved." (quoting *Guillory v. Domtar Indus. Inc.*, 95 F.3d 1320, 1326 (5th Cir. 1996))); *United States ex rel. Taylor-Vick v. Smith*, 513 F.3d 228, 231 (5th Cir. 2008) (stating that "we hesitate to grant summary judgment when a case turns on a state of mind determination").  Courts have applied this principle when denying summary judgment to defendants in employment discrimination cases where genuine disputes of material fact exist as to whether the plaintiff was discriminated against on the basis of his or her protected class.  *See, e.g.*, *Cappel v. La. Dep't of Transp. & Dev.*, No. 10-1810, 2012 WL 2990695, at *2 (E.D. La. July 20, 2012) (denying the defendant's motion for summary

69

judgment on the plaintiff's age, race, and sex discrimination claims in part because "where the Defendant's intent is at issue, it is inappropriate '[t]o grant summary judgment because the party's state of mind is inherently a question of fact which turns on credibility'" (quoting *Int'l Shortstop, Inc. v. Rally's, Inc.*, 939 F.2d 1257, 1265 (5th Cir. 1991), *cert. denied*, 502 U.S. 1059 (1992))); *see also Whatley v. Hopewell*, No. 1:21-CV-01185, 2022 WL 11385995, at *9 & n.27 (W.D. La. Oct. 19, 2022).

Here, the evidence cited by the EEOC creates a genuine issue of material fact as to whether Defendants rescinded Dare's offer because of his alleged disabilities.  Viewing the evidence in the light most favorable to the EEOC, a reasonable jury could conclude that Brown's and Bennett's knowledge of the disabilities that Dare's medications are ordinarily used to treat led them to reason that Dare had these disabilities and, in turn, that they could not hire Dare because of his disabilities.  While the court finds that the EEOC's evidence could lead a reasonable jury to make this determination, its evidence is nevertheless insufficient to support judgment as a matter of law in the EEOC's favor.  Indeed, viewing the evidence in the light most favorable to Defendants, a reasonable jury could take Brown at his word and conclude that Defendants did not base their employment decision on Dare's disabilities and, instead, were solely influenced by Dr. Starkey's safety warning without any consideration of Dare's underlying disabilities.  Accordingly, a genuine dispute of material fact remains as to whether Defendants rescinded Dare's offer of employment because of his alleged disabilities.  Neither Defendants nor the EEOC are entitled to summary judgment on this issue.

e.      The EEOC Is Not Required to Provide Comparator Evidence

Defendants also argue that the EEOC cannot prove its *prima facie* case because it has failed to demonstrate that Dare was replaced by a non-disabled person or treated less favorably than non-disabled employees.  Defendants note, however, that Fifth Circuit precedent is unclear as to whether comparator evidence is a mandatory element of a plaintiff's *prima facie* case under the ADA.  The EEOC retorts that it is not required to produce comparator evidence.  Instead, it argues, comparator evidence is simply one means of demonstrating a causal link between the plaintiff's disability and the adverse employment action.  The court agrees.

Indeed, in *LHC Grp., Inc.*, the Fifth Circuit expressly noted that three lines of cases set out different requirements for establishing a causal nexus in a disability discrimination case.  773 F.3d at 695.  The Fifth Circuit ultimately chose the formulation that required the plaintiff to prove only:  "(1) that he has a disability; (2) that he was qualified for the job; [and] (3) that he was subject to an adverse employment decision on account of his disability."  *Id.* at 697 (quoting *Zenor*, 176 F.3d at 853).  The court reasoned that the line of cases requiring a plaintiff to demonstrate that he was replaced by or treated less favorably than non-disabled employees "is best understood as providing *one possible way* to prove nexus between the employee's disability and [his] termination."  *Id.* at 696 (emphasis added).

In the wake of *LHC Grp., Inc.*, multiple published Fifth Circuit cases analyzing disability discrimination claims have articulated a *prima facie* framework that does not require (or even reference) comparator evidence.  *See, e.g.*, *Mueck*, 75 F.4th at 483-84 (setting out a three-part *prima facie* case that excludes any mention of comparator evidence and later stating that "[a] plaintiff may demonstrate *pretext* by presenting *'evidence of disparate treatment or* by showing

that the employer's proffered explanation is false or unworthy of credence'" (emphasis added)

(quoting *Gosby*, 30 F.4th at 527)); *Gosby*, 30 F.4th at 526-27 (reversing the district court's

holding that the plaintiff had failed to establish a causal link between her disability and her

termination because "[t]he proximity of [the plaintiff's] diabetic episode on the job and her

termination was sufficient to constitute a *prima facie* case"); *see also Thompson*, 2 F.4th at 470;

*Clark*, 952 F.3d at 582; *Rodriguez v. Eli Lilly & Co.*, 820 F.3d 759, 765 (5th Cir. 2016).

    While Defendants correctly note that other cases since *LHC Grp., Inc.*, have relied on a

*prima facie* framework that includes comparator evidence, none of these cases explicitly state that

the plaintiff must produce such evidence.  *See Claiborne v. Recovery Sch. Dist.*, 690 F. App'x

249, 256-57 (5th Cir. 2017) (explaining that, although the plaintiff purported to offer comparator

evidence, her evidence was insufficient because she could not establish that the alleged comparator

performed the same job duties); *Burton v. Freescale Semiconductor, Inc.*, 798 F.3d 222, 230 (5th

Cir. 2015) (noting that the only issue in dispute was whether the plaintiff was "regarded as"

disabled); *Hoffman v. Baylor Health Care Sys.*, 597 F. App'x 231, 235 (5th Cir.) (observing that

the plaintiff "relied solely on such comparator evidence of disparate treatment to satisfy both his

prima facie and pretext showings at the summary-judgment stage"), *cert. denied*, 577 U.S. 818

(2015).   In fact, as the EEOC points out, *Hoffman* explicitly states that the ADA

"*allow[s]*"—rather than *requires*—"a showing of causation by disparate treatment, that is, by

comparison with employees outside the protected class."  597 F. App'x at 235 (citing *Raytheon

Co.*, 540 U.S. at 53).

    Thus, after reviewing the Fifth Circuit's post-*LHC Grp., Inc.*, precedent, the court concurs

with its sister court's assessment that a plaintiff "does not have to provide evidence of a

comparator to establish a prima facie case of disability discrimination under the ADA." *Iqbal v. City of Pasadena*, 542 F. Supp. 3d 566, 571 n.2 (S.D. Tex. 2021).  As a result, the EEOC's failure to produce comparator evidence neither precludes it from establishing its *prima facie* case nor warrants summary judgment in Defendants' favor.

### 4. Defendants' Legitimate, Nondiscriminatory Reason for Revoking Dare's Conditional Offer of Employment

Because the EEOC has provided sufficient evidence to establish a *prima facie* case of disability discrimination, a rebuttable presumption of discrimination arises, and the burden of production shifts to Defendants to articulate a legitimate, nondiscriminatory reason for their actions.  *Mueck*, 75 F.4th at 483; *Gosby*, 30 F.4th at 526; *Clark*, 952 F.3d at 588.  While the employer need not prove that its actions were motivated by the legitimate reason, it must produce some evidence in support of its proffered rationale.  *Vincent v. Coll. of the Mainland*, 703 F. App'x 233, 237 (5th Cir. 2017) (quoting *Cannon v. Jacobs Field Servs. N. Am., Inc.*, 813 F.3d 586, 590 (5th Cir. 2016)); *see EEOC v. Chevron Phillips Chem. Co., LP*, 570 F.3d 606, 615 (5th Cir. 2009).  The defendant's burden is merely one of production and not of persuasion.  *Tex. Dep't of Cmty. Affs. v. Burdine*, 450 U.S. 248, 257-58 (1981); *Burton*, 798 F.3d at 232 n.10.  To meet this burden, an employer must produce evidence "which, taken as true, would permit the conclusion that there was a nondiscriminatory reason for the adverse action."  *McDaniel v. Nat'l R.R. Passenger Corp.*, 705 F. App'x 240, 246 (5th Cir. 2017) (quoting *Price v. Fed. Express Corp.*, 283 F.3d 715, 720 (5th Cir. 2002)); *see St. Mary's Honor Ctr. v. Hicks*, 509 U.S. 502, 507 (1993); *Rogers v. Pearland Indep. Sch. Dist.*, 827 F.3d 403, 408 (5th Cir. 2016), *cert. denied*, 580 U.S. 1092 (2017).

Here, Defendants present the evidence of Dr. Starkey's safety warning as their legitimate, nondiscriminatory reason for revoking Dare's offer of employment.  Specifically, Defendants assert that they acted based solely on Dr. Starkey's warning about safety concerns and their subsequent determination that Dare posed a direct threat to the health and safety of others at Dragon Rig and could not safely perform the essential functions of a welder.  In response, the EEOC argues that Defendants have failed to articulate a nondiscriminatory reason for rescinding Dare's offer because "merely obtaining a medical opinion about an applicant does not automatically absolve an employer from liability under the ADA" and an employer cannot "slavishly defer to a physician's opinion without first pausing to assess the objective reasonableness of the physician's conclusion."  The EEOC's arguments, however, are better directed to the question of whether Defendants have properly advanced a direct threat defense, given the previously discussed requirements that a direct threat determination must be based upon "an individualized assessment" and a "reasonable medical judgment that relies on the most current medical knowledge and/or on the best available objective evidence."[38]  29 C.F.R. § 1630.2(r). Taking Defendants' evidence as true, Defendants have met their burden of producing a legitimate, nondiscriminatory reason—namely, safety concerns—for revoking Dare's offer.

---

[38] To the extent Defendants intend to rely on their determination that Dare posed a direct threat as their legitimate, nondiscriminatory reason for revoking Dare's offer, the court reiterates that genuine disputes of material fact remain as to whether Defendants complied with the requirements of 29 C.F.R. § 1630.2(r).  Nevertheless, an employer's general safety concerns, separate from its determination that the employee poses a direct threat, can constitute a legitimate, nondiscriminatory reason.  *See Sutherland*, 2020 WL 5436654, at *11 (finding that even if there was "an issue of fact as to the applicability of the direct threat defense, defendants' documented concerns over plaintiff's ability to perform his job safely are a legitimate, nondiscriminatory reason for the allegedly adverse employment action").

5.     The EEOC's Argument that Defendants' Purportedly Nondiscriminatory
       Reason is a Pretext for Discrimination

The EEOC argues that Defendants' explanation is pretextual.[39]  If the employer meets its

burden of production, the presumption is dissolved, and the burden shifts back to the plaintiff to

demonstrate that the proffered reason is a pretext for discrimination—the defendant's alleged

nondiscriminatory reason is false and the real reason for the adverse action is disability

discrimination.  *Rogers*, 827 F.3d at 408 (quoting *Reeves*, 530 U.S. at 143); *Squyres v. Heico*

*Cos., L.L.C.*, 782 F.3d 224, 231 (5th Cir. 2015) (quoting *Hicks*, 509 U.S. at 507).  As with

discrimination cases generally, the plaintiff at all times bears the ultimate burden of persuading

the trier of fact that he has been the victim of illegal discrimination based on his disability.

*Saketkoo v. Adm'rs of Tulane Educ. Fund*, 31 F.4th 990, 999 (5th Cir. 2022) (quoting *Burdine*,

450 U.S. at 253); *see Heinsohn v. Carabin & Shaw, P.C.*, 832 F.3d 224, 235 (5th Cir. 2016).

To prevail on an ADA claim, the plaintiff must prove that an adverse employment decision was

made "because of his disability."  *Olivarez v. T-mobile USA, Inc.*, 997 F.3d 595, 600 (5th Cir.)

(citing *Neely*, 735 F.3d at 245), *cert. denied*, 142 S. Ct. 713 (2021).

The EEOC may meet its burden "either through evidence of disparate treatment or by

showing that the employer's explanation is false or 'unworthy of credence.'"  *Delaval*, 824 F.3d

at 480 (quoting *Laxton v. Gap Inc.*, 333 F.3d 572, 578 (5th Cir. 2003)); *see Mueck*, 75 F.4th at

483-84; *DeVoss v. Sw. Airlines Co.*, 903 F.3d 487, 492 (5th Cir. 2018).  The evidence must be

of sufficient weight that "a jury could conclude that the employer's articulated reason is

---

[39] The EEOC also asserts that it need not provide evidence of pretext because it maintains that
Defendants cannot produce evidence of a nondiscriminatory reason for revoking Dare's offer.  As
discussed above, however, the court rejects this argument.  The EEOC accordingly must provide evidence
of pretext.

pretextual." *Caldwell v. KHOU-TV*, 850 F.3d 237, 242 (5th Cir. 2017) (quoting *Chevron Phillips Chem. Co.*, 570 F.3d at 615); *see Kanida v. Gulf Coast Med. Pers. LP*, 363 F.3d 568, 575 n.5 (5th Cir. 2004) ("[T]he plaintiff always bears the burden of 'persuading the trier of fact that the defendant intentionally discriminated' against [him]." (quoting *Reeves*, 530 U.S. at 143)).   To satisfy this burden, the plaintiff must produce "substantial evidence" that the employer's proffered reasons for its actions are false or unworthy of credence.  *Delaval*, 824 F.3d at 480 (citing *Burton*, 798 F.3d at 233); *see Gosby*, 30 F.4th at 527; *Head v. City of Columbus Light & Water Dep't*, 746 F. App'x 389, 392 (5th Cir. 2018).   "Evidence is substantial if it is of such quality and weight that reasonable and fair-minded men [or women] in the exercise of impartial judgment might reach different conclusions."  *Wallace v. Seton Fam. of Hosps.*, 777 F. App'x 83, 89 (5th Cir. 2019) (quoting *Laxton*, 333 F.3d at 579); *see January v. City of Huntsville*, 74 F.4th 646, 654 (5th Cir. 2023).

While the employer's proffered nondiscriminatory justification renders the presumption of discrimination no longer operative, "evidence demonstrating that the employer's explanation is false or unworthy of credence, taken together with the plaintiff's prima facie case, is likely to support an inference of discrimination even without further evidence of defendant's true motive."  *Nall*, 917 F.3d at 348 (quoting *Diggs v. Burlington N. & Santa Fe Ry. Co.*, 742 F. App'x 1, 4 (5th Cir. 2018)); *Haire v. Bd. of Supervisors of La. State Univ. Agric. & Mech. Coll.*, 719 F.3d 356, 365 n.10 (5th Cir. 2013); *see Reeves*, 530 U.S. at 147 ("[O]nce the employer's justification has been eliminated, discrimination may well be the most likely alternative explanation . . . .").   Indeed, when "the evidence of pretext is substantial, the plaintiff may create a genuine issue of material fact without independent evidence that discrimination was the real reason for the adverse

employment action." *Crawford v. Formosa Plastics Corp.*, 234 F.3d 899, 903 (5th Cir. 2000)

(citing *Walton v. Bisco Indus., Inc.*, 119 F.3d 368, 372 (5th Cir. 1997)); *see Reeves*, 530 U.S.

at 143; *Burton*, 798 F.3d at 241.  Nevertheless, "discrimination suits still require evidence of

discrimination." *Rubinstein v. Adm'rs of the Tulane Educ. Fund*, 218 F.3d 392, 400 (5th Cir.

2000), *cert. denied*, 532 U.S. 937 (2001); *accord Kopszywa v. Home Depot USA, Inc.*, 620 F.

App'x 275, 279 (5th Cir. 2015) ("[E]vidence of pretext will not always be sufficient to survive

summary judgment."); *Churchill v. Tex. Dep't of Crim. Just.*, 539 F. App'x 315, 320 (5th Cir.

2013).  "[T]he question for summary judgment is whether a rational fact finder could find that the

employer discriminated against the plaintiff[ ] on the basis of [his disability]." *Pratt v. City of

Houston*, 247 F.3d 601, 606 (5th Cir. 2001) (citing *Hicks*, 509 U.S. at 511), *cert. denied*, 540

U.S. 1005 (2003).

        Here, the EEOC has presented evidence of pretext that, when considered in conjunction

with the evidence it proffers in support of its *prima facie* case, is sufficient to create a genuine

dispute of material fact.  For example, the EEOC points out that, although Defendants purport to

have revoked Dare's offer based on safety concerns and their belief that Dare posed a direct threat

to the safety of the workplace, before reaching this conclusion, neither Brown nor Bennett

consulted Blaylock—the sole employee of Defendants who had seen or met with Dare—to ask

about his perception of Dare and his ability to perform as a welder.  Brown and Bennett also

admitted that they personally had no knowledge regarding Dare's work history, his ability to

perform the functions of a welder, or his history of workplace accidents.  Moreover, the EEOC

points out that Brown and Bennett conceded that they did not attempt to obtain or learn any of this

information about Dare, and they similarly admitted that they did not communicate with Dr.

Starkey to ask any follow-up questions about Dare's ability to perform the job.  Furthermore, while Dr. Starkey based his safety warning on Dare's drug screen results, Dare's prescriptions, and his knowledge regarding the common effects and interactions of methadone and Xanax, he did not examine Dare, review his medical records, or otherwise communicate with Dare to determine whether he could perform as a welder or evaluate the actual effects of Dare's medications, rather than their hypothetical effects.  The EEOC summarizes the import of this evidence by arguing that "[t]he fact that no one associated with Defendants actually knew—or can show—whether Dare could perform the essential functions of the job safely demonstrates a complete lack of good faith, as well as falsity and pretext."

To further demonstrate pretext, the EEOC relies on evidence connecting Dare's medications to Defendants' adverse employment action.  In particular, the EEOC emphasizes that Blaylock testified that he was told that Defendants could not hire Dare because "[h]e was on medication that we couldn't have in the shop because of the dosage he was taking."  Blaylock then told Dare that if he could get off those medications, he could take another drug screen and then be considered for employment with Dragon Rig.  In fact, Dare testified in his deposition that Blaylock specifically referenced Dare's methadone prescription and told Dare that he would hire him if he could "get off of that shit."[40]

The EEOC likens Blaylock's statement to the decision-maker's statements in *Steel Painters*. In *Steel Painters*, the court found that "a jury could reasonably infer from [the decision-maker's]

---

[40] While Blaylock admits that he told Dare that he could complete another drug screen and be considered for employment with Dragon Rig if he could get off his medications, Blaylock testified that he did not know the specific medications that Dare was taking.  He also testified that he did not use the word "shit" to describe Dare's medications.

statement a general discriminatory animus towards recovering drug addicts who are being treated with methadone" because the decision-maker remarked, "we don't normally hire people on methadone," in addition to stating that while she had "heard that" methadone use was protected by the ADA, she was "advised that if [the plaintiff] worked in an office setting that would be one thing but working in a refinery, safety sensitive work, it is a different situation." 433 F. Supp. 3d at 1004. While the court agrees with Defendants that the present case does not involve such explicit assertions that Defendants "don't normally hire people on methadone," Defendants nevertheless admit that Blaylock advised Dare that he would need to "get off the medications" in order to have an opportunity to be hired by Dragon Rig. Indeed, viewing the evidence in the light most favorable to the EEOC, according to Dare, Blaylock specifically mentioned Dare's methadone prescription and referred to it as "shit," which could lead a reasonable jury to detect negative perceptions of methadone and discriminatory animus toward persons who are prescribed methadone. Particularly given the decision-makers' admissions that they were aware of the disabilities that Dare's medications were used to treat, Defendants' alleged reliance on Dare's medications creates a genuine dispute of material fact as to whether their purported conclusion that Dare posed "safety concerns" was a mere pretext for their underlying discriminatory animus toward Dare's alleged disabilities.[41]

---

[41] The EEOC also argues that Defendants did not follow their own policy to determine whether Dare could safely perform the duties of the position. Although the EEOC fails to cite this policy, the court deduces that it is referring to the Disability Accommodation provision in Defendants' Manual, which states that Defendants are "committed to . . . ensuring equal opportunity in employment for qualified persons with disabilities . . . [and] engaging in an interactive dialogue with all qualified individuals with disabilities, who might require an accommodation." As best the court can gather, the EEOC faults Defendants for failing to "engag[e] in an interactive dialogue" with Dare. Without further elaboration, this argument bears little weight in the court's analysis of pretext. The court also observes that, in the context of Title VII claims, courts have held that the failure of the employer to follow its own internal policies when making employment decisions does not, standing alone, establish discrimination or

In this instance, viewing the evidence in the light most favorable to the EEOC, a reasonable jury could conclude that Defendants' reliance on Dr. Starkey's safety warning and subsequent conclusion that Dare posed safety concerns was a pretext for discrimination based on Dare's alleged disabilities.  Accordingly, summary judgment is not warranted.

B.   Remaining Issues in Defendants' Summary Judgment Motion

1.   Defendants' Argument Regarding a Hypothetical Failure-to-Accommodate Claim

Defendants also argue that, to the extent the EEOC now attempts to assert a failure-to-accommodate claim, it is prohibited from doing so because such a claim is neither alleged in its complaint nor included in Dare's charge of discrimination.[42]  The EEOC responds

---

retaliation.  *See Sun v. TETRA Techs., Inc.*, No. 22-20646, 2023 WL 6892227, at *2 (5th Cir. Oct. 19, 2023) ("[O]ur precedent also makes clear that an employer's 'failure to follow its own policy is not probative of discriminatory animus in absence of proof that the plaintiff was treated differently than other non-minority employees because Title VII does not protect employees from the arbitrary employment practices of their employer, only their discriminatory impact.'" (quoting *Turner v. Baylor Richardson Med. Ctr.*, 476 F.3d 337, 345-46 (5th Cir. 2007))).

The EEOC also contends that Defendants "had never hired [or] considered hiring a person using" methadone or Xanax.  The court agrees with Defendants that the EEOC's assertion is an incorrect characterization of Brown's testimony.  In actuality, Brown testified that he was not "aware of" any Dragon Rig employee who has taken or was currently taking Xanax or methadone.  It is unclear to the court how such a statement amounts to evidence of pretext.  The EEOC cannot manufacture pretext by faulting Defendants for never previously hiring someone taking Xanax or methadone if Defendants have not (prior to Dare's application) had the opportunity to hire such an applicant.  Brown's testimony sheds no light on this subject.  Accordingly, the court does not consider this argument in assessing the EEOC's showing of pretext.

[42] Notably, a failure-to-accommodate claim is distinct from a disability discrimination claim.  *See Mueck*, 75 F.4th at 485 ("To prevail on a failure-to-accommodate claim, a plaintiff 'must show that (1) [he] is a qualified individual with a disability; (2) the disability and its consequential limitations were known by the covered employer; and (3) the employer failed to make "reasonable accommodations" for such known limitations.'" (quoting *Jennings*, 11 F.4th at 343)); *see also Clark*, 952 F.3d at 587.

80

that it is not asserting a failure-to-accommodate claim.[43]  Thus, Defendants' arguments on this issue are moot, and the court need not address them.

>    2.    Defendants' Argument that No Independent Claim Exists for Failure to Engage in an Interactive Process

Relatedly, Defendants also contend in their summary judgment motion that because "[t]he ADA does not create a freestanding claim for failure to engage in the interactive process," the EEOC's allegation in its complaint that Defendants withdrew Dare's offer of employment without "any further inquiry or engaging in the interactive process" cannot constitute a "separate, cognizable legal claim."  Defendants argue that employers are not always required to engage in an interactive process; rather, the interactive process is merely one means an employer may use to determine whether a reasonable accommodation is available for an employee with a disability.[44] Finally, Defendants maintain that because the EEOC concedes that it is not asserting a failure-to-accommodate claim, the question of whether Defendants engaged in the interactive process "is immaterial" to the case at bar.

In response, the EEOC alleges that Defendants "misunderstand the issues in this case" and conflate "individualized assessment" and "interactive process."  The EEOC clarifies that it is not

---

[43] In fact, as Defendants point out and the EEOC acknowledges, the EEOC admitted in its Objections and Answers to [Defendants'] Third Set of Interrogatories (#63-28) that Dare "was able to perform all essential functions of the welder position without an accommodation in 2019."

[44] Defendants cite several cases in support of the proposition that an employer's failure to engage in an interactive process does not constitute a *per se* violation of the ADA.  *See, e.g.*, *Picard v. St. Tammany Par. Hosp.*, 423 F. App'x 467, 470 (5th Cir. 2011) (confirming that a failure to engage in the interactive process is not a *per se* violation of the ADA because "the 'interactive process is not an end i[n] itself—it is a means to the end of forging reasonable accommodations.'" (quoting *Loulseged v. Akzo Nobel Inc.*, 178 F.3d 731, 736 (5th Cir. 1999))); *Eubank v. Lockhart Indep. Sch. Dist.*, 229 F. Supp. 3d 552, 560 (W.D. Tex. 2017) ("[T]he ADA creates a cause of action for failure to accommodate, not for failure to engage in an interactive process alone."), *aff'd*, 734 F. App'x 295 (5th Cir. 2018) (per curiam).

attempting to assert an independent claim for failure to engage in the interactive process.  Instead, the "primary question" at the heart of its disability discrimination claim is "whether Defendants violated the ADA when they withdrew Dare's conditional job offer because of his disabilities after failing to perform the *individualized assessment* to determine whether Dare could perform the essential functions of the job with his disabilities, or, if not, whether a reasonable accommodation by Defendants would have enabled him to perform those functions" (emphasis added).  The EEOC accordingly urges the court to "disregard[ ]" Defendants' argument on this issue.

For the sake of clarity, the court notes the following distinctions between the terms "interactive process" and "individualized assessment."  First, the EEOC's regulations explain that an employer and an individual might engage in an "interactive process" in order to identify an appropriate reasonable accommodation that will enable that individual to perform the essential functions of his job.  *See* 29 C.F.R. § 1630.2(o)(3) ("To determine the appropriate reasonable accommodation it may be necessary for the covered entity to initiate an informal, *interactive process* with the individual with a disability in need of the accommodation.  This process should identify the precise limitations resulting from the disability and potential reasonable accommodations that could overcome those limitations." (emphasis added)).  Notably, an employer's "duty to engage in the interactive process is only triggered after the employee has requested an accommodation."  *Mueck*, 75 F.4th at 487 (citing *Chevron Phillips Chem. Co.*, 570 F.3d at 621; *EEOC v. Agro. Distrib., LLC*, 555 F.3d 462, 471 (5th Cir. 2009)).  In contrast, an "individualized assessment" is required in order to evaluate whether an individual poses a "direct threat" to the workplace.  *See* 29 C.F.R. § 1630.2(r) ("The determination that an individual poses

a 'direct threat' shall be based on an *individualized assessment* of the individual's present ability to safely perform the essential functions of the job." (emphasis added)).

As discussed above, the EEOC is not asserting a failure-to-accommodate claim in this case. It likewise does not aver that Dare requested (or required) a reasonable accommodation from Defendants.  Thus, the EEOC appears to agree with Defendants that the so-called "interactive process" is not germane to the present case.

Defendants assert, however, that Dare was not qualified for the welding position at Dragon Rig because he posed a "direct threat."  In other words, Defendants essentially concede that although the "interactive process" is inapplicable to the case at bar, the separate issue of "individualized assessment" is integral to it.  Thus, because the EEOC agrees that it is not attempting to assert a nonexistent claim for failure to engage in an interactive process and Defendants, by raising the issue of the direct threat analysis, concede that the question of whether Dare was subject to an "individualized assessment" is central to this case, the court concludes that the parties' briefing on this issue presents no outstanding matter for the court's determination.

### 3.    Defendants' Argument that the EEOC Cannot Demonstrate that It Is Entitled to Punitive Damages

Finally, Defendants contend that the EEOC cannot produce any evidence to support its disability discrimination claim, and, thus, there is no discriminatory act upon which the EEOC can base its request for punitive damages.  Defendants also allege that they are entitled to summary judgment on the punitive damages issue because the record is devoid of any evidence that Brown or Bennett acted maliciously or with reckless indifference to Dare's rights under the ADA.

A complaining party may recover punitive damages if it demonstrates that the defendant engaged in "a discriminatory practice or discriminatory practices with malice or with reckless

indifference to the federally protected rights of an aggrieved individual." 42 U.S.C. § 1981a(b)(1); *see id.* § 1981a(a)(2) (explaining that in actions brought under the ADA, "the complaining party may recover compensatory and punitive damages as allowed in subsection (b)."). "This is a higher standard than the showing necessary for compensatory damages." *Wantou v. Wal-Mart Stores Tex., L.L.C.*, 23 F.4th 422, 439 (5th Cir. 2022) (citing *Kolstad v. Am. Dental Ass'n*, 527 U.S. 526, 534 (1999)), *cert. denied*, 143 S. Ct. 745 (2023). As the Fifth Circuit recently explained when upholding a punitive damages award in a Title VII case:

> Ultimately, the terms "malice" and "reckless indifference" "focus on the actor's state of mind." Both "pertain to the employer's knowledge that it may be acting in violation of federal law, not its awareness that it is engaging in discrimination [or retaliatory conduct]." Thus, the defendant employer "must at least discriminate in the face of a perceived risk that its actions will violate federal law to be liable for punitive damages." "Moreover, even if particular agents acted with malice or reckless indifference, an employer may avoid vicarious punitive damages liability if it can show" that the agents' actions were contrary to the employer's good-faith efforts to comply with [federal antidiscrimination statutes].

*Id.* (quoting *Kolstad*, 527 U.S. at 535-36; *EEOC v. Boh Bros. Constr. Co., L.L.C.*, 732 F.3d 444, 467 (5th Cir. 2013)); *see E.I. Du Pont de Nemours & Co.*, 480 F.3d at 732 (applying an identical standard for an award of punitive damages arising from the plaintiff's ADA claim).

Here, the EEOC argues that it has produced evidence sufficient to allow a reasonable jury to conclude that Bennett and Brown did not make a good-faith effort to comply with the ADA "in the face of a perceived risk that their conduct could violate federal law." The EEOC first cites Defendants' Equal Employment Opportunity ("EEO") policy (#63-5), which provides that Defendants are "committed to providing equal employment opportunity to all applicants and employees in all its employment practices and to provide a work environment free of discrimination and/or harassment on the basis of . . . disability . . . or any other category

protected by law."  The EEOC further notes that the Manual's Disability Accommodation provision states that Defendants are "committed to . . . ensuring equal opportunity in employment for qualified persons with disabilities . . . [and] engaging in an interactive dialogue with all qualified individuals with disabilities, who might require an accommodation."  In addition, the EEOC emphasizes that both Bennett and Brown acknowledged during their depositions that their respective jobs entail handling internal allegations of employment discrimination.[45]  Taking all of this evidence together, the EEOC claims that "[a] jury could conclude that because Defendants had a policy which prohibits disability discrimination and because Bennett and Brown were responsible for fielding discrimination complaints under Defendants' antidiscrimination policy, they knew or should have known" that their conduct "violated the ADA and the companies' internal policies."

Defendants do not controvert the EEOC's assertions about their policies or Bennett's and Brown's responsibilities for handling internal employment discrimination complaints.  Instead, they claim that the EEOC has failed to raise a genuine issue of material fact as to punitive damages because it relies solely on "the unsupported argument that 'Bennett and Brown made no effort, let alone good faith effort, to comply with the ADA.'"  The court concludes, however, that the EEOC has proffered sufficient evidence to create a genuine dispute of material fact as to whether—assuming that the EEOC can establish that Defendants revoked Dare's job offer because of his disabilities—Bennett and Brown acted on behalf of Defendants with "reckless indifference" to the risk that their actions could violate federal law.  In other words, the court is of the opinion

---

[45] Specifically, Bennett confirmed that he investigates internal complaints of alleged employment discrimination to determine whether the complaints are "accurate" and to identify "what remediations . . . [or] corrective actions need to happen."  Brown similarly testified that after employment discrimination complaints are made to an immediate supervisor, the supervisor passes that information along to him, and he and Bennett then handle the complaint.

that the EEOC's evidence could lead a reasonable jury to conclude that Bennett and Brown were recklessly indifferent to federal law of which they should have been cognizant, not only because the policy Manual specifically included a Disability Accommodation section and a reference to avoiding discrimination as to "categor[ies] protected by law," but also because their jobs required them to handle internal discrimination complaints on Defendants' behalf.  The EEOC has thus adduced sufficient evidence to create a genuine dispute of material fact as to whether, in the event that the EEOC proves its disability discrimination claim, it may recover punitive damages from Defendants.[46]  Accordingly, Defendants are not entitled to summary judgment on the issue of punitive damages.

     C.     <u>Remaining Issues in the EEOC's Summary Judgment Motion</u>

          1.     <u>The EEOC's Arguments Regarding Defendants' Affirmative Defense of Failure to Mitigate Damages</u>

The EEOC also seeks summary judgment on Defendants' affirmative defense that Dare failed to mitigate his damages.  Specifically, the EEOC argues that this defense should be struck as improperly pleaded because it is a "boilerplate assertion devoid of factual support" that does

---

[46] The EEOC's response brief also preemptively addresses Defendants' ability to assert the good-faith exception to punitive damages liability.  Specifically, the EEOC cites *Deffenbaugh-Williams v. Wal-Mart Stores, Inc.*, to argue that the mere fact that Defendants had an antidiscrimination policy is insufficient to satisfy the standard for making a "good-faith effort" to comply with federal antidiscrimination law.  188 F.3d 278, 286 (5th Cir. 1999).  The EEOC further relies upon *EEOC v. SDI of Mineola, L.L.C.*, to contend that Defendants cannot establish the good-faith defense because they "have never trained Bennett, Brown, or any other manager or supervisor on the ADA or more generally on workplace discrimination, including disability discrimination."  No. 6:21-cv-0026-JCB-KNM, 2022 WL 4127167, at *13-14 (E.D. Tex. Aug. 17, 2022), *adopted by* No. 6:21-cv-00226, 2022 WL 4125079 (E.D. Tex. Sept. 9, 2022).  Notably, however, Defendants' motion and reply brief do not reference their antidiscrimination policies in an attempt to raise the good-faith exclusion.  Therefore, because neither the EEOC nor Defendants seek summary judgment on the good-faith exception, the court need not address its applicability at this juncture.

not comply with pleading requirements.[47]  The EEOC further contends that Defendants have failed

to produce evidence to support the defense.  In response, Defendants first assert that a challenge

to the sufficiency of the pleading of an affirmative defense is more appropriately raised in a motion

to strike under Federal Rule of Civil Procedure 12(f).  Defendants also contend that Dare's own

deposition testimony provides evidence that Dare failed to mitigate his damages.

> a.   The EEOC's Request to Strike Defendants' Failure to Mitigate
> Defense

As an initial matter, the EEOC correctly states that the pleading standards for affirmative

defenses mirror those for complaints, and Defendants thus must "plead an affirmative defense with

enough specificity or factual particularity to give the plaintiff 'fair notice' of the defense that is

being advanced."  *Blount v. Johnson Controls, Inc.*, 328 F.R.D. 146, 149 (S.D. Miss. 2018)

(quoting *Woodfield v. Bowman*, 193 F.3d 354, 362 (5th Cir. 1999)).  Nevertheless, the Fifth

Circuit has recognized that "in some cases, merely pleading the name of the affirmative

defense . . . may be sufficient."  *Woodfield*, 193 F.3d at 362; *see Sunoco Partners Mktg. &

Terminals L.P. v. U.S. Venture, Inc.*, 598 F. Supp. 3d 520, 531 (S.D. Tex. 2022).  Courts have

applied this lenient standard to the affirmative defense of failure to mitigate damages, recognizing

that "[i]nformation necessary to plead more specifically is in the possession of the plaintiffs and

others" and "the defendants can only obtain that information through discovery."  *Tran v. Thai*,

No. H-08-3650, 2010 WL 723633, at *2 (S.D. Tex. Mar. 1, 2010) (determining that the defense

was adequately pleaded where defendants' answer alleged that "[t]he plaintiff has failed to mitigate

damages, if any, as required by law"); *see Njoku v. Harris Cnty. Hosp. Dist.*, No. 3:22-cv-00406,

---

[47] Defendants' Original Answer to Plaintiff's Original Complaint (#4) alleges:  "Defendants would show that Dare has failed to mitigate his damages, if any."

2024 WL 23175, at *3 (S.D. Tex. Jan. 2, 2024) (concluding that a "relatively spartan" statement of the failure-to-mitigate defense was sufficiently pleaded); *Morgan v. Goodman Mfg. Co., L.P.*, No. 4:19-CV-00850, 2021 WL 1169390, at *10 (S.D. Tex. Mar. 10, 2021) (holding that defendant's defense that the plaintiff "failed to mitigate his alleged damages" met the "lenient standard" of providing "fair notice"), *adopted by* No. 4:19-CV-00850, 2021 WL 1166756 (S.D. Tex. Mar. 26, 2021).[48]  As a result, the court denies the EEOC's request to strike Defendants' failure to mitigate defense as insufficiently pleaded.

> b.   Defendants' Evidence that Dare Failed to Mitigate His Damages

The EEOC also asserts that it is entitled to summary judgment on Defendants' failure to mitigate defense because it has shown that Dare "took reasonable steps under the circumstances to mitigate his backpay damages."  It alleges that Defendants, on the other hand, have failed to provide evidence of Dare's purported failure to mitigate his damages.  The EEOC notes that during discovery, in response to the EEOC's request that Defendants produce all documents related to their failure-to-mitigate argument, Defendants asserted that they were relying on the EEOC's complaint and "documents produced by [the EEOC]."  Thus, the EEOC avers, Defendants cannot produce any evidence in support of this affirmative defense, and the EEOC is entitled to summary judgment as a result.

In an employment discrimination case, the employer bears the burden of proving the plaintiff's failure to mitigate his damages.  *Miniex v. Hous. Hous. Auth.*, 400 F. Supp. 3d 620,

---

[48] Notably, the case that the EEOC cites to argue that an affirmative defense must be pleaded with "more than a boilerplate assertion devoid of factual support" did not involve a failure to mitigate defense. *See Willins v. Credit Sols. of Am., Inc.*, No. 3:09-cv-1025-M, 2010 WL 624899, at *1 (N.D. Tex. Feb. 23, 2010).

654 (S.D. Tex. 2019); *EEOC v. IESI La. Corp.*, 720 F. Supp. 2d 750, 754 (W.D. La. 2010) (quoting *Palasota v. Haggar Clothing Co.*, 499 F.3d 474, 486 (5th Cir. 2007)).  "A plaintiff suing for back pay under the ADA has a duty to mitigate [his] damages by using reasonable diligence to obtain substantially equivalent employment."  *Zavala v. Tex. Lehigh Cement Co., LP*, 635 F. Supp. 3d 524, 533 (W.D. Tex. 2022) (quoting *Miles-Hickman v. David Powers Homes, Inc.*, 613 F. Supp. 2d 872, 887 (S.D. Tex. 2009)).  "Whether an injured person has mitigated his damages requires a factual assessment of the reasonableness of his conduct."  *Id.* (quoting *Hill v. City of Pontotoc*, 993 F.2d 422, 427 (5th Cir. 1993)).  "But an employer must show 'not only that the plaintiff failed to exercise reasonable diligence, but that there were jobs available which plaintiff could have discovered and for which [he] was qualified.'"  *Id.* (quoting *Miles-Hickman*, 613 F. Supp. 2d at 887).[49]  "Substantially equal employment is employment that affords virtually identical promotional opportunities, compensation, job responsibilities, working conditions, and status [as the original position]."  *Id.* at 534 (quoting *Floca v. Homcare Health Servs., Inc.*, 845 F.2d 108,

---

[49] In *Zavala*, the United States District Court for the Western District of Texas noted that although the Fifth Circuit held in *Sparks v. Griffin*, 460 F.2d 433, 443 (5th Cir. 1972), that a defendant must prove both elements of the failure-to-mitigate defense, several Fifth Circuit cases decided after *Sparks* "state that if an employer proves the employee has not exercised reasonable diligence in seeking out new employment, it need not show the availability of substantially equivalent employment."  *Id.* at 534 n.6 (citing *Jackson v. Host Int'l*, 426 F. App'x 215, 222 (5th Cir. 2011); *West v. Nabors Drilling USA*, 330 F.3d 379, 393 (5th Cir. 2003); *Sellers v. Delgado Coll.*, 902 F.2d 1189, 1193 (5th Cir.), *cert. denied*, 498 U.S. 987 (1990)).  "Most" district courts, however, have held that *Sparks* continues to control in light of "the Fifth Circuit's principle that one panel cannot overrule the decision of another panel absent an *en banc* decision."  *Id.* (citing *Miniex*, 400 F. Supp. 3d at 620; *Garcia v. Harris County*, No. H-16-2134, 2019 WL 132382, at *2 (S.D. Tex. Jan. 8, 2019); *Buckingham v. Booz Allen Hamilton, Inc.*, 64 F. Supp. 3d 981, 986 (S.D. Tex. 2014)).  The *Zavala* court accordingly applied the *Sparks* rule and required the defendant to provide evidence that supported a genuine dispute of material fact as to both elements of the failure-to-mitigate defense.  *Id.*  Notably, neither the EEOC nor Defendants address this issue in their briefing.  In any event, the court need not decide this issue in the present case because Defendants have identified sufficient evidence to create a genuine dispute of material fact as to both whether Dare failed to exercise reasonable diligence and whether substantially equal employment was available to him.

111 (5th Cir. 1988)).  "[E]mployment must have been available in the employee's specific line of work in the same type of role." *Id.* (quoting *Floca*, 845 F.2d at 111).

In response to the EEOC's motion, Defendants rely on Dare's own deposition testimony as evidence that Dare failed to mitigate his damages after his conditional offer of employment was withdrawn in February 2019.  Defendants contend that Dare's testimony demonstrated that he "either worked irregularly for short periods of time after applying at Dragon [Rig] or voluntarily chose to be unemployed despite being able to work and the availability of welder positions." Specifically, as support for the element that Dare did not exercise "reasonable diligence in seeking out new employment," Defendants rely on Dare's testimony that he had not worked for any company as a "W-2 employee" during the ten years prior to his deposition in July 2022 and that he had not filed a tax return since 2012.  Defendants also provide evidence of an Itemized Statement of Earnings from the Social Security Administration, which reflects that the administration has "no record of earnings" for Dare from the years 2017-2021.  Additionally, as evidence that "substantially equivalent employment" as a welder was "available" to Dare, Defendants rely on Dare's agreement during his deposition to the following facts:  welders were in high demand, he could find a job as a welder "any time," he could earn as much as $55.00 per hour working as a welder, and he was voluntarily unemployed at the time of his deposition.

Defendants have thus produced evidence sufficient to create a genuine dispute of material fact as to both whether Dare failed to exercise reasonable diligence in seeking out other employment and whether substantially equivalent employment was available to him.  Accordingly, the EEOC is not entitled to summary judgment on Defendants' affirmative defense of failure to mitigate damages.

2.      The EEOC's Arguments Regarding Defendants' Failure to State a Claim
Defense

The EEOC also seeks summary judgment on Defendants' affirmative defense of failure to

state a claim, contending that the defense is insufficiently pleaded and that Defendants have failed

to produce any competent evidence to support it.[50]   The EEOC relies on *EEOC v. Courtesy*

*Building Services, Inc.*, as an example where a court rejected a defense of "failure to state a

claim" as "so broad that it is unclear merely from an assertion of the name of the defense what

the nature of the defense may be."  No. 3:10-CV-1911-D, 2011 WL 208408, at *3 (N.D. Tex.

Jan. 21, 2011) (citing *Lebouef v. Island Operating Co., Inc.*, 342 F. App'x 983, 985 (5th Cir.

2009)).

Notably, however, as Defendants point out, *Courtesy Building Services, Inc.*, was decided

in the context of a motion to strike under Rule 12(f), rather than on summary judgment.  *Id.* at *1.

Defendants also argue that, although they did not file a motion to dismiss pursuant to Federal Rule

of Civil Procedure 12(b)(6), Defendants have instead "moved to dismiss the EEOC's case in its

entirety pursuant to Federal Rule of Civil Procedure 56."  As a result, Defendants maintain, there

is no basis to grant the EEOC's motion on this ground.

Nevertheless, courts have determined that because "failure to state a claim is not an

affirmative defense, but rather raises a defect in a plaintiff's complaint," it is appropriate to grant

summary judgment to the plaintiff on such a defense.  *Herrera v. JK & HE Bus., LLC*, No.

H-14-2986, 2016 WL 8193294, at *9 (S.D. Tex. Oct. 14, 2016) (citing *PNC Bank, Nat'l Ass'n*

*v. SM & JH, LLC*, No. 4:12-CV-597-JCH, 2012 WL 2905047, at *2 (E.D. Mo. July 16, 2012);

---

[50] Specifically, Defendants' answer alleges:  "Defendants deny that Plaintiff has adequately pled
the claims in its Complaint or has stated a claim for which relief may be granted."

*Boldstar Tech., LLC v. Home Depot, Inc.*, 517 F. Supp. 2d 1283, 1292 (S.D. Fla. 2007)); *see EEOC v. Geoscience Eng'g & Testing, Inc.*, No. H-05-3365, 2007 WL 951632, at *2 (S.D. Tex. Mar. 28, 2007) (granting plaintiff's motion for summary judgment on the defense of failure to state a claim because the defendant had failed to assert that, "accepting as true all well-pleaded facts in Plaintiff's complaint, Plaintiff has failed to allege sufficient facts to state in its Complaint an actionable sexual harassment claim").

While Defendants seek to dismiss this case, they do not argue that dismissal is warranted based on deficiencies in the EEOC's complaint.  Indeed, the motions deadline in this case lapsed several months ago, and Defendants' opportunity to challenge the sufficiency of the EEOC's complaint on Rule 12(b)(6) grounds has thus expired.  As a result, the court concludes that the EEOC is entitled to summary judgment on Defendants' defense of failure to state a claim.

       3.      The EEOC's Arguments Regarding Defendants' Abandoned Defenses

The EEOC also seeks summary judgment on Defendants' affirmative defenses of laches/statute of limitations and failure to exhaust administrative remedies.  Defendants abandoned these defenses in their response brief.  Thus, the EEOC is entitled to summary judgment on the aforementioned defenses.

III.    Conclusion

Accordingly, Defendants' Motion for Summary Judgment (#63) is DENIED.  There exist genuine disputes of material fact with respect to the EEOC's claim of disability discrimination. The EEOC, therefore, may proceed to trial on its claim of disability discrimination against Defendants.  Defendants' motion is likewise denied as to punitive damages, as the EEOC has raised sufficient evidence to create a genuine dispute of material fact on this ground.  Furthermore,

Defendants' request that the court determine that Defendants did not operate as an integrated enterprise is denied for the reasons set forth below.[51]

The EEOC's Motion for Partial Summary Judgment (#69) is GRANTED in part and DENIED in part.  As noted above, genuine disputes of material fact remain with respect to the EEOC's disability discrimination claim.  The EEOC's motion for summary judgment is accordingly denied on this ground.  The EEOC's motion is likewise denied as to Defendants' affirmative defense of failure to mitigate damages, as Defendants have demonstrated that genuine disputes of material fact remain regarding this issue.

The EEOC's motion is, however, granted with respect to the issue of whether Defendants operated as an integrated enterprise.  There remain no material facts in dispute, and the EEOC is entitled to judgment as a matter of law that Defendants operated as an integrated enterprise.  Finally, the EEOC's motion is granted as to Defendants' defenses of failure to state claim, failure to exhaust administrative remedies, and statute of limitations/laches.

SIGNED at Beaumont, Texas, this 25th day of March, 2024.

_Marcia A. Crone_
_____
MARCIA A. CRONE
UNITED STATES DISTRICT JUDGE

---

[51] As noted above, Defendants' other requests for summary judgment are moot because the EEOC is not asserting causes of action for failure to accommodate or failure to engage in an interactive process.

93